UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x

ELEKTRA ENTERTAINMENT GROUP INC. et al.,          No. 05 CV 7340 (KMK)

                                 Plaintiffs,

                -against-

DENISE BARKER,

                               Defendant.

----------------------------------------------------------------x

**MEMORANDUM OF LAW OF**
**DEFENDANT TENISE BARKER IN SUPPORT**
**OF HER MOTION TO DISMISS THE COMPLAINT**

**Preliminary Statement**

        Defendant Tenise Barker (incorrectly sued herein as "Denise Barker"), by her attorneys Beldock Levine & Hoffman LLP, respectfully submits this memorandum of law in support of her motion for an Order, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, dismissing the Complaint herein on the ground that it fails to state a claim upon which relief can be granted.  A copy of the Complaint is annexed as Exhibit "A" to the accompanying affidavit of Morlan Ty Rogers.

**ARGUMENT**

**THE COMPLAINT MUST BE DISMISSED
BECAUSE IT DOES NOT PLEAD ANY SPECIFIC
ACTS OR TIMES OF COPYRIGHT INFRINGEMENT**

It is well established that a complaint alleging copyright infringement must "plead with specificity the acts by which a defendant has committed copyright infringement." Marvullo v. Gruner & Jahr, 105 F.Supp.2d 225, 230 (S.D.N.Y. 2000); DiMaggio v. International Sports Ltd., 97 Civ. 7767, 1998 U.S. Dist. LEXIS 13468 at *4-5 (S.D.N.Y. Aug. 31, 1998) (Appendix 1).  To withstand a motion to dismiss, the complaint must therefore allege with specificity "by what acts during what time the defendant infringed the copyright." Marvullo, supra, 105 F.Supp.2d at 230 (italics added); Brought to Life Music, Inc. v. MCA Records, Inc., 02 Civ. 1164, 2003 U.S. Dist. LEXIS 1967 at *3 (S.D.N.Y. Feb. 11, 2003) (Appendix 2) (granting Rule 12(b)(6) motion where "[p]laintiff ha[d] not attempted to describe 'by what acts and during what time' [the defendant] infringed the copyright"); Lindsay v. The Wrecked and Abandoned Vessel R.M.S. Titanic, 97 Civ. 9248, 1999 U.S. Dist. LEXIS 15837 at *8, 12 (S.D.N.Y. Oct. 13, 1999) (Appendix 3) (dismissing copyright infringement claim pursuant to Rule 12(b)(6); vague and conclusory allegations of infringement pleaded using "and/or" do not satisfy requirement of pleading particular infringing acts with specificity); Stampone v. Stahl, 05 Civ. 1921 at *3, 2005 WL 1694073 at *2 (D.N.J. July 19, 2005) (Appendix 4) (dismissing copyright claim pursuant to Rule 12(b)(6) where complaint failed "to set out *particular* infringing acts *with some specificity*") (italics added). See also Tom Kelley Studios Inc. v. Int'l Collectors Society Inc., 97 Civ. 0056, 1997 U.S. Dist. LEXIS 14571 at *2-3 (S.D.N.Y. Sept. 11, 1997) (Appendix 5) (granting motion for more definite statement).

Here, the Complaint must be dismissed since its sole allegation of copyright infringement – that the Doe Defendants used an online media distribution system "to download [certain allegedly copyrighted recordings], to distribute [them] to the public *and/or* to make [them] available for distribution to others," Complaint, ¶ 12 (italics added), is made in the most conclusory manner.  The Complaint makes no attempt to describe the specific acts of infringement or the dates and times on which they allegedly occurred.  Indeed, the Complaint does not allege any actual instances of downloading or distribution.[1]  The Complaint must therefore be dismissed.  Marvullo, supra, 105 F.Supp.2d at 230; Brought to Life Music, Inc., supra, 02 Civ. 1164, 2003 U.S. Dist. LEXIS 1967 at *3; Lindsay, supra, 97 Civ. 9248, 1999 U.S. Dist. LEXIS 15837 at *8, 12; Stampone, supra, 2005 WL 1694073 at *2.

The exhibits annexed to the Complaint do not make up for the lack of specificity in alleging copying (downloading)[2] or distribution to the public (uploading).  According to the Complaint, Exhibit A is a list of eight recordings whose copyright is allegedly owned by plaintiffs.  Neither the Complaint nor Exhibit A itself sets forth allegations regarding actual copying or distribution of these recordings to the public.  Exhibit B is simply a printout of a Kazaa list

---

[1]That the three types of activities supposedly constituting copyright infringement are connected by the term "and/or" further demonstrates that plaintiffs do not know of any specific instances of actual infringement and have no basis for claiming any.  See Lindsay, supra, 97 Civ. 9248, 1999 U.S. Dist. LEXIS 15837 at *8.

[2]Since the music files allegedly on defendant's computer could just as well have been copied legally from compact discs or purchased from an authorized online service, it is pure speculation for plaintiffs to claim that such files were illegally downloaded onto that computer.  Such unwarranted speculation cannot defeat a motion to dismiss.  Harris v. New York State Dept. of Health, 202 F.Supp.2d 143, 175 (S.D.N.Y. 2002); Gmurzynska v. Hutton, 257 F.Supp.2d 621, 631 (S.D.N.Y. 2003).  See also Yorktown Square Associates v. Union Dime Savings Bank, 79 A.D.2d 1040, 1041, 435 N.Y.S.2d 343, 344 (2d Dep't 1981) (mere speculation by plaintiff cannot defeat a motion to dismiss).

purporting to show that certain allegedly copyrighted recordings were *available* to a would be infringer through Ms. Barker's internet account.[3]

To the extent that these lists purport to identify sound recordings that were made *available* for downloading, such allegations simply fail to state a cognizable claim of copyright infringement since it is well established that no copyright infringement liability can be predicated upon making the works *available* unless there was actual dissemination of unauthorized copies. Arista Records, Inc. v. MP3Board, Inc., 00 Civ. 4660, 2002 U.S. Dist. LEXIS 16165 at *14 (S.D.N.Y. Aug. 29, 2002) (Appendix 7) ("[i]nfringement of the distribution right requires an actual dissemination of ... copies") (emphasis added); National Car Rental System, Inc. v. Computer Associates International, Inc., 991 F.2d 426, 434 (8th Cir. 1993) ("[i]nfringement of [the distribution right] requires an actual dissemination of either copies or phonorecords") (emphasis added) (citing 2 Nimmer on Copyright § 8.11[A], at 8-124); In re Napster, Inc., 377 F.Supp.2d 796, 802 (N.D.Cal. May 31, 2005) (copyright owner must prove that the defendant "actually disseminated" copies of the copyrighted work to members of the public) or that the copies being offered were themselves illegal copies.

---

[3]To the extent that plaintiffs claim that they (or their agents) viewed or downloaded actual copies of these recordings from defendant's computer, such activity still would not involve distribution or dissemination "to the public" and thus would not constitute copyright infringement. U.S. Naval Institute v. Charter Communications, Inc., 936 F.2d 692, 695 (2d Cir. 1991) ("It is elementary that the lawful owner of a copyright is incapable of infringing a copyright interest that is owned by him"); RSO Records v. Peri, 79 Civ. 5098, 1980 U.S. Dist. LEXIS 13490 at *8 (S.D.N.Y. Sep. 5, 1980) (Appendix 6) (complaint alleging that plaintiffs participated in reproduction and distribution of infringing copies failed to state valid infringement claim against defendants; "a copyright owner cannot infringe his own copyright"); Higgins v. Detroit Education Television Foundation, 4 F.Supp.2d 701, 705 (E.D.Mich. 1998) ("[a] plaintiff may not claim to have been damaged by reason of a defendant's sale of alleged infringing copies if the copies were sold to plaintiff's agent because such a sale prevents the distribution of such copies to the general public").

Merely making copyrighted works *available* for downloading by others does not, by itself, violate the copyright owner's right of distribution. In re Napster, Inc., supra, 377 F.Supp.2d at 802, 805 (granting summary judgment on this issue); Arista Records, supra,00 Civ. 4660, 2002 U.S. Dist. LEXIS 16165 at *13-14 (posting on MP3Board website of links leading to infringing audio files does not establish unlawful dissemination of copies of such files to the public). See also Obolensky v. G.P. Putnam's Sons, 628 F.Supp. 1552, 1555-56 (S.D.N.Y.) (publisher did not infringe on copyright owner's right of distribution of copyrighted book by listing the book in a trade publication as belonging to publisher where publisher neither copied the book nor sold any copies of the book; "there is no violation of the right to vend copyrighted works ... where the defendant offers to sell copyrighted materials but does not consummate a sale"), aff'd, 795 F.2d 1005 (2d Cir. 1986); 2 Paul Goldstein, Copyright § 5.5.1, at 5:102 to 5-102-1 (2d ed. 2000 & Supp. 2005) ("an actual transfer must take place; a mere offer for sale will not violate the right"); SBK Catalogue Partnership v. Orion Pictures Corp., 723 F.Supp. 1053, 1064 (D.N.J. 1989) (merely "authorizing" a third party to distribute copyrighted works without proof that the third party actually did so does not constitute copyright infringement); CACI Intern., Inc. v. Pentagen Technologies Intern., 93 Civ. 1631, 1994 U.S. Dist. LEXIS 21457 at *12 (E.D.Va. Jun. 16, 1994) (Appendix 8) (marketing of software package without actually distributing it does not constitute copyright infringement).

It is incomprehensible for the federal courts to be burdened with tens of thousands of identical lawsuits based on boilerplate complaints which allege, in essence, nothing – and for each defendant to be required to spend tens of thousands of dollars on litigation to do battle over the merits of "claims" that have not even been made.

Contrary to the foregoing decisions is Elektra Entertainment Group Inc. v. Santangelo 05 Civ. 2414, 2005 U.S. Dist. LEXIS 30388 (S.D.N.Y. Nov. 28, 2005) (Appendix 9), wherein Judge McMahon of this Court recently denied our motion to dismiss a boilerplate complaint virtually identical to the Complaint in the instant case.  We respectfully disagree with Judge McMahon's decision and believe it is contrary to (1) the great weight of authority, (2) common sense, and (3) sound judicial administration.  Since the Elektra decision was not an appealable order, we were unable to appeal therefrom.  It is not binding on this Court, and we submit that this Court should decline to follow its conclusion.

It is clear that the Complaint does not make out "a concrete showing of a prima facie claim of copyright infringement."  Sony Music Entertainment v. Does 1-40, 326 F.Supp.2d 556, 564-65 (S.D.N.Y. 2004).  The Court should therefore dismiss the Complaint with prejudice for failure to state a claim upon which relief can be granted.  See Cuoco v. Moritsugu, 222 F.3d 99, 112 (2d Cir. 2000) (dismissing without leave to replead because nothing in the complaint "suggests that the plaintiff has a claim that she has inadequately or inartfully pleaded and that she should therefore be given a chance to reframe").

## **CONCLUSION**

The Court should grant the within motion in all respects.

Respectfully submitted,

BELDOCK LEVINE & HOFFMAN LLP
Attorneys for defendant Tenise Barker
(incorrectly sued herein as "Denise Barker")


By:     s/ Morlan Ty Rogers
       Morlan Ty Rogers (MR 3818)
99 Park Avenue
New York, NY 10016
(212) 490-0400

*Of Counsel*:
Ray Beckerman
Morlan Ty Rogers

1998 U.S. Dist. LEXIS 13468, *; 49 U.S.P.Q.2D (BNA) 1215;
Copy. L. Rep. (CCH) P27,817

LEXSEE 1998 U.S. DIST. LEXIS 13468

**JOE DIMAGGIO, Plaintiff, -against- INTERNATIONAL SPORTS LTD., d/b/a BOXING ILLUSTRATED, JOHN G. LEDES, and HAVEN C. ROOSEVELT, Defendants.**

**97 Civ. 7767 (HB)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*1998 U.S. Dist. LEXIS 13468; 49 U.S.P.Q.2D (BNA) 1215; Copy. L. Rep. (CCH) P27,817*

**August 28, 1998, Decided**
**August 31, 1998, Filed**

**DISPOSITION:** [*1] Defendant's motion to dismiss plaintiff's complaint GRANTED.

**COUNSEL:** For JOE DIMAGGIO, plaintiff: Stephen A. Weingrad, Weingrad & Weingrad, L.L.P., New York, NY.

For JOHN LEDES and INTERNATIONAL SPORTS LTD., d/b/a BOXING ILLUSTRATED, defendants: David A. Cutner and Debra I. Resnick of Cutner & Associates, PC., New York, NY.

**JUDGES:** Harold Baer Jr., U.S.D.J.

**OPINIONBY:** Harold Baer Jr.

**OPINION:**

**OPINION AND ORDER**

**Hon. Harold Baer, Jr., District Judge: n1**

n1 Sylvia Beltran, a second-year student at Columbia Law School, assisted in the research and preparation of this decision.

Defendants move to dismiss plaintiff's complaint pursuant to *Fed.R.Civ.P. 12(b)(6)* and *12(b)(1).* For the reasons stated below, the defendants' motion to dismiss is GRANTED, with leave to replead within 30 days.

I. Background

Plaintiff Joe DiMaggio ("DiMaggio") is a freelance photographer who photographs well-known prize fighters. In his complaint, he alleges that he created and copyrighted photographic images, which were infringed by the defendants, through their unauthorized publication of said photographs. (Am. Compl.P 15). Specifically, plaintiff alleges that he created images known as *The Scream* [*2] and *Mike Tyson in Ring*, and that he has secured the copyright of said images. (Am Compl. P 17). Plaintiff contends that in early 1995, in the May-June issues of a magazine known as *Boxing Illustrated*, and in promotional material, the defendants infringed his copyright by publishing multiple images referred to as *Mike Tyson in Ring*. (Am. Compl. P 20). Plaintiff further alleges that the defendants infringed plaintiff's copyright by publishing multiple images referred to as "*The Scream*" in the same issue of *Boxing Illustrated*. (*Id.* at P 21). In addition to his copyright claim, the plaintiff also alleges various state law claims including claims for breach of contract, equitable relief, loss of use, conversion, and for return of a holding fee. (Am. Compl. PP 27-40).

Defendant International Sorts Ltd. ("ISL") is a wholly-owned subsidiary of U.S. Equities, which was formed for the purpose of publishing *Boxing Illustrated. Nordco A.S. v. Ledes, 1997 U.S. Dist. LEXIS 13904, 1997 WL 570546, 44 U.S.P.Q.2D (BNA) 1220, 1221 (S.D.N.Y. 1997).* n2 According to the complaint, defendant John Ledes is a principal, officer and shareholder of ISL. (Am. Compl. P 6). *Boxing Illustrated* [*3] is a magazine that had been published by National Sports Publishing Co., Inc. ("National Sports"). After National Sports ceased publication of *Boxing Illustrated*, ISL began publication of the magazine, and, in April 1996, changed its name to *International Boxing Digest. See 44 U.S.P.Q.2D (BNA) at 1221-1222.*

n2 This Court may consider the *Nordco* decision in ruling on a motion to dismiss under Rule 12(b)(6) because it was cited in the plaintiff's amended complaint. *San Leandro Emergency Med. Group Profit Sharing Plan v.*

*Philip Morris Cos., 75 F.3d 801, 808-09 (2d Cir. 1996).*

## II. Discussion

### A. Plaintiff's Copyright Claim

To establish a claim of copyright infringement, plaintiff is required to demonstrate two elements: (1) ownership of a valid copyright and (2) copying constituent elements of the copyrighted work without authorization. *See Fonar Corp. v. Domenick, 105 F.3d 99, 103 (2d Cir. 1997).* Copying may be proven by showing access and substantial similarity between the works. *Eckes v. Card* [*4] *Prices Update, 736 F.2d 859, 863 (2d Cir. 1984).*

*Rule 8(a)(2)* of the Federal Rules of Civil Procedure requires a "short and plain statement of the claim showing that the pleader is entitled to relief." In applying this rule to copyright infringement actions, courts have required that particular infringing acts be alleged with specificity. *Tom Kelley Studios Inc. v. Int'l Collectors Society Inc., 1997 U.S. Dist. LEXIS 14571, 1997 WL 598461,* at *1, *44 U.S.P.Q.2D (BNA) 1799* (S.D.N.Y. Sept. 25, 1997); *Franklin Elec. Publishers, Inc. v. Unisonic Products Corp., 763 F. Supp. 1, 4 (S.D.N.Y. 1991).* The complaint must include: (1) which specific original works are the subject of the copyright claim; (2) that plaintiff owns the copyrights in these works; (3) that the copyrights in question have been registered in compliance with the statute; and (4) by what acts and during what time defendant has infringed the copyright. *Tom Kelley Studios, 1997 WL 598461,* at *1; *Kelly v. L.L. Cool J., 145 F.R.D. 32, 36 (S.D.N.Y. 1992), aff'd, 23 F.3d 398* (2d Cir.), *cert. denied, 513 U.S. 950, 130 L. Ed. 2d 318, 115 S. Ct. 365 (1994); Foster v. WNYC-TV, 1989 U.S. Dist. LEXIS 13724, 1989* [*5] *WL 146277, 14 U.S.P.Q.2D (BNA) 1048* (S.D.N.Y. Nov. 20, 1989).

Defendants contend that plaintiff has failed to allege such facts. I agree. Plaintiff alleges that the image *The Scream* and multiple images referred to as *Mike Tyson in the Ring* were created and copyrighted by him, and were copied largely and placed on the market by the defendants. (Am. Compl. PP 17-18). However, plaintiff fails to specify which original works are the subject of the copyright claim. Rather, he refers to nebulous multiple images entitled *Mike Tyson in the Ring* and *The Scream. See Cole v. Allen, 3 F.R.D. 236, 237 (S.D.N.Y. 1942)*(complaint failed to allege copyright claim where plaintiff alleged that defendant copied episodes and incidents from any of six books). While plaintiff comes close to compliance on this score, he fails totally on the required allegations of statutory compliance. Although plaintiff alleges that he owns the copyrights in multiple images known as *The Scream* and *Mike Tyson in Ring* (Am. Compl. PP 17, 19), he fails to allege with sufficient clarity that the copyrights in these images were registered pursuant to statutory requirements. Plaintiff's amended complaint states [*6] that he obtained a certificate of registration covering these images, and states that a copy of his copyrighted images is attached as Exhibit A. (Am. Compl.PP 17, 22). However, Exhibit A is a certificate of registration dated May 8, 1989 for a work or works entitled *The Life and Times of Joe DiMaggio*. There are no photographs attached to the certificate and there is no indication that this certificate of registration covers the works at issue, *Mike Tyson in the Ring* and *The Scream*. n3

n3 The complaint is also deficient with respect to the fourth requirement. Although the amended complaint specifies that the infringing images were allegedly published in the May-June 1995 issues of *Boxing Illustrated*, it does not specify what specific images were infringed, but again, refers to the multiple images entitled *Mike Tyson in the Ring* and *The Scream*. In addition, although the amended complaint states that a copy of defendants' infringing images is attached as Exhibit B, Exhibit B contains only one unidentified photograph.

[*7]

The complaint in the instant matter is similar to the complaint that was rejected for failure to comply with Rule 8 in *Kelly v. L.L. Cool J., 145 F.R.D. 32 (S.D.N.Y. 1992).* In *Kelly*, the complaint alleged copyright infringement of two songs, *Dance to the Drummer's Beat* and *What You're Going to Do*. The court held that the complaint failed to allege whether and when the copyright in one of these songs was registered pursuant to statutory requirements. Although the complaint had attached to it a copyright certificate for *Dance to the Drummer's Beat*, it did not contain a certificate for *What You're Going to Do*. Thus, the court held that the complaint failed to allege statutory registration of said song. *Id. at 36.* Similarly, here, plaintiff's complaint fails to allege that the images *Mike Tyson in the Ring* and *The Scream*, whatever they may consist of, were registered pursuant to the statutory requirements. Accordingly, plaintiff's copyright claim is dismissed for failure to comply with the requirements of Rule 8.

### B. Jurisdiction

The plaintiff's copyright claim provides this Court with original subject matter jurisdiction. Diversity jurisdiction [*8] is another matter. The complaint fails to allege subject matter jurisdiction pursuant to *28 U.S.C. § 1332* because the pleadings do not demonstrate that the parties are completely diverse. Diversity jurisdiction exists in a civil action between citizens of different states

1998 U.S. Dist. LEXIS 13468, *; 49 U.S.P.Q.2D (BNA) 1215;
Copy. L. Rep. (CCH) P27,817

when the matter in controversy exceeds the sum or value of $ 75,000. *28 U.S.C. § 1332*(a)(1). The party seeking to invoke jurisdiction under *28 U.S.C. § 1332* bears the burden of demonstrating that the grounds for diversity exist and that diversity is complete. *Advani Enterprises, Inc. v. Underwriters at Lloyds, 140 F.3d 157, 160 (2d Cir. 1998).*

Here, the complaint does not even allege what state the plaintiff Joe DiMaggio, an individual, is a citizen of. Rather it states that plaintiff has his place of business in Pennsylvania. (Am. Compl. P 3). This allegation is insufficient because an individual is considered to be a citizen of the state where he or she is domiciled. *See Gilbert v. David, 235 U.S. 561, 569, 59 L. Ed. 360, 35 S. Ct. 164 (1915).* Plaintiff's complaint gives no indication of where he is domiciled. Moreover, although the complaint alleges that defendant ISL is a domestic corporation organized [*9] under the laws of New York, it does not allege where ISL's principal place of business is. It therefore fails to identify ISL's citizenship, because a corporation is deemed to be a citizen of any state by which it has been incorporated *and* where it has its principal place of business. *See 28 U.S.C. § 1332*(c); *Advani Enterprises, 140 F.3d at 161* (complaint which merely alleged that plaintiff was a U.S. corporation with an office in New York failed to identify plaintiff's citizenship for diversity purposes). Finally, the complaint does not allege what state defendant Haven C. Roosevelt is a citizen of; rather, it alleges that he is licensed to practice law in New York. n4

n4 Moreover, although I need not reach this issue now, plaintiff's allegation that the amount in controversy is greater than $ 75,000 as required under *28 U.S.C. § 1332* is dubious. A party invoking the jurisdiction of the federal court has the burden of proving with reasonable certainty that the claims are in excess of the statutory jurisdictional amount. *Tongkook America, Inc. v. Shipton Sportswear Co., 14 F.3d 781, 784 (2d Cir. 1994).*

[*10]

Accordingly, because plaintiff's claim for copyright infringement is dismissed and plaintiff has failed to allege diversity jurisdiction, this Court declines to exercise supplemental jurisdiction over the plaintiff's purported state law claims. *28 U.S.C. § 1367*(c)(3); *United Mine Workers of America v. Gibbs, 383 U.S. 715, 16 L. Ed. 2d 218, 86 S. Ct. 1130 (1966); Anderson v. M & T Pretzel, Inc., 1997 U.S. Dist. LEXIS 20876, 1997 WL 802934, 46 U.S.P.Q.2D (BNA) 1094* (S.D.N.Y. Dec. 31, 1997); *Calloway v. Marvel Entertainment Group, 1983 WL 1141,* at *3 (S.D.N.Y. June 30, 1983). n5

n5 Plaintiff moves for Rule 11 sanctions against the defendants for filing the instant motion. This motion is summarily denied. Plaintiff's motion fails to comply with the procedural requirements of Rule 11, and, in any event, is frivolous.

III. Conclusion

For the foregoing reasons, defendant's motion to dismiss plaintiff's complaint is GRANTED. However, because many of plaintiff's deficiencies may be curable, [*11] plaintiff is afforded the opportunity to replead. *See, e.g., Calloway, 1983 WL 1141,* at *3. Thus, leave to replead is granted and plaintiff may file a Second Amended Complaint within 30 days from the date of this Opinion and Order, failing that, the motion is granted and the movant is instructed to prepare and serve a proposed order on notice. The plaintiff will have 72 hours to submit a proposed counter-order.

**SO ORDERED.**

New York, New York
August 28, 1998

Harold Baer Jr.

U.S.D.J.

2003 U.S. Dist. LEXIS 1967, *; 65 U.S.P.Q.2D (BNA) 1954

LEXSEE 2003 U.S. DIST. LEXIS 1967

**BROUGHT TO LIFE MUSIC, INC., Plaintiff, - against - MCA RECORDS, INC., ANDRE YOUNG p/k/a DR. DRE, SCOTT STORCH and MARY J. BLIGE, Defendants.**

**02 Civ. 1164 (RWS)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2003 U.S. Dist. LEXIS 1967; 65 U.S.P.Q.2D (BNA) 1954*

**February 11, 2003, Decided
February 14, 2003, Filed**

**DISPOSITION:** [*1] Motion to dismiss granted.

**COUNSEL:** DeSIMONE, AVILES, SHORTER & OXAMENDI, Attorneys for Plaintiff, New York, NY, By: RALPH DeSIMONE, ESQ., LOUISE CHERKIS, ESQ., Of Counsel.

SONNENSCHEIN NATH & ROSENTHAL, Attorneys for Defendant Scott Storch, New York, NY, By: CHRISTINE LEPERA, ESQ., HOWARD H. WELLER, ESQ., Of Counsel.

**JUDGES:** ROBERT W. SWEET, U.S.D.J.

**OPINIONBY:** ROBERT W. SWEET

**OPINION: Sweet, D.J.,**

Defendant Scott Storch ("Storch") has moved to dismiss the complaint of plaintiff Brought to Life Music, Inc. ("BTLMI") pursuant to *Rule 12(b)(6), Fed. R. Civ. P.*, for failure to state a claim and pursuant to Rule 12(b)(2) and (3), Fed. R. Civ. P., for lack of personal jurisdiction and venue. For the reasons set forth below, the motion is granted.

**Prior Proceedings**

The complaint in this action was filed on February 13, 2002, alleging copyright infringement of BTLMI's musical recording "Sam Adams" and inducement to infringe the same work.

The complaint states as to Storch:

Upon information and belief, defendant Mr. Scott Storch is an associate of the defendant Andre Young p/k/a Dr. Dre and provided a copy of the musical track Sam Adams to defendant Andre Young p/k/a Dr. Dre.

The plaintiff Brought To Life, [*2] Inc. is informed and believes, therefore avers, that the defendants have infringed upon the copyright of plaintiff Brought To Life, Inc. in its Sam Adams musical track by copying portions of the Sam Adams musical track from the song entitled FAMILY AFFAIR appearing on the compact disc entitled NO MORE DRAMA, and the compact disc NO MORE DRAMA being the infringing work has been sold within this judicial district and elsewhere.

Plaintiff alleges copying and infringement by the remaining defendants.

The instant motion was heard and marked fully submitted on January 15, 2003.

**The Standard For 12(b)(6)**

Dismissal of a complaint pursuant to *Federal Rules of Civil Procedure 12(b)(6)* is appropriate only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of the claim which would entitle him to relief." *Carell v. The Shubert Organization, Inc., 104 F. Supp. 2d 236, 246 (S.D.N.Y. 2000).* A pleading "must at least set forth sufficient information for the court to determine whether some recognized legal theory exists on which relief" can be found. 2 James Wm. Moore et al., Moore's Federal Practice P 12.34[1][b] (3d ed. [*3] 2002). Moreover, it is the legal sufficiency of the complaint, "not the weight of any evidence offered in support of the action" that is to be assessed. *Spadafor v. Reale, 2001 U.S. Dist. LEXIS 13514, 2001 WL 1020359,* at *1 (S.D.N.Y. Sept. 5, 2001).

**The Complaint Fails to Allege a Claim for Copyright**

2003 U.S. Dist. LEXIS 1967, *; 65 U.S.P.Q.2D (BNA) 1954

## Infringement

To withstand a motion to dismiss, a properly plead copyright infringement claim must allege:

> (i) which specific original work is the subject of the claim, (ii) that plaintiff owns the copyright in the work, (iii) that the copyright has been registered in accordance with the statute, and (iv) by what acts during what time the defendant infringed the copyright.

*Marvullo v. Gruner & Jahr AG & Co., 2001 U.S. Dist. LEXIS 266, 2001 WL 40772,* at *2 (S.D.N.Y. Jan. 17, 2002) (citing *Kelly v. L.L. Cool J., 145 F.R.D. 32, 35 (S.D.N.Y. 1992),* aff'd, *23 F.3d 398* (2d Cir.) cert. denied, *513 U.S. 950 (1994)).*

Plaintiff here has not alleged that Storch has violated any of its alleged exclusive rights in its works. Specifically, Storch is not alleged to have (i) reproduced plaintiff's work; (ii) prepared derivative works based [*4] on plaintiff's work; (iii) distributed copies of plaintiff's work to the public for sale; or (iv) performed plaintiff's work publicly by means of digital audio transmission. See *17 U.S.C. § 106.* Plaintiff has not attempted to describe "by what acts and during what time" Storch infringed the copyright.

## The Complaint Fails to Allege a Claim for Contributory Copyright Infringement

To establish a claim for contributory copyright infringement, a plaintiff must allege that the defendant "with knowledge of the infringing activity, induced, caused, or materially contributed to the infringing conduct of another." *Gershwin Publishing Corp. v. Columbia Artists Management, Inc., 443 F.2d 1159, 1162 (2d Cir. 1971).* A plaintiff must allege that the defendant knew of, and substantially participated in, the alleged direct infringement, for a claim of contributory infringement to stand.

Significantly, with regard to the participation prong, an allegation that a defendant "merely provided the means to accomplish an infringing activity" is insufficient to establish a claim for contributory infringement. *Livnat v. Lavi, 1998 U.S. Dist. LEXIS 917, 1998 WL 43221,* [*5] at *3 (S.D.N.Y. Feb. 2, 1998) (citation omitted); see also *Quiroga v. Fall River Music, Inc., 1998 U.S. Dist. LEXIS 19039, 1998 WL 851574,* at *37 (S.D.N.Y. Dec. 7, 1998) ("[a] mere allegation that the defendant provided the third party with the opportunity to engage in wrongful conduct would not even be enough to survive a motion to dismiss"); *Display*

*Producers, Inc. v. Shulton, Inc., 525 F. Supp. 631, 633 (S.D.N.Y. 1981)* (a mere allegation that the defendant provided the primary infringer "with the opportunity to engage in wrongful conduct does not, without more, state a claim for contributory infringement . . ."). Rather, participation in the infringement must be "substantial" and the "authorization or assistance must bear a direct relationship to the infringing acts, and the contributory infringer must have acted in concert with the direct infringer." *Livnat, supra, 1998 U.S. Dist. LEXIS 917, 1998 WL 43221,* at *3 (citing 3 Melville B. Nimmer, David Nimmer, *Nimmer on Copyright § 12.04*[A][2][a], at 12-75 (1996)).

In addition to the requirement of substantial participation, knowledge of the infringing activity is also critical to sustaining a claim for contributory infringement. [*6] Thus, one who "supplies another with instruments by which another commits a tort, must be shown to have knowledge that the other will or can reasonably be expected to commit a tort with the supplied instrument. The test is whether [the] wrongdoing . . . might well have been anticipated by the defendant." *Display Producers, 525 F. Supp. at 633* (citations omitted). Moreover, while knowledge of the infringing activity may be actual or constructive, "one who furnishes a copyrighted work to another but is innocent of any knowledge of the other party's intended illegitimate use will not be liable." *Livnat, supra, 1998 U.S. Dist. LEXIS 917, 1998 WL 43221,* at *3 (citing 3 *Nimmer on Copyright § 12.04*[A][2][b] at 12-76-77).

Here, the complaint does not allege that Storch had knowledge of, or reasonably should have anticipated the alleged infringement and alleges only that (i) Storch gave defendant Andre Young a copy of BTLMI's song, and that (ii) its copyright was infringed with knowledge.

There is no allegation of any participation in the alleged infringement by Storch, let alone substantial participation amounting to the "conversion [of] plaintiff's song for his own use. [*7] "

BTLMI has not distinguished the authorities cited by Storch. See *Carell v. The Shubert Organization, Inc., 104 F. Supp. 2d 236, 271 (S.D.N.Y. 2000)* (motion to dismiss claim of contributory infringement granted where plaintiff failed to allege authorization or participation sufficient for liability); *Cable News Network, L.P., L.L.I.P. v. GOSMS.com, Inc., 2000 U.S. Dist. LEXIS 16156, 2000 WL 1678039,* at *6 (S.D.N.Y. Nov. 6, 2000) (motion to dismiss claim of contributory infringement granted where plaintiff failed to allege supervision or control over, or contribution to, the infringement); *Livnat, supra, 1998 U.S. Dist. LEXIS 917, 1998 WL 43221,* at *4 (plaintiff could not sustain a claim for contributory copyright infringement against a defendant who left plaintiff's photographs with the primary infringer since the defendant lacked actual or

Case 1:05-cv-07340-RJS    Document 13-3    Filed 02/06/2006    Page 3 of 4

Page 3

2003 U.S. Dist. LEXIS 1967, *; 65 U.S.P.Q.2D (BNA) 1954

constructive knowledge that the primary infringer would make use of the photographs) and *Calloway v. The Marvel Entertainment Group, 650 F. Supp. 684, 1983 WL 1152,* at *2 (S.D.N.Y. Dec. 23, 1983) (motion to dismiss claim of contributory infringement granted where plaintiff failed to allege that defendant supervised or had a financial interest in the infringing [*8] activities or participated in the dissemination of the work or materially contributed to the infringement).

In fact, the allegation by BTLMI of contributory infringement is made in plaintiff's opposition, not in the complaint. As this Court previously pointed out, more specific allegations contained in an opposing brief cannot be used to supplement otherwise conclusory allegations in a complaint. *Livnat v. Lavi, 1997 U.S. Dist. LEXIS 13633, 1997 WL 566097,* at FN1 (S.D.N.Y. Sept. 8, 1997). In any event, even the allegations in BTLMI's opposition fail to support a claim of contributory infringement against defendant Storch. The allegation that Storch's infringement is "well documented in his association with co-defendant Andre Young" does not allege a claim for contributory infringement.

## The Complaint Fails to Allege Personal Jurisdiction Adequately

BTLMI has alleged that Storch is a Pennsylvania resident (Compl. P 4) and has failed to show that jurisdiction over Storch may be asserted under CPLR 301, which applies to non-resident defendants who are "engaged in such a continuous and systematic course of 'doing business' in New York as to warrant a finding of 'presence'" in the [*9] state. *Carell, (supra), 104 F. Supp. 2d at 268.* Thus, a non-resident defendant must conduct, or purposefully direct business, in New York "'not occasionally or casually, but with a fair measure of permanence and continuity.'" Id. (citations omitted); *Landoil Resources Corp. v. Alexander & Alexander Servs., Inc., 918 F.2d 1039, 1043 (2d Cir. 1991)* (citation omitted). In determining whether a defendant "does business" in New York for purposes of CPLR 301, courts traditionally consider the existence of an office in New York, the solicitation of business in New York, the presence of bank accounts and other property in New York, and the presence of employees or agents in New York. See *Carell, supra, 104 F. Supp. 2d at 268; Landoil Resources, supra, 918 F.2d at 1043.* Nowhere in the complaint does BTLMI allege the existence of any of the traditional indicia.

The activities set forth in the opposition to the motion include (i) Storch's involvement with musical recordings produced in New York; (ii) the derivation of income from the sale of musical recordings nationwide, including New York; (iii) musical performances [*10] in New York; and (iv) co-publishing relationship with a New York entity. These activities, not alleged in the complaint but asserted, do not constitute as stated the degree of continuous and systematic contacts required under CPLR 301. See *Mantello v. Hall, 947 F. Supp. 92, 98 (S.D.N.Y. 1996)* (finding allegations that defendant regularly entered into licensing agreements with New York entities for rights to produce plays elsewhere and regularly hired New York actors did not amount to "doing business" and stating that "'the mere existence of a business relationship with entities within the forum state is insufficient to establish presence'") (citations omitted); *Jacobs v. Felix Bloch Erben Verlag fur Buhne Film und Funk KG, 160 F. Supp. 2d 722, 732 (S.D.N.Y. 2001)* (producers' contacts with this forum, which included viewing theater productions, negotiating, and casting and hiring talent for productions overseas, were insufficient to establish jurisdiction under CPLR 301). BTLMI has relied on *ABKCO Indus., Inc. v. Lennon, 85 Misc. 2d 465, 377 N.Y.S.2d 362 (N.Y. Sup.Ct. 1975).* That case was "an exception to the norm" and a "departure [*11] from established principle and precedent" because the defendant there, a member of The Beatles, exploited his musical recordings through New York accountants and attorneys whom he had retained on a continuing basis (see *ABKCO Indus., Inc. v. Lennon, 52 A.D.2d 435, 384 N.Y.S.2d 781, 784 (1st Dep't 1976)*) and was therefore found to be doing business in New York "pervasively, unmistakably, undeniably, continuously, and substantially." *377 N.Y.S.2d at 366.*

Under CPLR 302(a)(1), which establishes jurisdiction when the defendant transacts business in the state, "it is well-settled that the relationship between the claim and the in-state transaction must be 'direct.'" *Jacobs, 160 F. Supp. 2d at 739* (finding connection between alleged copyright infringement and defendants' in-state activities was too remote).

Cases invoking a contributory infringement theory to establish an agency relationship sufficient to invoke CPLR 302(a)(2) require a close nexus between the defendant and the primary infringer such that the defendant can be deemed to be purposefully using an intermediary "to take advantage of the market in the forum state, while avoiding [*12] jurisdiction for infringement." *The Topps Co., Inc. v. Gerrit J. Verbug Co., 961 F. Supp. 88, 91 (S.D.N.Y. 1997).* No such connection is alleged here.

CPLR 302(a)(3) authorizes jurisdiction over non domiciliaries who commit a tortious act outside the state causing injury to person or property within the state. As concluded above, the complaint has failed to allege that Storch committed such an act.

In the absence of appropriate jurisdictional allegations, the complaint is dismissed.

2003 U.S. Dist. LEXIS 1967, *; 65 U.S.P.Q.2D (BNA) 1954

**Conclusion**

For the reasons set forth above, the motion of Storch is granted, and the complaint is dismissed with leave granted to replead within twenty (20) days.

It is so ordered.

**New York, NY**

**February 11, 2003**

**ROBERT W. SWEET**

**U.S.D.J.**

LEXSEE 1999 U.S. DIST. LEXIS 15837

**ALEXANDER LINDSAY, Plaintiff, -against- The Wrecked and Abandoned Vessel R.M.S. TITANIC, HER ENGINES, TACKLE, EQUIPMENT, FURNISHINGS, Located Within One Nautical Mile of a Point Located at 41 [degrees], 43'32" North Latitude and 49 [degrees], 56'49" West, and ARTIFACTS, and VIDEO Located at 17 Battery Place, New York, NY, in rem, and R.M.S. TITANIC, INC., TITANIC VENTURES LIMITED PARTNERSHIP, OCEANIC RESEARCH AND EXPLORATION LIMITED, SUAREZ CORPORATION INDUSTRIES, INC., and DISCOVERY COMMUNICATIONS, INC., d.b.a. THE DISCOVERY CHANNEL, in personam, Defendants. n1**

n1 Prior to the issuance of this opinion, the plaintiff dismissed from the case defendant Ben Suarez, in his individual capacity as president of Suarez Corporation, Inc., pursuant to Rule 41(a)(1) of the Fed. R. Civ. P.

**97 Civ. 9248 (HB)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*1999 U.S. Dist. LEXIS 15837; 52 U.S.P.Q.2D (BNA) 1609; Copy. L. Rep. (CCH) P27,967*

**October 12, 1999, Decided**
**October 13, 1999, Filed**

**DISPOSITION:** [*1] Defendants' motions to dismiss the plaintiff's copyright claims alleged in the amended complaint DENIED in part and GRANTED in part, the plaintiff's cause of action for copyright infringement against SCI dismissed.

**COUNSEL:** For ALEXANDER LINDSAY, plaintiff: Christopher R. Carpentieri, C.R. Carpentieri, P.C., New York, NY.

For R.M.S. TITANIC, SUAREZ CORPORATION INDUSTRIES, INC., defendants: Edward Rosenthal, Frankfurt, Garbus, Klein & Selz, P.C., New York, NY.

For R.M.S. TITANIC INC., GEORGE TULLOCH, TITANIC VENTURES LIMITED PARTNERSHIP, OCEANIC RESEARCH AND EXPLORATION LIMITED, defendants: Edward Rosenthal, Frankfurt, Garbus, Klein & Selz, P.C., Allan H. Carlin, New York, NY.

For R.M.S. TITANIC, GEORGE TULLOCH, TITANIC VENTURES LIMITED PARTNERSHIP, OCEANIC RESEARCH AND EXPLORATION LIMITED, counter-claimants: Edward Rosenthal, Frankfurt, Garbus, Klein & Selz, P.C., New York, NY.

For ALEXANDER LINDSAY, counter-defendant: Christopher R. Carpentieri, C.R. Carpentieri, P.C., New York, NY.

**JUDGES:** Harold Baer Jr., U.S.D.J.

**OPINIONBY:** Harold Baer Jr.

**OPINION:**

**OPINION & ORDER**

**HAROLD BAER, JR., District Judge:**

The plaintiff, Alexander Lindsay, commenced this lawsuit in 1997, [*2] seeking damages based upon his share of the revenues generated by the salvage operations conducted at the wreck site of the famous sunken vessel, the R.M.S. Titanic. Defendants R.M.S. Titanic, Inc. ("RMST") and Suarez Corporation Inc. ("SCI") answered and asserted counterclaims against the plaintiff for copyright infringement. The plaintiffs' amended complaint joined defendant Discovery Communications, Inc. ("DCI") and added claims of copyright infringement against RMST, SCI and DCI. Pursuant to *Rule 12(b)(6) of the Federal Rules of Civil Procedure*, the defendants now move to dismiss the plaintiff's copyright claims alleged in the amended complaint. n2 The plaintiff cross-moves for summary judgment as to both his salvage and

copyright claims. For the reasons discussed below, the defendants' motions are DENIED in part and GRANTED in part, and the Court reserves decision on the plaintiff's motion.

n2 Although the Court has reviewed the voluminous supplementary submissions provided with and after the filing of these motions, I am excluding this virtual sea of materials and decline to convert the defendants' motions to dismiss to motions for summary judgment. Accordingly, I base my ruling on these motions solely on the pleadings. See *Amaker v. Weiner, 179 F.3d 48, 51-52 (2d Cir. 1999)* (finding that the inclusion of affidavits or exhibits with a motion to dismiss does not require conversion to a motion for summary judgment provided the court does not rely on such submissions in deciding the motion to dismiss). In any event, a cursory review of the documents submitted with these motions reveals that the factual waters of this case are sufficiently muddied so as to warrant denial of summary judgment at this juncture as well.

[*3]

## I. BACKGROUND

The plaintiff, a citizen of the United Kingdom and resident of the State of New York, is an independent documentary film maker engaged in the business of creating, producing, directing, and filming documentaries. (Amended Complaint ("Am. Compl.") P 4.) Defendant R.M.S. Titanic, Inc. ("RMST") is a publicly traded U.S. corporation, organized under the laws of the State of Florida, which conducts business within and has its office and principal place of business in New York City. (Am. Compl. P 8.) Defendant George Tulloch ("Tulloch") is a shareholder, president and member of the board of directors of RMST. (Am. Compl. P 7.) Defendant Titanic Ventures Limited Partnership ("TVLP") is a limited partnership organized under the laws of Connecticut and currently doing business in the State of New York. n3 (Am. Compl. P 9.) Defendant Oceanic Research and Exploration Limited ("OREL") is a Delaware corporation and general partner of TVLP. Defendant Tulloch is also the president and sole shareholder of OREL (defendants RMST, Tulloch, TVLP and OREL collectively as "RMST"). Defendant Suarez Corporation, Inc. ("SCI") is an Ohio corporation doing business in the State of New [*4] York. Defendant Discovery Communications, Inc. ("DCI") is a Maryland corporation doing business as "The Discovery Channel", and is engaged in the business of making, financing and distributing documentary films. (Am. Compl. P 13.)

n3 In May 1993, RMST acquired all the assets and assumed the liabilities of TVLP, a limited partnership that was formed in 1987 for purposes of exploring the Titanic wreck site. (Am. Compl. P 19.)

In 1993, RMST was awarded exclusive status as salvor-in-possession of the Titanic wreck site and is therefore authorized to carry on salvage operations at the vessel's wreck site. (Am. Compl. PP 8, 20.) As a condition of obtaining these rights, RMST allegedly agreed to maintain all the artifacts it recovered during the salvage operations for historical verification, scientific education, and public awareness. (Am. Compl. P 22.)

In 1994, the plaintiff, under contract with a British television company, filmed and directed the British documentary film, "Explorers of the Titanic," a chronicle [*5] of RMST's third salvage expedition of the Titanic. (Am. Compl. P 25.) To film this documentary, Lindsay sailed with RMST and the salvage expedition crew to the wreck site and remained at sea for approximately one month. (Am. Compl. P 27.) The plaintiff alleges that during and after filming this documentary in 1994, he conceived a new film project for the Titanic wreck using high illumination lighting equipment. (Am. Compl. P 28.)

The plaintiff later discussed his idea with defendant George Tulloch and, according to the plaintiff, the two agreed to work together on the venture. (Am. Compl. PP 29.) In March 1995, the plaintiff traveled to New York and developed a comprehensive business plan for the new film project entitled, "Titanic: A Memorial Tribute." (Am. Compl. P 30.) Tulloch allegedly informed the plaintiff that he would agree to the plan -- which purported to include provisions for compensating Lindsay for his work on the project -- but that Tulloch would have to obtain approval from the RMST Board of Directors. (Am. Compl. P 31.) The plaintiff agreed to join RMST to raise money not only for the film project, but for other aspects of the 1996 salvage operation as well. [*6] Compl. P 32.)

Lindsay moved into an office at RMST in and around April 1995. Around this time, Tulloch repeatedly told Lindsay that he would obtain approval from RMST's Board of Directors for a contract for the plaintiff based upon the terms of Lindsay's film plan. (Am. Compl. P 33.) The contract was to include terms of Lindsay's compensation, including sharing in the profits derived from any film, video and still photographs obtained from the 1996 salvage operation. (Am. Compl. P 36.) This contract was never executed.

As part of his pre-production efforts, the plaintiff created various storyboards for the film, a series of drawings which incorporated images of the Titanic by

identifying specific camera angles and shooting sequences "that reflected Planitff's [sic] creative inspiration and force behind his concept for shooting the Subject Work." (Am. Compl. P 38.) The plaintiff also alleges that he, along with members of his film team, designed the huge underwater light towers that were later used to make the film. (Am. Compl. P 43.) Lindsay also "personally constructed the light towers" and thereafter "for approximately 3-4 weeks directed, produced, and acted as the cinematographer [*7] of the Subject Work, underwater video taping of the Titanic wreck site, and otherwise participated in the 1996 salvage operation." (Am. Compl. PP 45-46.) He also directed the filming of the wreck site from on board the salvage vessel "Ocean Voyager" after leading daily planning sessions with the crew of the Nautile, the submarine used to transport the film equipment and photographers to the underwater wreck site. (Am. Compl. P 47.) The purpose of these sessions was to provide the photographers with "detailed instructions for positioning and utilizing the light towers." (Id.)

The plaintiff now alleges that he was never fully compensated for his services and that, *inter alia*, the defendants are now "unlawfully profiting from the exploitation of the" film project at issue. (Am. Compl. PP 57-60.)

The plaintiff originally brought this action under the Court's admiralty jurisdiction to enforce his salvage claims against defendants RMS Titanic, Inc., Titanic Ventures Limited Partners, Oceanic Research and Exploration Limited (collectively as "RMST"), and Suarez Corporation.

These defendants moved to dismiss the plaintiff's salvage claims. By order dated September 2, 1998, I denied [*8] the motion to dismiss, having found that the plaintiff had met his burden of pleading all the necessary elements for bringing a salvage claim. See *Lindsay v. Titanic, 1998 U.S. Dist. LEXIS 13604, No. 97 Civ. 9248, 1998 WL 557591* (S.D.N.Y. Sept. 2, 1998).

RMST and SCI then answered the complaint and included counterclaims for copyright infringement arising from the plaintiff's use of certain video footage taken from the wreck during the 1996 expedition. By order dated April 9, 1999, I granted the plaintiffs motion to amend his complaint to add copyright infringement claims against RMST and SCI and to join Discovery Communications, Inc. ("DCI") d/b/a The Discovery Channel, for copyright infringement of what appears to be the same footage at issue in the defendants' counterclaims.

The plaintiff's amended complaint now includes 13 causes of action, including those based on copyright infringement, salvage claims, and state law causes of action for fraud, breach of contract, and conversion. The defendants now move pursuant to *Rule 12(b)(6) of the Federal Rules of Civil Procedure* to dismiss Lindsay's copyright claims, and the plaintiff cross-moves for summary judgment on his copyright and salvage claims. [*9]

### III. DISCUSSION

#### A. Standards for Motion to Dismiss

Dismissal of a complaint pursuant to Rule 12(b)(6) is permitted "only where it appears beyond doubt that the plaintiff can prove no set of facts in support of the claim which would entitle him to relief." *Scotto v. Almenas, 143 F.3d 105, 109-10 (2d Cir. 1998).* "The task of the court in ruling on a Rule 12(b)(6) motion is 'merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof.'" *Cooper v. Parsky, 140 F.3d 433, 440 (2d Cir. 1998)* (quoting *Ryder Energy Distribution Corp. v. Merrill Lynch Commodities, Inc., 748 F.2d 774, 779 (2d Cir. 1984)).* In deciding a 12(b)(6) motion, the Court must accept as true all material facts alleged in the complaint and draw all reasonable inferences in the nonmovant's favor. See *Thomas v. City of New York, 143 F.3d 31, 36 (2d Cir. 1998).*

#### B. Copyright Claims

##### 1. Pleading Requirements

To withstand a motion to dismiss, a complaint based on copyright infringement must allege: (1) which specific original works are the subject [*10] of the copyright claim; (2) that the plaintiff owns the copyrights in those works; (3) that the copyrights have been registered in accordance with the statute; and (4) "by what acts during what time" the defendant infringed the copyright. *Kelly v. L.L. Cool J., 145 F.R.D. 32, 35 (1992),* aff'd, *23 F.3d 398* (2d Cir.), cert. denied, *513 U.S. 950, 130 L. Ed. 2d 318, 115 S. Ct. 365 (1994).*

Although the complaint is not a model of clarity, it meets for the most part, these standards. With regard to the first element, the complaint refers to the plaintiffs copyright interest in the "Subject Work," and -- as the defendants point out -- makes several different references to what exactly this work constitutes. (See Am. Compl. PP 28, 76, 78.) n4 However, piecing together these various allegations, and drawing all reasonable inferences in the plaintiff's favor, it becomes clear for purposes of this motion that the "Subject Work" consists of the illuminated underwater footage that was filmed utilizing the large light towers that Lindsay helped design and construct. (See Am. Compl. P 46.) Regarding the second and third elements, the plaintiff [*11] alleges that he owns these works, (Am. Compl. P 55), and that they were accepted and registered with the U.S. Register of Copyrights. (Am. Compl. P 78.)

n4 Lindsay defines the "Subject Work" as: "a new film project for the Titanic wreck using high illumination lighting equipment" (Am. Compl. P 28); "the documentary film Titanic: In a New Light" (Am. Compl. P 76); and "the illuminated underwater video footage." (Am. Compl. P 78.)

As to the fourth element -- how and when the defendants infringed the copyright -- the plaintiff has satisfied his burden as to all the defendants except SCI. With respect to RMST, the complaint alleges that RMST "unlawfully entered into the exclusive license agreement with DCI," (Am. Compl. P 62), "enered [sic] into contracts conveying video clips and still images . . . to various Titanic artifacts exhibitions throughout the world," and "RMST displays images from the Subject Work on its INTERNET web site." (Am. Compl. P 63.) The complaint alleges that DCI incorporated portions [*12] of the illuminated footage into three separate documentaries that aired on certain dates in 1997. (Am. Compl. P 64.)

The plaintiffs' contentions against SCI, however, do not fare as well. Lindsay alleges that SCI "used plaintiff's name and likeness" to promote a 1996 cruise expedition to observe the salvage operations. (Am. Compl. P 42.) In addition, the amended complaint charges that "SCI did knowingly and willfully infringe upon Plaintiff's copyright . . . by unlawfully purchasing and/or otherwise obtaining copies of the Subject Work" and has and will "exploit and profit from the Subject Work." (Am. Compl. P 73.) I find that these vague and conclusory allegations are, as a matter of law, insufficient to withstand the instant motion. *Kelly, 145 F.R.D. at 36, n.3* ("Rule 8 requires that the particular infringing acts be set out with some specificity. Broad, sweeping allegations of infringement do not comply with Rule 8."). Accordingly, the plaintiff's third cause of action as against SCI is hereby dismissed.

### 2. Authorship

The defendants first argue that the plaintiff cannot have any protectable right in the illuminated footage since he did not dive to the ship [*13] and thus did not himself actually photograph the wreckage. This argument, however, does not hold water.

The Copyright Act of 1976 provides that copyright ownership "vests initially in the author or authors of the work." *17 U.S.C. § 201*(a). Generally speaking, the author of a work is the person "who actually creates the work, that is, the person who translates an idea into a fixed, tangible expression entitled to copyright protection." *Community for Creative Non-Violence v. Reid, 490 U.S. 730, 737, 104 L. Ed. 2d 811, 109 S. Ct.*

2166 (1989) (citing *17 U.S.C. § 102*). In the context of film footage and photography, it makes intuitive sense that the "author" of a work is the individual or individuals who took the pictures, i.e. *the* photographer. However, the concept is broader than as argued by the defendants.

For over 100 years, the Supreme Court has recognized that photographs may receive copyright protection in "so far as they are representatives of original intellectual conceptions of the author." *Burrow-Giles Lithographic Co. v. Sarony, 111 U.S. 53, 58, 28 L. Ed. 349, 4 S. Ct. 279 (1884).* An individual [*14] claiming to be an author for copyright purposes must show "the existence of those facts of originality, of intellectual production, of thought, and conception." *Feist Publications, Inc. v. Rural Telephone Service Company, Inc., 499 U.S. 340, 346-347, 113 L. Ed. 2d 358, 111 S. Ct. 1282 (1991)* (citing *Burrow-Giles, 111 U.S. at 59-60).* Some elements of originality in a photograph includes "posing the subjects, lighting, angle, selection of film and camera, evoking the desired expression, and almost any variant involved." *Rogers v. Koons, 960 F.2d 301, 307* (2d Cir.), cert. denied, *506 U.S. 934, 121 L. Ed. 2d 278, 113 S. Ct. 365 (1992).* Taken as true, the plaintiff's allegations meet this standard. Lindsay's alleged storyboards and the specific directions he provided to the film crew regarding the use of the lightowers and the angles from which to shoot the wreck all indicate that the final footage would indeed be the product of Lindsay's "original intellectual conceptions."

The fact that Lindsay did not literally perform the filming, i.e. by diving to the wreck and operating the cameras, will not defeat his claims of [*15] having "authored" the illuminated footage. The plaintiff alleges that as part of his pre-production efforts, he created so-called "storyboards," a series of drawings which incorporated images of the Titanic by identifying specific camera angles and shooting sequences. (Am. Compl. P 38.) During the expedition itself, Lindsay claims to have been "the director, producer and cinematographer" of the underwater footage. (Am. Compl. P 46.) As part of this role, Lindsay alleges that he directed daily planning sessions with the film crew to provide them with "detailed instructions for positioning and utilizing the light towers." (Am. Compl. P 47.) Moreover, the plaintiff actually "directed the filming" of the Titanic from on board the Ocean Voyager, the salvage vessel that held the crew and equipment. (Am. Compl. P 47) Finally, Lindsay screened the footage at the end of each day to "confirm that he had obtained the images he wanted." (Am. Compl. P 48.)

All else being equal, where a plaintiff alleges that he exercised such a high degree of control over a film operation -- including the type and amount of lighting

used, the specific camera angles to be employed, and other detail-intensive artistic [*16] elements of a film -- such that the final product duplicates his conceptions and visions of what the film should look like, the plaintiff may be said to be an "author" within the meaning of the Copyright Act.

Indeed, the instant case is analogous to *Andrien v. Southern Ocean County Chamber of Commerce, 927 F.2d 132 (3d Cir. 1991).* There, the Third Circuit recognized that "a party can be considered an author when his or her expression of an idea is transposed by mechanical or rote transcription into tangible form under the authority of the party." *Id. at 135.* The plaintiff in Andrien had received a copyright for a map of Long Beach Island, New Jersey which was created from a compilation of pre-existing maps and the plaintiff's personal survey of the island. To transform his concepts and the information he had gathered into the final map, the plaintiff hired a printing company to print the map in final form. The plaintiff testified that the maps were made by the printer "with me at her elbow practically" and that he spent time each day at the print shop during the weeks the map was made, directing the map's preparation in specific detail. In reversing [*17] the lower court's granting of summary judgment against the plaintiff, the court noted that the printers had not "intellectually modified or technically enhanced the concept articulated by Andrien," nor did they "change the substance of Andrien's original expression." *Id. at 135.* See also *Lakedreams v. Taylor, 932 F.2d 1103, 1108 (5th Cir. 1991)* (noting that authors may be entitled to copyright protection even if they do not "perform with their own hands the mechanical tasks of putting the material into the form distributed to the public"). It is too early to tell whether the allegations of the plaintiff here satisfy the copyright laws, but crediting his story as I must, dismissal is unwarranted at this stage of the litigation.

The defendants' argue that *Geshwind v. Garrick, 734 F. Supp. 644 (S.D.N.Y. 1990),* vacated in part, *738 F. Supp. 792 (S.D.N.Y.1990),* aff'd, *927 F.2d 594 (2d Cir.), cert. denied, 502 U.S. 811 (1991),* mandates dismissal. That case, however, is inapposite. The plaintiff there, a producer of computer graphics animation and special effects, had contracted to produce [*18] a 15-second animation piece. The plaintiff hired Digital, a computer graphics company to, in essence, produce the animated piece. The court in Geshwind found that Digital, by its employee, was the "author" within the meaning of the Copyright Act. In ruling that the plaintiff was not an "author," Judge Patterson found that the plaintiff there had made only minimal contributions to the final product and had only some, if any, of his "suggestions" incorporated into the final product. *Id. at 650.* This is in stark contrast to the case at bar where Lindsay alleges that his *contributions* -- not suggestions -- were anything

but minimal, and he describes himself as the driving force behind the final film product at issue here.

### 3. Joint-Authorship

In the alternative, the defendants argue that Lindsay is, at best, a joint author of the underwater footage with RMST. This contention is based on the notion that Christian Petron, the main photographer of the film, was at least a joint-author of the footage with the plaintiff. Since Petron's participation was accomplished under the auspices of a work for hire agreement with RMST, the defendants' argument continues, [*19] any rights to authorship Petron may have received via his filming were conferred upon RMST. As a joint author with the plaintiff then, RMST cannot be liable for copyright infringement since each co-author acquires an undivided interest in the entire work and has the right to use the work as he or she pleases. *Thomson v. Larson, 147 F.3d 195, 199 (2d Cir. 1998); Weissmann v. Freeman, 868 F.2d 1313, 1318 (2d Cir.)* ("An action for infringement between joint owners will not lie because an individual cannot infringe his own copyright."), cert. denied, *493 U.S. 883, 107 L. Ed. 2d 172, 110 S. Ct. 219 (1989).* Similarly, any copyright claim against DCI would fail since RMST, as a joint author, has the right to license the joint work to third parties. *Thomson, 147 F.3d at 199.*

A "joint work" under the Copyright Act is one "prepared by two or more authors with the intention that their contributions be merged into inseparable or independent parts of a unitary whole." *17 U.S.C. § 101.* To prove co-authorship status, it must be shown by the individual claiming co-authorship status that each of the putative [*20] co-authors (1) fully intended to be co-authors, and (2) made independently copyrightable contributions to the work. *Thomson, 147 F.3d at 200* (citing *Childress v. Taylor, 945 F.2d 500, 507-508 (2d Cir. 1991)).*

Drawing all inferences in favor of Lindsay, I conclude that no such status existed in the case at bar. With regard to the intent prong of the analysis, "an important indicator of authorship is a contributor's decision making authority over what changes are made and what is included in a work." *147 F.3d at 202-3* (citing *Erickson v. Trinity Theatre, Inc., 13 F.3d 1061, 1071-72 (7th Cir. 1994)* (actor's suggestions of text did not support a claim of co-authorship where the sole author determined whether and where such suggestions were included in the work)). In other words, where one contributor retains a so-called "veto" authority over what is included in a work, such control is a strong indicator that he or she does not intend to be co-authors with the other contributor. According to the pleadings, the plaintiff exercised virtually total control over the content of the film as "the director, producer and cinematographer" of the [*21] production. (Am. Compl. P 46.) Additionally, he briefed the photographers with

regards to, *inter alia*, the specific camera angles they were to employ, (Am. Compl. P 47), and Lindsay screened the film each day to make sure the proper footage was obtained. (Am. Compl. P 48.) Based on these allegations, and implicit in the notion that the film crew was simply "following directions," n5 Lindsay retained what appeared to be exclusive authority over what was included in the footage. Assuming as I must at this stage of the litigation that this is true, it can hardly be said that the plaintiff intended Petron -- or any other contributor -- to be a co-author. Accordingly, the claims by RMST that it -- by virtue of Petron's role as a photographer under a work-for-hire agreement -- was a joint-author within the meaning of the Copyright Act must fail.

> n5 Along these lines, Lindsay's alleged control over the filming rendered the film crew's role to one of no more than "rote or mechanical transcription that [did] not require intellectual modification," *Andrien, 927 F.2d at 135,* a contribution that would not be independently copyrightable. Id.; *Thomson, 147 F.3d at 200.* RMST's claims of joint-authorship would thus fail on this prong as well.

[*22]

### 4. Accounting

Lindsay's fifth cause of action seeks an accounting by DCI, SCI, and RMST of moneys these defendants received from their unauthorized use of the copyrighted footage at issue. Regardless of whether this Court -- or a jury -- ultimately finds that Lindsay and RMST are joint authors, with respect to DCI, the plaintiff's complaint here sinks under its own weight.

The duty to provide an accounting from profits obtained runs only between co-owners of a copyright. *Margo v. Weiss, 1997 U.S. Dist. LEXIS 20867, *26, No. 96 Civ. 3842, 1998 WL 2558,* at *9 (S.D.N.Y. Jan. 5, 1998) ("The duty to account for profits presupposes a relationship as co-owners of the copyright . . . ."); cf. *Thomson, 147 F.3d at 199* ("Each joint author has the right to use or to license the work as he or she wishes, subject only to the obligation to account *to the other joint owner* for any profits that are made.") (emphasis added); *Kaplan v. Vincent, 937 F. Supp. 307, 316 (S.D.N.Y. 1996)* ("Each author maintains the right to use or license the work, subject only to an accounting *to the other co-owner.*") (emphasis added). Because DCI is only a

licensee of a putative joint owner [*23] of the copyright at issue here, Lindsay's claim for an accounting fails as a matter of law and must be dismissed. n6

> n6 Because the plaintiff fails to state a cognizable copyright claim against defendant SCI, as discussed herein, count five is also dismissed as to defendant SCI.

### III. CONCLUSION

For the reasons discussed above, the defendants' motions are DENIED in part and GRANTED in part such that the plaintiff's cause of action for copyright infringement against SCI is dismissed, as is Lindsay's cause of action for an accounting with respect to DCI and SCI only. The plaintiff's remaining copyright-based claims n7 and other causes of action have survived this motion. n8 The current pre-trial scheduling order remains in place, and the case is on the January 2000 trailing trial calendar.

> n7 These causes of action are as follows: declaration of copyright ownership; copyright infringement by RMST; copyright infringement by DCI; and an accounting, with respect to RMST only.

[*24]

> n8 These causes of action, not at issue in the instant motions to dismiss, include: breach of contract; breach of implied covenant of good faith; quantum meruit; conversion; "money lent"; fraud; fraudulent misrepresentation; declaration of co-salvor status; and common law fraud and deceit.

**SO ORDERED.**

Dated: October 12, 1999
New York, New York

Harold Baer Jr.

U.S.D.J.



# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

**MARTIN LUTHER KING JR. FEDERAL BLDG. & U.S. COURTHOUSE**
**50 WALNUT STREET, P.O. BOX 419**
**NEWARK, NJ 07101-0419**
**(973) 645-6340**

**WILLIAM J. MARTINI**
**JUDGE**

## LETTER OPINION

July 19, 2005

Fredrick Stampone
347 7th Street
Carlstadt, NJ 07072
*Pro Se*

Tim Stahl
Lamico America
37-10 Broadway
Fair Lawn, NJ 07410
*Pro Se*

  **Re:   Stampone v. Stahl, et al.,**
    **Civil Action No. 05-1921 (WJM)**

Dear Litigants:

Defendant Tim Stahl brings a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) alleging that the Complaint fails to state a claim for which relief can be granted.[1]  Plaintiff Fredrick Stampone does not oppose this motion.  The Court resolves this matter on the papers.  Fed. R. Civ. P. 78.  For the reasons set forth below, defendant's motion is **GRANTED,** and plaintiff's Complaint is **DISMISSED**.

## BACKGROUND[2]

Plaintiff filed his Complaint with this Court pursuant to federal copyright, trademark, and civil rights laws.  On March 25, 2005, plaintiff delivered a computer disk to defendants, which contained artwork that he wanted them to copy.  Plaintiff alleges that defendants infringed on his

---

[1] In this unique situation, the Court is dealing with two *pro se* parties.  Consequently, their pleadings are liberally construed.

[2] All facts are taken from the Complaint.

copyright by not returning plaintiff's original computer disk when asked and then using it to reproduce plaintiff's artwork.

Defendants were hired by plaintiff to make fifty copies of plaintiff's artwork and laminate those copies. When plaintiff came to pick up the copies, he was unhappy with the colors, but decided to give defendant another chance to get it right. On March 31, 2005, plaintiff returned to the store to pick up the copies. Again, plaintiff rejected them because the colors were still not right. Plaintiff then agreed to give defendants one more final try.

The next day Stahl called plaintiff to inform him that he could not get the colors right, and therefore, plaintiff should come to the store to pick up his disk. Plaintiff went to pick up his disk. However, the disk that was returned to him was not the same one that he had given Stahl. Plaintiff demanded his original disk back. Stahl explained that another employee may have taken it, and that he would have it returned by the following day. On April 4, 2005, plaintiff sent a certified letter to Stahl demanding the name and phone number of the person who was in possession of his disk. The following day, Stahl responded with the name and phone number of an employee identified as "Gill." Plaintiff then contacted Gill, who told plaintiff that the disk had been thrown away. Plaintiff responded by saying to Gill that he had better find the disk or else plaintiff would sue. Plaintiff proceeded to send another letter demanding the return of his disk, reiterating that unless it was returned he would sue defendants. Plaintiff then filed suit in this Court. Stahl filed a motion to dismiss, alleging that plaintiff's Complaint fails to state a claim. That motion is now before the Court.

## DISCUSSION

### A.  Standard of Review

In deciding a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), all allegations in the complaint must be taken as true and viewed in the light most favorable to the plaintiff. *Warth v. Seldin,* 422 U.S. 490, 501 (1975). "While a court will accept well-plead allegations as true for purposes of the motion, it will not accept legal or unsupported conclusions, unwarranted inferences, or sweeping legal conclusions cast in the form of factual allegations." *In re Cendant Corp. Sec. Litig.,* 76 F. Supp. 2d 539, 542 (D.N.J. 1999). If, after viewing the allegations in the complaint in the light most favorable to the plaintiff, it appears beyond doubt that no relief could be granted "under any set of facts which could prove consistent with the allegations," a court may dismiss a complaint for failure to state a claim. *Hishon v. King & Spalding,* 467 U.S. 69, 73 (1984); *Zynn v. O'Donnell,* 688 F.2d 940, 941 (3d Cir. 1982).

In the case of a *pro se* litigant, the court must "find that it is clear 'beyond a reasonable doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Zynn v. O'Donnell,* 688 F.2d at 941 (quoting *Haines v. Kerner,* 404 U.S. 519, 521 (1972)).

2

**B.** **The Complaint Fails to State a Claim**

A court deciding a motion to dismiss needs to determine whether the allegations presented state a legal claim. *Arista Records, Inc. v. Flea World, Inc.,* 356 F. Supp. 2d 411, 424 (D.N.J. 2005) (quoting *Markowitz v. Northeast Land Co.,* 906 F.2d 100, 103 (3d Cir. 1990)). Rule 12(b)(6) must be read in conjunction with Rule 8(a), which requires "a short and plain statement of the claim showing the pleader is entitled to relief." *Warren v. Fox Family Worldwide, Inc.,* 171 F. Supp. 2d 1057, 1061 (C.D. Cal. 2001) (citations omitted). Rule 8 has been expressly applied to copyright actions. *See Gee v. CBS, Inc.,* 471 F. Supp. 600, 643 (E.D. Pa. 1979); *Flynn v. Health Advocate, Inc.*, 2004 WL 1588235, *4 (E.D. Pa. July 8, 2004); *Sharp v. Patterson*, 2004 WL 2480426, *12 (S.D.N.Y. Nov. 3, 2004). To be sufficient under Rule 8, plaintiff needs to allege "which specific original work is the subject of the copyright claim, that plaintiff owns the copyright, that the work in question has been registered in compliance with the statute and by what acts and during what time defendant has infringed the copyright." *Gee,* 471 F. Supp. at 643. Plaintiff's allegations have failed to meet the minimal Rule 8 burden.

The first three elements of the pleading requirement deal with the plaintiff's ability to prove ownership of the copyright. In this case, the Court need not determine the adequacy of plaintiff's allegations concerning those elements. Rather, the Court will skip ahead to focus on the fourth element, which requires the complaint to set out particular infringing acts with some specificity. *See Marvullo v. Gruner & Jahr,* 105 F. Supp. 2d 225, 230 (S.D.N.Y. 2000). Broad sweeping allegations of infringement do not comply with Rule 8. *Id.* For a violation of a copyright to occur, the defendant must have copied the plaintiff's work in the course of the defendant's business without the plaintiff's approval. *Major League Baseball Promotion Corp. v. Colour-Tex, Inc.,* 729 F. Supp. 1035, 1039 (D.N.J. 1990). Based on the Complaint, all copying by Stahl, and the other defendants, was done at the insistence of plaintiff. Plaintiff does not allege that Stahl or the other defendants copied any of plaintiff's work without authorization.

More specifically, plaintiff fails to allege any specific acts that would lead the Court to find that there was an infringement of his alleged copyright. Plaintiff only mentions that by not returning the disk, Stahl was using it to steal and reproduce plaintiff's artwork. (Compl. at ¶ 14). But such an allegation is "too broad and sweeping to satisfy Rule 8." *Marvullo,* 105 F. Supp. 2d at 230. Plaintiff fails to allege any specific acts or times where the alleged infringement occurred. In sum, plaintiff's Complaint, which fails to allege with any specificity acts of copyright infringement, fails to state a copyright claim.

Plaintiff's Complaint alleges a violation of trademark laws. That allegation, however, stands alone; it is not supported by any additional factual allegations that could support a trademark infringement suit. A trademark violation arises when the use of a similar mark by defendants is likely to cause confusion concerning the source and origin of the goods. *See Opticians Ass'n of Am. v. Independent Opticians of Am.,* 920 F.2d 187, 192 (3d Cir. 1990). Because plaintiff's Complaint only alleges a legal conclusion of trademark infringement, it fails to state a trademark claim.

3

Lastly, plaintiff's Complaint asserts defendants violated his civil rights.  Like his trademark claim, this claim has no factual support; the Complaint merely asserts a legal conclusion.  Therefore, the Court concludes that the Complaint fails to state a civil rights claim.

## C.     Jurisdiction

Federal courts are under a continuing obligation to ensure that subject matter jurisdiction exists.  Rule 12(h)(3) provides that "[w]henever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action."  Fed. R. Civ. P. 12(h)(3).

Because the Complaint appears to allege that all parties are citizens of New Jersey, there is no diversity of citizenship.  *See* 28 U.S.C. § 1332(a)(1).  Thus, plaintiff's Complaint must be predicated upon federal question jurisdiction.  Federal question jurisdiction gives the district courts original jurisdiction for all civil actions arising under the Constitution, laws, or treaties of the United States.  28 U.S.C. § 1331.  Section 1331 requires that a federal question be presented on the face of the plaintiff's well-pleaded complaint. *Gateway 2000 v. Cyrix Corp.,* 942 F. Supp. 985, 989 (D.N.J. 1996).  In the present case, plaintiff's Complaint relies on federal copyright, trademark and other civil rights laws to establish jurisdiction.  However, because these claims are legally insufficient, no federal question remains in this case.[3]  Thus, this case must be dismissed for lack of jurisdiction.

## CONCLUSION

For the aforementioned reasons, defendant's motion to dismiss is granted and plaintiff's Complaint is dismissed.

An appropriate Order accompanies this Letter Opinion.

s/ William J. Martini
**William J. Martini, U.S.D.J.**

---

[3] Although plaintiff may have a cause of action in state court, this Court need not and will not address the merits of those claims.

Case 1:05-cv-07340-RJS   Document 13-6   Filed 02/06/2006   Page 1 of 2

Page 1

1997 U.S. Dist. LEXIS 14571, *; 44 U.S.P.Q.2D (BNA) 1799

5 of 5 DOCUMENTS

**TOM KELLEY STUDIOS INC., SAM SHAW, MILTON H. GREENE ARCHIVES, LLP, and DOUGLAS KIRKLAND, Plaintiffs, -against- INTERNATIONAL COLLECTORS SOCIETY INC., JOHN E. VAN EMDEN, SCOTT L. TILSON, JEFFREY B. FRANZ, HOWARD E. FRIEDMAN, and CMG WORLDWIDE, INC., Defendants.**

**97 Civ. 0056 (WK)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*1997 U.S. Dist. LEXIS 14571; 44 U.S.P.Q.2D (BNA) 1799*

**September 11, 1997, Decided**
**September 25, 1997, Filed**

**DISPOSITION:** [*1] Defendants' motion for a more definite statement under Rule 12(e) granted.

**COUNSEL:** For Plaintiffs: Stephen A. Weingrad, Esq., Weingrad & Weingrad, L.L.P., New York, New York.

For Defendants: Bradford J. Badke, Esq., Dewey Ballantine, New York, New York.

**JUDGES:** WHITMAN KNAPP, SENIOR U.S.D.J.

**OPINIONBY:** WHITMAN KNAPP

**OPINION:**

MEMORANDUM AND ORDER

**WHITMAN KNAPP, SENIOR DISTRICT JUDGE**

This is an action brought by plaintiffs Tom Kelley Studios Inc., Sam Shaw, Milton H. Greene Archives, LLP, and Douglas Kirkland (collectively "plaintiffs") for copyright and trademark infringement against defendants International Collectors' Society, Inc., John e. Van Emden, Scott L. Tilson, Jeffrey B. Franz, Howard E. Friedman and CMG Worldwide, Inc. (collectively "defendants") for the sale of stamps bearing the image of Marilyn Monroe. Presently before us is defendants motion pursuant to *Rule 12(e) of the Federal Rules of Civil Procedure* for a more definite statement of the Complaint. For the following reasons, defendants' motion is granted.

**DISCUSSION**

A motion for a more definite statement should be granted where a complaint is "so vague or ambiguous that a party cannot reasonably be required [*2] to frame a responsive pleading." *Fed. R. Civ. P. 12(e)*. However, "rule 12(e) is not to be used to ascertain a plaintiff's legal theories *** [nor] a substitute for discovery." See, e.g., *Resolution Trust Corp. v. Elizabeth Street Owners Associates (S.D.N.Y. 1997) 1997 WL 202109*, at *5 (citations omitted). Thus, if a complaint complies with the liberal pleading requirements of *Federal Rule of Civil Procedure 8(a)*, then the Rule 12(e) motion should be denied. See, e.g., *MTV Networks v. Curry (S.D.N.Y. 1994) 867 F. Supp. 202, 207.*

With respect to the claim for copyright infringement, Rule 8(a) "requires that the particular infringing acts be set out with some specificity. *Kelly v. L.L.Cool J. (S.D.N.Y. 1992) 145 F.R.D. 32, 36 n. 3* (citing *Franklin Electronic Publishers v. Unisonic Prod. Corp. (S.D.N.Y. 1991) 763 F. Supp. 1, 4),* aff'd. (2d Cir. 1994) *23 F.3d 398.* Thus, a complaint must allege "1) which specific original works are the subject of the copyright claim, 2) that plaintiff owns the copyrights in those works. 3) that the copyrights have been registered in accordance with the statute, and 4) by what acts during what time the defendant infringed the copyright." [*3] See, e.g., *Kelly v. L.L.Cool J. 145 F.R.D. at 37* (citations omitted).

Upon review, we find that the Complaint fails to satisfy these minimum pleading requirements. Though the Complaint does allege copyright infringement by the individual defendants, there are no allegations of specific acts of infringement with respect to specific copyrights owned by plaintiffs. Similarly, the Complaint fails to allege specific acts of alleged trademark infringement. See, e.g., *MTV Networks, 867 F. Supp. at 207-08* (granting motion for a more definite statement on claim for unfair competition due to alleged trademark infringement). Furthermore, copies of those images attached to the Complaint are blurred and indistinct, thereby making it difficult to ascertain their particular

1997 U.S. Dist. LEXIS 14571, *; 44 U.S.P.Q.2D (BNA) 1799

characteristics. n1

n1 Attached to their Memorandum of Law in Opposition to Defendants Rule 12(e) Motion, Plaintiffs have submitted copies of several Certificates of Registration issued by the United States Copyright Office, as well as copies of Marilyn Monroe images of greater clarity than those attached to the Complaint. Such attachments, as well as all others plaintiffs deem relevant to their claims, should be incorporated in the more definite Complaint.

[*4]

**CONCLUSION**

Accordingly, defendants' motion for a more definite statement under Rule 12(e) is granted. n2 Plaintiffs are directed to file a more specific complaint within fifteen (15) days of the date of this order alleging all the claims in satisfaction of *Federal Rule of Civil Procedure 8(a)*.

n2 As Plaintiffs termed the initial complaint as an "Amended Complaint" for reasons not relevant to the instant motion, the more definite complaint should be labeled "Second Amended Complaint."

**SO ORDERED.**

New York, New York
September 11, 1997

WHITMAN KNAPP, SENIOR U.S.D.J.

1980 U.S. Dist. LEXIS 13490, *; Copy. L. Rep. (CCH) P25,187

3 of 3 DOCUMENTS

**RSO RECORDS, INC., MCA RECORDS, INC., WARNER BROS. RECORDS, INC., RCA CORPORATION, CBS, INC., CASABLANCA RECORDS AND FILMWORKS, INC., ELEKTRA/ASYLUM/NONESUCH RECORDS, a division of WARNER COMMUNICATIONS, INC., Plaintiffs, against JOSEPH PERI, CARL FEUERSTEIN, SAM PERI, DYNASTY GRAPHICS, INC., CREATIVE DISC, INC., Defendants.**

**No. 79 Civ. 5098-CSH**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*1980 U.S. Dist. LEXIS 13490; Copy. L. Rep. (CCH) P25,187*

**September 5, 1980**

**OPINIONBY:** [*1]

HAIGHT

**OPINION:**

MEMORANDUM OPINION AND ORDER
HAIGHT, District Judge:

Plaintiffs, owners of registered copyrights in sound recordings and album graphics, move pursuant to *F.R.Civ.P. 8, 11* and *12(b)(6)* to dismiss the counterclaim interposed by defendants. The action arises from defendants' alleged infringement of plaintiffs' exclusive rights to reproduce and distribute their copyrighted works. Defendants contend that their counterclaim, challenging the cleanliness of plaintiffs' hands and demanding compensatory and punitive damages, is adequately pleaded and defend its sufficiency. For the reasons stated, plaintiffs' motion to dismiss the counterclaim is granted.

This action was commenced on September 25, 1979 on the heels of defendant Joseph Peri's plea of guilty to wire fraud and wilful infringement of plaintiff RSO Records, Inc.'s (RSO) copyrighted sound recording "Shadow Dancing." *United States v. Peri,* 79 Cr. 237(CES). RSO and six additional co-plaintiff recording companies claim herein respective sole ownership of copyrights held pursuant to certificates of registration issued by the Registrar of Copyrights and allege full compliance with all pertinent provisions of the [*2] Copyright Act, *17 U.S.C. § 101* et seq. and other applicable law.

The complaint charges Joseph Peri, two other individual defendants and two corporate defendants with continuing infringements of plaintiffs' copyrights through unauthorized reproduction and distribution of plaintiffs' respective works to the public. Plaintiffs seek damages; permanent injunctive relief against further infringement; and seizure and forfeiture of defendants' inventory of allegedly counterfeit recordings and labels and the means used in the production of such goods. Plaintiffs' prior ex parte application for a writ of seizure of the infringing goods and defendants' machinery and equipment was granted on September 25, 1979, pursuant to *17 U.S.C. § 503*(a) and Rules 3-13 of the Supreme Court's Rules of Practice for Copyright Cases.

Defendants Joseph Peri, Carl Feuerstien, Sam Peri and Dynasty Graphics, Inc. served their answer on December 19, 1979. Defendant Creative Disc, Inc. has yet to appear or answer the complaint.

The answer denies the material allegations of the complaint and alleges several affirmative defenses. The fifth affirmative defense, also denominated a counterclaim, states in [*3] full:

"11. Upon information and belief, plaintiffs, through their employees, agents, or others acting under their direction or control, have solicited, importuned, aided, abetted, or otherwise participated with the answering defendants in the acts complained of to the extent that such acts occurred.

"12. Plaintiff [sic] are therefore barred from obtaining the relief sought by their unclean hands.

"13. The aforesaid acts of plaintiffs were committed in disregard and derogation of the rights of the defendants and have injured defendants in their business and in their reputation in the community, all to defendants' damages in the amount of $2,000,000.00.

1980 U.S. Dist. LEXIS 13490, *; Copy. L. Rep. (CCH) P25,187

"14. The aforesaid acts of plaintiffs were committed willfully, knowingly, and in malicious disregard and derogation of the laws of the United States, the common law, and the rights of the general public, and by reason thereof, punitive damages should be assessed in the amount of $2,000,000.00."

Contending that the counterclaim is interposed merely for purposes of delay and that it violates the pleading requirements of the Federal Rules of Civil Procedure, see *F.R.Civ.P. 8* and *11*, as well as failing to state a claim, [*4] plaintiffs move to dismiss the counterclaim. Plaintiffs argue that the only operative paragraph of the counterclaim alleges that plaintiffs themselves "participated" with defendants "in the acts complained of" in the complaint, i.e., in the counterfeiting of plaintiffs' own copyrighted property. Plaintiffs' Memorandum of Law at 7. In plaintiffs' view, "[this] allegation either makes no sense at all or if intended by defendants to be understood as it reads, gives no basis for a counterclaim which demands from plaintiffs damages of $4,000,000." Id. Further, plaintiffs advert to prejudice they will suffer if they are compelled to respond to the counterclaim as presently pleaded; in view of their perception that the counterclaim sets forth neither a "short and plain statement" of anything, as required by the pleading rules, to which they might make a meritorious response, nor does it independently show how defendants may be entitled to relief. Id. at 8. Rather, plaintiffs maintain, the counterclaim was laid solely for its in terrorem and dilatory effect and is "sham and false on its face. Accordingly, plaintiffs seek dismissal of the counterclaim for its failure to assert any [*5] claim upon which relief can be granted. Id.

Viewing the instant motion as an attempt by plaintiffs "to either avoid discovery of their own actions or to obtain premature discovery of defendants," defendants' Memorandum of Law at 4, defendants contend that "the counterclaim is simply stated and requires only that plaintiffs inspect their own pleadings to determine the very wrongdoing they are alleged to have participated in." Id. Defendants therefore conclude that:
"[This] motion represents an attempt by plaintiffs to preclude inquiry into an area that defendants are entitled to explore. To the extent that additional information regarding the counterclaims [sic] is possessed by defendants, plaintiffs obviously can obtain such information through discovery." Id.

The heart of an affirmative federal pleading need consist only of a "short and plain statement of the claim showing that the pleader is entitled to relief." *F.R.Civ.P. 8(a)*. With the demise of technical forms of action the objective of the federal rules is to require that the pleading discharge the function of giving the opposing party fair notice of the nature and basis or grounds of the

claim and a general indication [*6] of the type of litigation involved. C. Wright and A. Miller, 5 Federal Practice and Procedure: Civil § 1215 at 108-110 (1969) (hereinafter "Wright and Miller"). By their express incorporation of the body of the complaint, the allegations of the counterclaim adequately apprise plaintiffs of the subject matter of the claim and the grounds for relief. The "essence" of the counterclaim, according to defendants, is:
"... that plaintiffs, or others acting under their control, induced and participated with the defendants in the wrongdoing now complained of to the extent that any such wrongdoing occurred. Thus, it is claimed, upon information and belief, that plaintiffs were at least partly responsible for such wrongdoing." Defendants' Memorandum of Law at 2.
Typically then, it would remain for plaintiffs to develop the factual underpinnings of the claim by means of discovery. See Wright and Miller, supra at 110-112. In the present circumstances, however, it is wholly disingenuous for defendants to rely on their pleading by pointing plaintiffs to the avenue of discovery as a means for eliciting the further factual detail they seek by way of the instant motion.

The Court is advised [*7] without contravention that at their depositions held on March 3, 1980, both defendants Joseph Peri and Carl Feuerstein invoked a purported Fifth Amendment privilege and refused to answer questions posed by counsel for plaintiffs or to produce any documents relating to their defenses or counterclaim.

Given the view I take of the legal sufficiency of the counterclaim, I need not resolve the parties' differences over its adequacy as a matter of pleading; nor am I requested to impose sanctions for defendants' refusal to respond to plaintiffs discovery requests. For assuming the adequacy of the pleading of the counterclaim even without the further illumination which pre-trial discovery might have shed, I find the allegations of paragraphs 11 through 14 insufficient in law to constitute a claim upon which relief could be granted.

Alleged wrongdoing on the part of a plaintiff in a copyright action may bar relief where the plaintiff's misconduct "affects the equitable relations between the parties in respect of something brought before the court for adjudication," and the defendant can show that as a result he has been injured in his personal capacity. *Mitchell Bros. Film Group v.* [*8] *Cinema Adult Theater, 604 F.2d 852, 863 (5th Cir. 1979),* quoting *Keystone Driller Co. v. General Excavation, 290 U.S. 240 (1933).* Thus, while the allegation of paragraphs 11 through 14 of the answer adequately raise the doctrine of unclean hands as a defense to the relief sought by plaintiffs, see *Mitchell Bros., supra, 604 F.2d at 865 n.26,* viewed as an affirmative claim and even assuming

1980 U.S. Dist. LEXIS 13490, *; Copy. L. Rep. (CCH) P25,187

the truth of these allegations in the context of plaintiffs' motion to dismiss pursuant to *F.R.Civ.P. 12(b)(6)*, the counterclaim sets forth no substantive right to recovery.

As noted, the complaint charges defendants with injuring plaintiffs' copyrights by reproducing and distributing counterfeit renditions of plaintiffs' protected works. Since it is well established that a copyright owner cannot infringe his own copyright, see, e.g., *Richmond v. Weiner, 353 F.2d 41 (9th Cir. 1965)*, cert. denied, *384 U.S. 928 (1966); Donna v. Dodd, Mead & Co., Inc., 374 F.Supp. 429, 430 (S.D.N.Y. 1974)*, allegations of plaintiffs' "inducement" or "participation" in the infringements charged in the complaint states no valid claim upon which relief can be granted.

Since defendants offer no alternative theory [*9]

under which plaintiffs' participation in defendants' alleged acts of infringement would be actionable, it follows from the foregoing that plaintiffs' motion pursuant to *F.R.Civ.P. 12(b)(6)* to dismiss the counterclaim must be granted. Accordingly, to the extent that paragraphs 11 through 14 purport to allege an affirmative counterclaim against plaintiffs, the allegations and accompanying ad damnum clause are stricken; the answer will be deemed to allege at paragraphs 11 through 14 only the affirmative defense of unclean hands.

It is So Ordered.

2002 U.S. Dist. LEXIS 16165, *; Copy. L. Rep. (CCH) P28,483

LEXSEE 2002 U.S. DIST. LEXIS 16165

**ARISTA RECORDS, INC., ET AL., Plaintiffs, -against- MP3BOARD, INC., Defendant.**

**00 Civ. 4660 (SHS)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2002 U.S. Dist. LEXIS 16165; Copy. L. Rep. (CCH) P28,483*

**August 28, 2002, Decided**
**August 29, 2002, Filed**

**SUBSEQUENT HISTORY:** Judgment entered by, in part *Arista Records, Inc. v. MP3Board, Inc., 2003 U.S. Dist. LEXIS 11392* (S.D.N.Y., July 2, 2003).

**DISPOSITION:** [*1] Plaintiff's motion for summary judgment denied. Defendant's motion for summary judgment denied. Third party defendant's motion for summary judgment granted.

**COUNSEL:** For ARISTA RECORDS, INC., ATLANTIC RECORDING CORPORATION, BMG MUSIC, CAPITOL RECORDS, INC., ELEKTRA ENTERTAINMENT GROUP INC., HOLLYWOOD RECORDS, INC., INTERSCOPE RECORDS, LAFACE RECORDS, MOTOWN RECORD COMPANY, L.P., SONY MUSIC ENTERTAINMENT INC., UMG RECORDINGS, INC., VIRGIN RECORDS AMERICA, INC., WARNER BROS. RECORDS INC., plaintiffs: Richard S. Mandel, J. Christopher Jensen, Jonathan Z. King, Cowan, Liebowitz & Latman, P.C., Katherine B. Forrest, Cravath, Swaine & Moore, New York, NY.

For ARISTA RECORDS, INC., ATLANTIC RECORDING CORPORATION, BMG MUSIC, CAPITOL RECORDS, INC., ELEKTRA ENTERTAINMENT GROUP INC., HOLLYWOOD RECORDS, INC., INTERSCOPE RECORDS, LAFACE RECORDS, MOTOWN RECORD COMPANY, L.P., SONY MUSIC ENTERTAINMENT INC., UMG RECORDINGS, INC., VIRGIN RECORDS AMERICA, INC., WARNER BROS. RECORDS INC., plaintiffs: Steven B. Fabrizio, Recording Industry Association of America, Inc., Michael J. Huppe, Recording Industry Association of America, Washington, DC.

For MP3BOARD, INC., defendant: Kevin Anthony Fox, Newman Tannenbaum [*2] et al., NY, NY.

For MP3BOARD, INC., defendant: Ira Rothken, Rothken Law Firm, San Rafael, Ca.

For RECORDING INDUSTRY ASSOCIATION OF AMERICA INC., counter-defendant: Steven M. Hayes, Parcher, Hayes & Snyder, New York, NY.

For ARISTA RECORDS, INC., ATLANTIC RECORDING CORPORATION, BMG MUSIC, CAPITOL RECORDS, INC., ELEKTRA ENTERTAINMENT GROUP INC., HOLLYWOOD RECORDS, INC., INTERSCOPE RECORDS, LAFACE RECORDS, MOTOWN RECORD COMPANY, L.P., SONY MUSIC ENTERTAINMENT INC., UMG RECORDINGS, INC., VIRGIN RECORDS AMERICA, INC., WARNER BROS. RECORDS INC., counter-defendants: Richard S. Mandel, J. Christopher Jensen, Jonathan Z. King, Cowan, Liebowitz & Latman, P.C., Katherine B. Forrest, Cravath, Swaine & Moore, New York, NY.

For ARISTA RECORDS, INC., ATLANTIC RECORDING CORPORATION, BMG MUSIC, CAPITOL RECORDS, INC., ELEKTRA ENTERTAINMENT GROUP INC., HOLLYWOOD RECORDS, INC., INTERSCOPE RECORDS, LAFACE RECORDS, MOTOWN RECORD COMPANY, L.P., SONY MUSIC ENTERTAINMENT INC., UMG RECORDINGS, INC., VIRGIN RECORDS AMERICA, INC., WARNER BROS. RECORDS INC., counter-defendants: Steven B. Fabrizio, Recording Industry Association, Michael J. Huppe, Recording Industry Association of America, [*3] Washington, DC.

For MP3BOARD, INC., counter-claimant: Kevin Anthony Fox, Newman Tannenbaum et al., NY, NY.

For MP3BOARD, INC., third-party plaintiff: Kevin Anthony Fox, Newman Tannenbaum et al., NY, NY.

**JUDGES:** SIDNEY H. STEIN, U.S. District Judge.

**OPINIONBY:** SIDNEY H. STEIN

**OPINION:**

OPINION & ORDER

SIDNEY H. STEIN, U.S. District Judge.

Plaintiffs, several leading record companies, have sued MP3Board, Inc. for contributory and vicarious copyright infringement, *17 U.S.C. § § 101* et seq., and state law unfair competition. The record companies allege that MP3Board operates an Internet site which provides users with links to pirated copies of the record companies' copyrighted musical recordings, thereby facilitating the users' infringement of the record companies' copyrights. MP3Board has instituted a third-party claim against the Recording Industry Association of America ("RIAA"), a trade association of record companies, for tortious interference and knowing material misrepresentation of infringement in violation of the Digital Millennium Copyright Act ("DMCA"), stemming from the RIAA's sending copyright infringement notices to MP3Board's Internet Service [*4] Providers ("ISPs").

The record companies have moved for summary judgment pursuant to *Federal Rule of Civil Procedure 56*, seeking an order finding MP3Board liable for contributory and vicarious copyright infringement and unfair competition. MP3Board has moved for summary judgment on the grounds that its activities are protected by the First Amendment to the United States Constitution, and has alternatively moved for partial summary judgment on each of the counts of the complaint for a variety of reasons and on the grounds that the record companies have failed to show damages. The RIAA has also moved for summary judgment with respect to MP3Board's third party claims against it.

The record companies' motion for summary judgment is denied because material issues of fact exist regarding whether any direct infringement occurred with the aid of the MP3Board site. MP3Board's motion for summary judgment is denied because its activities are not protected by the First Amendment and because material issues of fact exist regarding whether MP3Board has engaged in contributory or vicarious copyright infringement. The RIAA's motion for summary judgment is granted because its actions were justified [*5] and it did not materially misrepresent that links to infringing material were posted on the MP3Board site.

**OVERVIEW**

Several major record companies have brought suit against MP3Board for operating a Web site, located at http://www.mp3board.com, which provides Internet users with resources enabling them to locate sound recording files from publicly available Web sites. Such audio files can be created by using computer software to digitally copy an audio recording directly onto a computer's hard drive, compressing the digital information via a technology such as MP3 in order to allow for more efficient storage and transmission of the file over the Internet. The record companies have alleged that many of the audio files which can be located with the assistance of MP3Board's Web site are pirated copies of the record companies' copyrighted works.

During the relevant time period, no music files were located on the MP3Board Web site; rather, the Web site featured an automated search engine that searched for, aggregated and organized links to media files on the Web, and provided a tutorial offering users instruction in how to locate and download such files. (MP3Board's Objections [*6] to Pls.' Resp. Ex. A; Eli Mapstead Dep. at 118, 227, 304, 308; Mathewson Dep. at 79-80; Pls.' Exs. 24, 25, 35, 36; Am. Answer P 41.) MP3Board additionally solicited users to post links on the MP3Board site to other sites containing audio files and provided a link to a third party named Freedrive where users could store audio files online. (MP3Board's Objections to Pls.' Resp. Ex. A; Pls.' Exs. 8, 9, 10; Am. Answer P 39.) The MP3Board site also featured a message board which allowed users to post questions or song requests to be replied to by other users or MP3Board staff. (MP3Board's Objections to Pls.' Resp. Ex. A.) In response to users' posted requests, MP3Board personnel personally searched for links to songs and posted the links on the message board, solicited other users to provide the requested works, and obtained and posted passwords to enable users to access certain music files. (Eli Mapstead Dep. at 199-200, 202-03, 205-06, 342; Mathewson Dep. at 52; MP3Board's Objections to Pls.' Resp. Exs. A, B; Am. Answer P 41; Pls.' Ex. 22.)

On October 27, 1999, the RIAA, acting on behalf of its member record companies, served a subpoena and notice letter to AboveNet Communications, Inc. [*7] , the ISP that connected MP3Board's Web site to the Internet. The letter identified artists whose work was being allegedly infringed and requested that AboveNet remove or disable access to the MP3Board site or MP3Board's links to infringing works. (Creighton Decl. P 7 and Ex. A; McDevitt Decl. P 4; McDevitt Dep. at 8-10.) AboveNet did not substantially interrupt MP3Board's service as a result of this letter, and MP3Board suffered no injury. (Eli Mapstead RIAA Dep. at 26, 27; see also Lars Mapstead RIAA Dep. at 385-86.) MP3Board did not dismantle access to any links to the identified artists' works. (Noah Mapstead Dep. at 175-77, 194-98.)

On April 18, 2000, the RIAA sent a notice to Metromedia Fiber Network, Inc., AboveNet's corporate

Case 1:05-cv-07340-RJS    Document 13-8    Filed 02/06/2006    Page 3 of 13

Page 3

2002 U.S. Dist. LEXIS 16165, *; Copy. L. Rep. (CCH) P28,483

successor. (Creighton Decl. P 8.) Like the October 1999 notice, the April 2000 notice also named representative artists whose works were allegedly being infringed and requested that Metromedia remove MP3Board site or the infringing links from its system. (Creighton Decl. Ex. B.) Moreover, the letter warned Metromedia that failure to comply could subject it to liability pursuant to the DMCA. (Creighton Decl. Ex. B.) In response, Metromedia disabled [*8] Internet access to the MP3Board Web site beginning on April 19, 2000. (Eli Mapstead RIAA Dep. at 37-38, 40.) MP3Board requested that Metromedia restore its service, and Metromedia replied that it would only restore MP3Board's service if MP3Board supplied a counter notification in accordance with the DMCA. On April 21, 2000, MP3Board supplied a counter notification to Metromedia asserting that it had removed the infringing material identified in the RIAA's notice. (Lars Mapstead RIAA Dep. at 498; Knowles Decl. Ex. K.) Metromedia restored MP3Board's Internet connectivity on May 5, 2000. (Eli Mapstead RIAA Dep. at 197.)

On May 25, 2000, the RIAA wrote directly to MP3Board and demanded that MP3Board remove all infringing links from its site by June 2, 2000, naming twenty-one artists and twenty-two song titles which were representative of the titles being infringed, and also attaching printouts of screen shots of MP3Board's Web site on which the RIAA identified 662 links which the RIAA believed to lead to material infringing upon the record companies' copyrights. (Pls.' Ex. 36, Ex. C.) MP3Board failed to dismantle access to any of the identified links in response to this letter. (Noah [*9] Mapstead Dep. at 175-77, 194-98.) On June 23, 2000, the record companies filed suit against MP3Board in the Southern District of New York.

**DISCUSSION**

Summary judgment may be granted "only when the moving party demonstrates that 'there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Allen v. Coughlin, 64 F.3d 77, 79 (2d Cir. 1995)* (quoting *Fed. R. Civ. P. 56(c)*); see also *Celotex Corp. v. Catrett, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986).* The Court must "view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor, and may grant summary judgment only when 'no reasonable trier of fact could find in favor of the nonmoving party.'" *Allen, 64 F.3d at 79* (citation omitted) (quoting *Lund's, Inc. v. Chemical Bank, 870 F.2d 840, 844 (2d Cir. 1989)).*

Once the moving party meets its initial burden of demonstrating the absence of a genuine issue of material fact, the nonmoving party must come forward with specific facts to show there is a factual question that must

be resolved [*10] at trial. *Fed. R. Civ. P. 56(e)*; see also *Legal Aid Soc'y v. City of New York, 114 F. Supp. 2d 204 (S.D.N.Y. 2000).* A nonmoving party must produce evidence in the record and "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible." *Ying Jing Gan v. City of New York, 996 F.2d 522, 532 (2d Cir. 1993).* In short, a nonmoving party must "do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986).*

**I. The Record Companies' Motion for Summary Judgment is Denied Because Issues of Material Fact Exist Regarding Whether the Record Companies' Copyrights Were Infringed by MP3Board's Users.**

In order to establish liability for contributory or vicarious copyright infringement, a plaintiff must first prove that direct infringement of its works occurred by showing that it owned a valid copyright and unauthorized infringement of its protected material occurred. See *Sony Corp. of Amer. v. Universal City Studios, 464 U.S. 417, 434, 78 L. Ed. 2d 574, 104 S. Ct. 774 (1984);* [*11] *Feist Publ'ns v. Rural Tel. Serv. Co., 499 U.S. 340, 361, 113 L. Ed. 2d 358, 111 S. Ct. 1282 (1991); Rogers v. Koons, 960 F.2d 301, 306 (2d Cir. 1992).* The record companies' ownership of the sound recordings at issue has not been disputed. (Plts.' Rule 56.1 Stmt. PP 23-24.) The RIAA has also confirmed that the 58 files listed in the complaint as available through MP3Board's Web site constituted unauthorized copies of the copyrighted recordings. (Creighton Reply Decl. P 8.)

However, the record companies have failed to prove that any direct infringement resulted from MP3Board's operations. Pursuant to *17 U.S.C. § 501*(a), infringement occurs when one of the exclusive rights granted to copyright holders by *17 U.S.C. § 106* is violated. See *A & M Records, Inc. v. Napster, Inc., 239 F.3d 1004, 1014 (9th Cir. 2001).* While the structure of MP3Board's site and the scale of the operation certainly give rise to a strong statistical inference that MP3Board users downloaded files containing copyrighted music in violation of the record companies' reproduction rights under Section 106(1), the record companies have failed to eliminate all [*12] genuine issues of material fact.

MP3Board freely acknowledges the possibility that infringement is conducted with the aid of its site. MP3Board has stated that it "is generally aware that some of the music files ... may contain infringing material," and it admits that it "allows" and "generally encourages" site visitors to download music files, thus promoting the "highly effective facilitation of access to popular music." (Am. Answer PP 2, 3, 40, 52.) "MP3Board acknowledges that users may use its systems

Case 1:05-cv-07340-RJS     Document 13-8     Filed 02/06/2006     Page 4 of 13

Page 4

2002 U.S. Dist. LEXIS 16165, *; Copy. L. Rep. (CCH) P28,483

for purposes of infringement." (MP3Board's Statement of Material Facts in Opp'n to Pls.' Mot. for Summ. J. P 56 (emphasis in original).) MP3Board's principals also testified that they were aware that some of MP3Board's links connected to copyrighted works, and they assumed that those unauthorized copies were downloaded by users of the service through those links. (Eli Mapstead Dep. at 313, 316; Lars Mapstead Dep. at 249.). One principal admitted that it was "particularly likely" that MP3Board's users have used links on MP3Board's Web site to download full-length copies of major record labels' songs. (Noah Mapstead Dep. at 107.) There is also evidence that MP3Board personally assisted [*13] users in obtaining particular songs that the users requested, see Section II(A)(1) infra, and a finder of fact could certainly infer that it is likely that those users subsequently downloaded the songs they had requested. However, the record companies have not eliminated all issues of material fact by setting forth any direct evidence of infringement, such as user logs or other technical data showing the downloading of copyrighted and unauthorized files. At the summary judgment stage, the record companies cannot rely solely upon circumstantial evidence and admissions by MP3Board officers that it is statistically "likely" that direct infringement occurred.

Additionally, while the record companies and the RIAA have conclusively established that links to unauthorized infringing files were posted on the MP3Board Web site by describing how the RIAA investigators followed the links on the MP3Board Web site and determined that they lead to audio files that infringed upon plaintiffs' copyrights, (Creighton Decl. P 10; McDevitt Decl. P 5), to show the unlawful "distribution" of a copyrighted work pursuant to *17 U.S.C. § 106*(3) the record companies must show that [*14] an unlawful copy was disseminated "to the public." *Hotaling v. Church of Jesus Christ of Latter-Day Saints, 118 F.3d 199, 203 (4th Cir. 1997)* (internal quotations omitted). "Infringement of the distribution right requires an actual dissemination of ... copies." *National Car Rental Sys. v. Computer Assocs. Int'l, Inc., 991 F.2d 426, 434 (8th Cir. 1993)* (citing 2 *Nimmer on Copyright § 8.11*[A], at 8-124.1); see also *Napster, 239 F.3d at 1014*. While a copyright holder may not be required to prove particular instances of use by the public when the proof is impossible to produce because the infringer has not kept records of public use, see *Hotaling, 118 F.3d at 204*, in the present case there has been no showing that the record companies did not have access to such data. Accordingly, the record companies' motion for summary judgment regarding contributory and vicarious copyright infringement and unfair competition is denied.

**II. MP3Board's Motion for Summary Judgment is Denied Because Issues of Material Fact Exist**

**Regarding Whether MP3Board is Liable for Contributory Copyright Infringement, Vicarious Infringement,** [*15] **and Unfair Competition.**

**A. Issues of Material Fact Exist Regarding Whether MP3Board is Liable for Contributory Copyright Infringement.**

"A party 'who, with knowledge of ... infringing activity ... materially contributes to the infringing conduct of another, may be held liable as a 'contributory' infringer.'" *Matthew Bender & Co., Inc. v. West Publ'g Co., 158 F.3d 693, 706 (2d Cir. 1998)* (quoting *Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc., 443 F.2d 1159, 1162 (2d Cir. 1971));* see also *Ex-Tixz, Inc. v. Hit Tix, Inc., 919 F. Supp. 728, 732 (S.D.N.Y. 1996).* In order to carry its burden, MP3Board must demonstrate the absence of material facts regarding (1) the noninfringing conduct of MP3Board's users, (2) MP3Board's lack of material contribution to that infringement, or (3) MP3Board's lack of knowledge of the infringing activity. MP3Board has failed to demonstrate the absence of material facts with respect to any of the elements. As an initial matter, for the reasons set forth in Section I, supra, material facts exist regarding the first element of direct infringement; while the record companies did not eliminate all [*16] issues of material fact, they showed statements by MP3Board's officers and circumstantial evidence regarding MP3Board's Web site which suffice to defeat summary judgment against them on the issue of direct infringement.

**1. Issues of Material Fact Exist Regarding Whether MP3Board Materially Contributed to Any Infringement.**

MP3Board cannot obtain summary judgment on the contributory infringement claim on the grounds that no material issues of fact exist regarding MP3Board's material contribution to any infringement. Liability for contributory infringement exists if the defendant engages in "personal conduct that encourages or assists the infringement." *Matthew Bender, 158 F.3d at 706.* Merely supplying the "'means' to accomplish an infringing activity" cannot give rise to the imposition of liability for contributory copyright infringement. *Sony, 464 U.S. at 436;* see also *Napster, 239 F.3d at 1020-21.* "Participation in the infringement must be substantial. The ... assistance must bear a direct relationship to the infringing acts, and the contributory infringer must have acted in concert with the direct infringer." *Zvi Livnat v. Shai Bar Lavi, 1998 U.S. Dist. LEXIS 917, No. 96 Civ. 4967, 1998 WL 43221, at *3 (S.D.N.Y. Feb. 2, 1998)* [*17] (internal quotation marks and citations omitted). MP3Board argues that the record companies have not shown that MP3Board substantially participated in any infringement. MP3Board styles itself a "passive" tool, contending that "any participation by MP3Board in its users' infringement is tangential to their direct

Case 1:05-cv-07340-RJS    Document 13-8    Filed 02/06/2006    Page 5 of 13

Page 5

2002 U.S. Dist. LEXIS 16165, *; Copy. L. Rep. (CCH) P28,483

downloading from a third-party website." (MP3Board Mem. in Opp'n at 14, 15.)

However, there is sufficient evidence from which a factfinder could determine that MP3Board engaged in an overall course of conduct which materially contributed to copyright infringement. The MP3Board site featured a search engine: an automated system devoted to searching for, aggregating and organizing links. (MP3Board's Objections to Pls.' Resp. Ex. A.) The site also solicited third parties to post links to sites containing audio files. (MP3Board's Objections to Pls.' Resp. Ex. A; Pls.' Exs. 8, 9, 10; Am. Answer P 39.) MP3Board provided a link to a third party named Freedrive where users could store audio files online. (MP3Board's Objections to Pls.' Resp. Ex. A.) MP3Board offered new users "getting started" information and a tutorial containing instructions on how [*18] to locate and download audio files via MP3Board -- actually using one of the record companies' copyrighted recordings as an example. (Eli Mapstead Dep. at 118, 227, 304, 308; Mathewson Dep. at 79-80; Pls.' Exs. 24, 25, 35, 36; Am. Answer P 41.)

The site also contained a message board which allowed users to post questions to be answered by other users or MP3Board staff. (MP3Board's Objections to Pls.' Resp. Ex. A.) Significantly, when individual users posted messages on the message board requesting particular songs which they could not find links to on the MP3Board site, MP3Board personnel personally searched for links to the requested song files and posted the links on the message board. (Eli Mapstead Dep. at 202-03, 205-06; Mathewson Dep. at 52; MP3Board's Objections to Pls.' Resp. Ex. B; Am. Answer P 41.) When one MP3Board employee could not find any links to one particular work, he solicited users to provide the work. (Pls.' Ex. 22.) MP3Board also obtained and posted passwords to enable users to access certain music files. (Eli Mapstead Dep. at 199-200, 342.)

Thus, based upon all the foregoing facts, genuine issues of material fact exist regarding whether MP3Board materially contributed [*19] to infringement. Not only could a jury find that MP3Board provided the facilities to promote infringing activity, see, e.g., *Fonovisa, Inc. v. Cherry Auction, Inc., 76 F.3d 259, 261, 264 (9th Cir. 1996); Sega Enters. v. Maphia, 857 F. Supp. 679, 687 (N.D. Cal. 1994); Sega Enters. v. Sabella, 1996 U.S. Dist. LEXIS 20470, No. 93 Civ. 4260, 1996 WL 780560,* at *8 (N.D. Cal. Dec. 18, 1996), but also that it directly assisted users in locating and downloading infringing files, see *Intellectual Reserve, Inc. v. Utah Lighthouse Ministry, Inc., 75 F. Supp. 2d 1290, 1294-95 (D. Utah 1999).* Viewed in totality, the record companies have introduced evidence that raises a material issue of fact regarding whether MP3Board's active role in facilitating its users' copying constituted substantial material participation in infringement.

## 2. Issues of Material Fact Exist Regarding Whether MP3Board Knew that Infringing Activity Was Taking Place.

A defendant must possess either actual or constructive knowledge of the infringing activity to be found contributorily liable. See *Zvi Livnat, 1998 U.S. Dist. LEXIS 917, 1998 WL 43221,* at *3; see also *Napster, 239 F.3d at 1020* [*20] (requiring that the secondary infringer "know or have reason to know" of direct infringement). Issues of fact exist regarding MP3Board's constructive knowledge as well as whether MP3Board obtained actual knowledge of infringement occurring via its site.

### a. Issues of Material Fact Exist Concerning Whether MP3Board Possessed Constructive Knowledge of Infringing Activity.

As an initial matter, it is axiomatic that without any knowledge of infringing activity, a defendant cannot be found strictly liable for contributory infringement simply for providing a technology that may allow others to exchange copyrighted material. A court may not impute constructive knowledge of infringement to a defendant "merely because ... [a] technology may be used to infringe plaintiffs' copyrights," where the system is "capable of commercially significant noninfringing uses." *Napster, 239 F.3d at 1020-21* (citing *Sony, 464 U.S. at 436, 442-43).* In Sony, the U.S. Supreme Court refused to permit liability to be imposed upon Sony for providing customers with equipment (the Betamax video cassette recorder) with "constructive knowledge ... that their customers may [*21] use that equipment to make unauthorized copies of copyrighted material." *Sony, 464 U.S. at 439.* Rather, a plaintiff must actually show the defendant knew that infringing activity was taking place instead of simply relying on the technology's potential. At this stage of the litigation, material facts exist regarding whether the Court can impute constructive knowledge to MP3Board based upon its technology's capabilities; the parties have not set forth sufficient facts for the Court to determine whether MP3Board's activities are covered by the Sony doctrine and whether MP3Board's Web site is "capable of commercially significant noninfringing uses."

However, the record companies have introduced direct evidence that MP3Board should have known of any infringement. There is evidence from which a jury could find that MP3Board possessed constructive knowledge of infringement, despite the fact that this case does not share the same strong indicia of constructive knowledge as in the cases cited by the record companies. See *Fonovisa, 76 F.3d at 261; A & M Records, Inc. v. Napster, Inc., 114 F. Supp. 2d 896, 919; Playboy Enters., Inc. v. Russ Hardenburgh, Inc., 982 F. Supp. 503, 513, 514 (N.D. Ohio 1997)* [*22] (the defendant had an active

2002 U.S. Dist. LEXIS 16165, *; Copy. L. Rep. (CCH) P28,483

screening procedure by which the defendant's employees personally viewed all files posted on the bulletin board service); *Maphia, 857 F. Supp. at 683* ("the uploading and downloading of unauthorized copies of Sega's copyrighted video games is particularly known to defendant"); *Sabella, 1996 U.S. Dist. LEXIS 20470, 1996 WL 780560,* at *8 (the defendant, the operator of the bulletin board service, read the user log containing files labeled as Sega Genesis games several times a day, advertised copiers which played unauthorized copies of Sega games, gave downloading privileges to customers that bought copiers, and offered a gift award that would enable users to 'get started right away with [their] collection of games'"). Nor does the operating of an audio file search engine have "no other imaginable [noninfringing] use," thus inevitably suggesting infringement to a rational person. *RSO Records, Inc. v. Peri, 596 F. Supp. 849 (S.D.N.Y. 1984)* (where the defendant was engaged in photographing the packaging of copyrighted records and tapes).

The record companies contend that evidence of MP3Board's knowledge can be found in the fact that [*23] MP3Board created 16 genre categories on its site, such as "Pop" and "Classical," in which link contributors could display their posted links, and one of these categories was entitled "Legal MP3s." (Eli Mapstead Dep. at 153.) The record companies urge that the category heading "Legal MP3s" constitutes evidence that MP3Board recognized that the other categories contained MP3s which were not legal. MP3Board responds that the genre heading "Legal MP3s" does not constitute an admission as to the contents of the other genres, particularly because Epitonic, a third-party MP3 supplier, specifically requested the title "Legal MP3" to describe the category, which contained exclusively Epitonic content. (Eli Mapstead Dep. at 105; Lars Mapstead Dep. at 128.) The record companies also argue that a substantial number of the posted links themselves promoted their illegal nature, as the posters of the links gave themselves such names as "SUPERiLLEGAL MP3z," "FREE ILLEGAL MP3 FILES DIRECT DOWNLOAD," "FREE FAST ILLEGAL MP3 DIRECT DOWNLOAD," "The BIGGEST Archive of ILLEGAL MP3 FLZ," "100% ILLEGAL FAST DOWNLOADS," "a HUGE Archive of Illegal MP3 Files!!" and "any song you want." (Pls.' Ex. 23.) MP3Board [*24] contends in response that there is no evidence that it monitored the posting of links, and it has stated that it does not investigate the links, and perceived the names of the posters to be the site-owners' efforts to boost traffic on their sites by means of attention-getting methods. (Lars Mapstead Decl. P 11; Lars Mapstead Dep. at 129.)

Nonetheless, the above-stated facts, combined with the fact that MP3Board's principals acknowledged a statistical possibility that some of the links found on MP3Board's Web site went to copyrighted works and

that users had downloaded unauthorized copies of copyrighted sound recordings through the links, (Lars Mapstead Dep. at 249, 451; Eli Mapstead Dep. at 313, 355; Noah Mapstead Dep. at 107), give rise to triable issues of fact regarding whether MP3Board possessed constructive knowledge of the infringing nature of links.

**b. Issues of Material Fact Exist Regarding Whether MP3Board Acquired Actual Knowledge of Infringement.**

There is also much stronger evidence that MP3Board acquired actual knowledge of infringement from a notice that the RIAA sent to MP3Board pursuant to the DMCA. In order for a notice to be considered effective pursuant to [*25] the DMCA, it must provide "identification of the reference or link, to material or activity claimed to be infringing ... and information reasonably sufficient to permit the service provider to locate that reference or link." *17 U.S.C. § 512*(d)(3). The RIAA sent notification letters on October 27, 1999 and April 18, 2000 to MP3Board's ISPs, who forwarded copies of the letters to MP3Board, and also sent a notification letter on May 25, 2000 directly to MP3Board. While the letters dated October 27, 1999 and April 18, 2000 fell short of the DMCA's standard in providing MP3Board with knowledge of infringement, the letter dated May 25, 2000 did provide MP3Board with sufficient knowledge.

The letter from the RIAA to AboveNet dated October 27, 1999 failed to put MP3Board on notice of any infringement. It stated that the MP3Board site:

> offers over one thousand direct links to sound files on other Internet sites for download. Many of these files contain recordings owned by our member companies, including songs by such artists as Sugar Ray, Ricky Martin, Radiohead, TLC, Red Hot Chili Peppers, Madonna, Shania Twain, Lou Bega, the Fugees and Ace of Base. We [*26] have a good belief that the above-described activity is not authorized by the copyright owner, its agent, or the law.

(Pls.' Ex. 34.) By solely listing artists' names, and neglecting to specify any infringing links or even particular songs, the letter did not include "identification of the reference or link, to material or activity claimed to be infringing ... and information reasonably sufficient to permit the service provider to locate that reference or link." *17 U.S.C. § 512*(d)(3).

The record companies' citation to the Fourth Circuit's decision in *ALS Scan, Inc. v. Remarq*

*Communities, Inc.,* 239 F.3d 619, 622 (4th Cir. 2001), cannot save this letter. ALS Scan set forth that "when a letter provides notice equivalent to a list of representative works that can be easily identified by the service provider, the notice substantially complies with the notification requirements." *239 F.3d at 622.* The plaintiff in ALS Scan alerted the defendant to infringement in sufficient detail when it

> (1) identified two sites created for the sole purpose of publishing ALS Scan's copyrighted works, (2) asserted that virtually [*27] all the images at the two sites were [ALS Scan's] copyrighted material, ... (3) referred RemarQ to two web addresses where RemarQ could find pictures of ALS Scan's models and obtain ALS Scan's copyright information ... [and (4)] noted that material at the site could be identified as ALS Scan's material because the material included ALS Scan's 'name and/ or copyright symbol next to it.'

Id.

However, by merely listed ten artists in the October 27 letter, the RIAA fell short of "substantially complying with the notification requirement." Id. The citation to a handful of performers does not constitute a representative list of infringing material, and certainly did not provide information reasonably sufficient to enable MP3Board to locate the particular infringing works. Therefore, MP3Board's failure to delete links to sites containing music files of the enumerated artists in response to the October 1999 letter, (Lars Mapstead Dep. at 399), cannot give rise to any liability. *C.f. Religious Tech. Ctr. v. Netcom On-Line Communication Servs., Inc.,* 907 F. Supp. 1361, 1374 (N.D. Cal. 1995) (where a bulletin board service operator cannot reasonably verify [*28] a claim of infringement due to the copyright holder's failure to provide the necessary documentation to show that there is likely infringement, the operator's lack of knowledge is reasonable and there is no liability for contributory infringement for allowing the continued distribution of the works).

The email from the RIAA to Metromedia dated April 18, 2000, and subsequently forwarded to MP3Board, similarly stated that the MP3Board site:

> is offering direct links to files on other Internet sites containing full-length sound recordings for other users to download, including songs by such artists as Third

Eye Blind, Rage Against the Machine, No Doubt, Rammstein and the Bloodhound Gang. We have a good faith belief that the above-described activity is not authorized by the copyright owner, its agent, or the law.

(Pls.' Ex. 35.) This email, nearly identical in form to the October 27, 1999 letter, similarly failed to put MP3Board on notice of any infringement because it listed solely artists' names, and neglected to specify any links or even particular songs.

However, in contrast with the earlier letters, the letter from the RIAA to MP3Board dated May 25, 2000 substantially [*29] complied with the DMCA notification requirements. The letter not only named particular artists along with specified songs, but was accompanied by printouts of screen shots of MP3Board's Web site, on which the RIAA highlighted and placed an asterisk next to 662 links which the RIAA believed to infringe upon the record companies' copyrights. (Pls.'s Ex. 36, Ex. C.) Despite the fact that the RIAA did not provide MP3Board with the specific Universal Resource Locators ("URLs") of the pages to which the links connected, the RIAA provided MP3Board with the pages on MP3Board's own site where the links appeared. (Pls.'s Ex. 36, Ex. C.) Overall, the letter and its attachments identified the material or activity claimed to be infringing and provided information reasonably sufficient to permit MP3Board to locate the links and thus complied with the DMCA. See *17 U.S.C. § 512*(d)(3); ALS Scan; *239 F.3d at 622;* see also *Napster,* 239 F.3d at 1021-22 & n.6; *Fonovisa,* 76 F.3d at 261, 264; *Olan Mills, Inc. v. Linn Photo Co.,* 23 F.3d 1345, 1348 (8th Cir. 1994); *Napster,* 114 F. Supp. 2d at 918. [*30]

MP3Board failed to dismantle access to any of the identified links in response to these letters. (Noah Mapstead Dep. at 175-77, 194-98.) MP3Board's argument, that it was not required to disable access to or even investigate the links because the RIAA did not submit the links in electronic form or accompanied with the URLs of the pages to which the links connected, are baseless and not grounded in the text of the DMCA or any judicial interpretation of that statute. Despite the fact that the RIAA did not provide MP3Board with specific URLs, it provided MP3Board with the pages on MP3Board's own site where the links appeared, thus identifying the links to material or activity claimed to be infringing and information reasonably sufficient to permit MP3Board to locate the links. Therefore, because issues of material fact exist regarding whether MP3Board materially contributed to infringing activity and had acquired knowledge of the infringement, summary judgment in favor of MP3Board with respect to the claim of contributory copyright infringement is denied.

**B. Issues of Material Fact Exist Regarding Whether MP3Board is Liable for Vicarious Infringement.**

A company may be found vicariously [*31] liable for copyright infringement if it has the right and ability to supervise infringing activity and also has a direct financial interest in that activity. See *Gershwin Publ'g, 443 F.2d at 1162*. Vicarious liability, "commonly imposed upon publishers, printers, and vendors of copyrighted materials," is appropriate where a company is "in a position to police the conduct of the 'primary' infringer." *Shapiro, Bernstein & Co. v. H. L. Green Co., 316 F.2d 304, 308 (2d Cir. 1963)* (citations omitted).

As an initial matter, although the record companies correctly state that, in general, vicarious infringement is a tort of strict liability and hence the vicarious infringer need not possess knowledge of the infringement, the record companies do not address the additional limitations upon copyright infringement liability relating to online material provided by the DCMA -- albeit an affirmative defense only vaguely raised in MP3Board's answer. Nonetheless, the DMCA provides that a service provider:

> shall not be liable ... for infringement of copyright by reason of the provider referring or linking users to an online location containing infringing material [*32] or infringing activity, by using information location tools, including a directory, index, reference, pointer, or hypertext link, if the service provider does not have actual knowledge that the material or activity is infringing [or] in the absence of such actual knowledge, is not aware of facts or circumstances from which infringing activity is apparent.

*17 U.S.C. § 512*(d)(1). There are material issues of fact as to whether MP3Board qualifies as a "service provider" entitled to the "safe harbor" protections of section 512(d). MP3Board contends that it is a "traditional search engine," (Def.'s Statement of Material Facts P 20), while plaintiffs contend that MP3Board provides a host of services not provided by traditional search engines, (Pls.' Resp. to Def.'s Statement of Material Facts P20). Even if MP3Board meets the definition of a "service provider" it must still surmount the other hurdles of section 512 -- a proposition of doubtful certainty -- to qualify for the liability limitations the statute affords. Notably, the statute limits liability rather than providing a complete exemption. See *17 U.S.C. § 512*(d); see also [*33] *Perfect 10, Inc. v. Cybernet Ventures, Inc., No. CV 01-2595, 213 F. Supp. 2d 1146, 2002 U.S. Dist. LEXIS 7333,* at *77 (C.D. Cal. Apr. 22, 2002); 3 *Nimmer on Copyright § 12B.01*[C][2], at 12B-18. Moreover, because there are material issues of fact regarding MP3Board's knowledge of the infringing activity -- another factor weighed in the availability of the "safe harbor" provision -- MP3Board cannot obtain summary judgment pursuant to the defense of lack of knowledge. See *17 U.S.C. § 512*(d); see also Section II(A)(2), supra.

**1. Issues of Material Fact Exist Regarding Whether MP3Board Had the Right and the Ability to Supervise the Infringing Activities.**

The record companies have introduced evidence showing that MP3Board possessed the right and the ability to supervise its users and the information displayed on its site. A defendant's "ability to block infringers' access to a particular environment for any reason" constitutes proof of its right and ability to supervise and control the infringing activities. *Napster, 239 F.3d at 1023;* see also *Fonovisa, 76 F.3d at 262-63* (a swap-meet operator could exclude vendors [*34] for any reason); *Shapiro, 316 F.2d at 306-08*. The facts have shown that MP3Board had the right and ability to police those who posted links to the site, as well as the ability to delete the links themselves from being displayed to users.

While there is no evidence that MP3Board could control which links were initially found by its automated procedures, MP3Board could delete links from its database and thus prevent them from being displayed in response to user queries. (Lars Mapstead Dep. at 338, 488-89.) Moreover, MP3Board had stated a policy of restricting users from posting certain types of links, such as those linking to pornography, hate, and hacker and "warez" (illegally copied and distributed commercial software) sites, and did in fact remove offending links from the site and banned repeat offenders of MP3Board's rules from posting any additional links. (Lars Mapstead Dep. at 338; Eli Mapstead Dep. at 328-31, 408-08.) Thus, there is evidence that MP3Board had the right and ability to remove links to infringing works and bar the participation of users who transmitted those infringing files. See *Napster, 239 F.3d at 1024;* see also *Fonovisa, 76 F.3d at 260, 262*. [*35]

**2. Issues of Material Fact Exist Regarding Whether MP3Board Possessed a Direct Financial Interest in the Infringing Activities.**

The record companies have also introduced evidence indicating that MP3Board possessed a direct financial interest in the exchange of infringing files. Infringement which increases a defendant's user base or otherwise acts as a draw for customers constitutes a direct financial interest. See *Napster, 239 F.3d 1004 at 1023; Fonovisa, 76 F.3d at 262-64* (financial benefit exists where "infringing performances enhance the attractiveness of a

Case 1:05-cv-07340-RJS    Document 13-8    Filed 02/06/2006    Page 9 of 13

Page 9

2002 U.S. Dist. LEXIS 16165, *; Copy. L. Rep. (CCH) P28,483

venue"); *Shapiro, 316 F.2d at 307.* MP3Board's principals testified that the revenue MP3Board received from banner advertisements on the site was directly tied to the number of users who were exposed to those ads. (Lars Mapstead Dep. at 173, 219, 507-08; Eli Mapstead Dep. at 383; Eli Mapstead RIAA Dep. at 87.) Furthermore, the RIAA's letter dated May 25, 2000 set forth that an extremely high proportion of the links on MP3Board's site went to infringing works. (Pls.'s Ex. 36, Ex. C.) The MP3Board site is exclusively and consciously devoted to locating audio files, and its financial [*36] interest in the locating and copying of music files is thus far more substantial and direct than the general interest, content neutral search engines with which MP3 wishes to compare itself. A jury could certainly find that MP3Board possessed a direct financial interest in infringing activities.

**C. Issues of Material Fact Exist Regarding Whether MP3Board Is Liable for Unfair Competition.**

The record companies have also sued MP3Board for unfair competition pursuant to New York common law with respect to the record companies' pre-1972 sound recordings, which are not subject to federal statutory copyright protection. See *17 U.S.C. § 301*(c); *Firma Melodiya v. ZYX Music, GmbH, 882 F. Supp. 1306, 1316 (S.D.N.Y. 1995).* Summary judgment on this claim in favor of MP3Board is also denied.

In New York, an unfair competition claim may be grounded in the appropriation of the exclusive property of the plaintiff by the defendant. See *H.L. Hayden Co. v. Siemens Med. Sys., Inc., 879 F.2d 1005, 1025 (2d Cir. 1989).* Pursuant to New York common law, "an unfair competition claim involving misappropriation usually concerns the taking and [*37] use of the plaintiff's property to compete against the plaintiff's own use of the same property." *Roy Export Co. v. CBS, 672 F.2d 1095, 1105 (2d Cir. 1982).* Due to the legal overlap between the New York tort of unfair competition based upon misappropriation and federal copyright infringement, see *Kregos v. Associated Press, 3 F.3d 656, 666 (2d Cir. 1993),* summary judgment in favor of MP3Board is denied for the reasons stated above denying summary judgment on the copyright infringement claims.

**D. Summary Judgment is Denied with Respect to MP3Board's Argument That Its Activities Are Entitled to First Amendment Protection.**

MP3Board's argument that its activities are protected by the First Amendment to the U.S. Constitution is without merit. The U.S. Court of Appeals for the Second Circuit has held that "the fair use doctrine encompasses all claims of first amendment in the copyright field." *New Era Publs. Int'l v. Henry Holt & Co., 873 F.2d 576, 584 (2d Cir. 1989);* see also *17 U.S.C. § 107; Napster, 239*

*F.3d at 1028* (rejecting Napster's asserted free speech right to publish a "directory" [*38] in the form of a music file search index because Napster's users were not fair users); *Nihon Keizai Shimbun v. Comline Business Data, Inc., 166 F.3d 65, 74 (2d Cir. 1999)* ("First Amendment concerns are protected by and coextensive with the fair use doctrine"); *Religious Tech. Ctr. v. Netcom On-Line Commun. Servs., 923 F. Supp. 1231, 1258* (stating that the Copyright Act balances First Amendment concerns with the rights of copyright holders).

In its summary judgment papers, MP3Board has not asserted that the activities in question constitute "fair use" and therefore do not violate plaintiffs' copyrights. Moreover, even if it had, the evidence indicates that such a claim would fail. In analyzing the defense of "fair use," the Copyright Act specifies four factors that must be considered:

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work.

*17 U.S.C. § 107.* [*39] Other relevant factors may also be considered in order to apply the test in light of the overall purposes of the Copyright Act. See *Harper & Row, Publishers, Inc. v. Nation Enters., 471 U.S. 539, 549, 85 L. Ed. 2d 588, 105 S. Ct. 2218 (1985); Sony, 464 U.S. at 448, 454.*

Assuming plaintiffs' allegations to be true, all four mandatory factors weigh against a finding of fair use in the present case. Regarding the first factor, "the purpose and character of the use," the purpose of MP3Board and its users was commercial, as they were allegedly "profiting from the exploitation of the copyrighted work without paying the customary prices." *Harper & Row, 471 U.S. at 562.* Moreover, the copied works were simply retransmitted, not transformed. See *Napster, 239 F.3d at 1015.* Regarding the second factor, "the nature of the copyrighted work," the published creative sound recordings copied are "close to the core of intended copyright protection," and, conversely, far removed from the more factual or descriptive type of work that is more amenable to fair use. See *UMG Recordings, Inc. v. MP3.com, Inc., 92 F. Supp. 2d 349, 351-52 (S.D.N.Y. 2000)* [*40] (citations omitted). Regarding the third

Case 1:05-cv-07340-RJS    Document 13-8    Filed 02/06/2006    Page 10 of 13

Page 10

2002 U.S. Dist. LEXIS 16165, *; Copy. L. Rep. (CCH) P28,483

factor, "the amount and substantiality of the portion used in relation to the copyrighted work as a whole," plaintiffs contend that entireties of copyrighted works were infringed rather than small portions. Regarding the fourth factor, "the effect of the use upon the potential market for or value of the copyrighted work," the alleged activities of MP3Board and its users on their face could harm the market for the original works. See *Napster, 239 F.3d at 1017.* Thus, because all four factors weigh against a finding of fair use, and there are no other relevant factors apparent, MP3Board's motion for summary judgment based upon the theory that its activities are protected by the First Amendment is denied.

**E. Issues of Material Fact Exist Regarding Damages.**

MP3Board briefly argues that the record companies have not shown that they have suffered actual damages, or that MP3Board obtained any profits as a result of any infringement. MP3Board is correct: the amount of damages has not been litigated or established at this juncture. However, MP3Board also summarily -- and incorrectly -- argues that the record companies cannot prove [*41] statutory damages. The Copyright Act permits a copyright owner to elect to recover an award of statutory damages simply upon a showing of infringement. *17 U.S.C. § 504*(c). Should the record companies establish copyright infringement, they may elect to pursue an award of statutory damages.

**III. The RIAA's Motion for Summary Judgment with Respect to MP3Board's Claims Against the RIAA Is Granted.**

MP3Board has asserted two claims against the RIAA stemming from the RIAA's notices of copyright infringement sent to MP3Board's ISPs: (a) knowing material misrepresentation of infringement in violation of the DMCA, and (b) tortious interference with contractual relations and prospective economic advantage. The RIAA is entitled to summary judgment on those claims.

On October 27, 1999, the RIAA served a subpoena and DMCA notice letter to AboveNet that identified representative artists and requested AboveNet's "immediate assistance in stopping this unauthorized activity. Specifically, we request that you remove the site, delete the infringing links or that you disable access to this site or the infringing links being offered via your system." (Creighton Decl. [*42] P 7 and Ex. A; McDevitt Decl. P 4; McDevitt Dep. at 8-10.) However, the October 27, 1999 letter caused at most a very short-term interruption in MP3Board's service and, by MP3Board's own statements, no injury to MP3Board. (Eli Mapstead RIAA Dep. at 26-27; Lars Mapstead RIAA Dep. at 385-86.)

On April 18, 2000, the RIAA sent a second DMCA notice to Metromedia, identifying a URL of an MP3Board page, naming representative artists whose works were allegedly being infringed, and requesting Metromedia's

> immediate assistance in stopping this unauthorized activity. Specifically, we request that you remove the site or the infringing links from your system and that you inform the site operator of the illegality of his or her conduct.

> You should understand that this letter constitutes notice to you that this site operator may be liable for the infringing activity occurring on your server. In addition, under the Digital Millennium Copyright Act, if you ignore this notice, you and/ or your company may be liable for any resulting infringement.

(Creighton Decl. P 8 and Ex. B.) In response to this letter, Metromedia disabled Internet access to the MP3Board Web site beginning April 19, 2000 and [*43] did not restore service until May 5, 2000. (Eli Mapstead RIAA Dep. at 37-38, 40, 197.) As an initial matter, because MP3Board was only damaged by the April 18, 2000 notice, only that notice is potentially actionable.

**A. The RIAA Is Entitled to Summary Judgment with Respect to MP3Board's Claim of "Knowing Material Misrepresentation of Infringement" in Violation of the DMCA.**

MP3Board asserts that the RIAA's notice contained knowing and material misrepresentation. Pursuant to *17 U.S.C. § 512*(f),

> Any person who knowingly materially misrepresents ... that material or activity is infringing ... shall be liable for any damages ... incurred by the alleged infringer ... who is injured by such misrepresentation, as the result of the service provider relying upon such misrepresentation in removing or disabling access to the material or activity claimed to be infringing.

As set forth in Section II(A)(2)(b), supra, the RIAA's letter dated April 18, 2000 did not constitute an effective notification to MP3Board pursuant to the DMCA because it listed solely artists' names, and neglected to specify any links or even particular songs. For the same reasons, [*44] the letter did not substantially comply

Case 1:05-cv-07340-RJS    Document 13-8    Filed 02/06/2006    Page 11 of 13

Page 11

2002 U.S. Dist. LEXIS 16165, *; Copy. L. Rep. (CCH) P28,483

with the notification requirements for Metromedia, as it did not provide location information reasonably sufficient to permit Metromedia to locate the material pursuant to *17 U.S.C. § 512*(c)(3)(A). See *ALS Scan, 239 F.3d at 625; see also Netcom, 907 F. Supp. at 1374.*

The April 2000 letter was simply not specific enough to provide adequate notice. Although the DMCA permits a copyright owner to identify a "representative" list of works, *17 U.S.C. § 512*(c)(3)(A)(ii), in this case, a bare list of musical artists whose songs were allegedly linked to did not constitute a representative list of works, or notice equivalent to a list of representative works that can be easily identified by the service provider. See *ALS Scan, 239 F.3d at 625.* While the DMCA only requires that a copyright owner need only comply "substantially" with the prescribed format, the RIAA's April notice fell short of even that standard. *17 U.S.C. § 512*(c)(3)(A); see also *ALS Scan, 239 F.3d at 625.* The RIAA cannot shift the DMCA's duty to identify [*45] infringing material from the copyright holders or their agents to ISPs, which is what the April 18, 2000 letter seeks to do.

Nonetheless, liability cannot be incurred by the RIAA pursuant to Section 512(f) for merely sending a letter that constitutes insufficient notification; rather, the DMCA standard is whether the copyright owner's agent "knowingly materially misrepresents ... that material or activity is infringing." There is no evidence that the RIAA incorrectly stated that MP3Board was "offering direct links to files on other Internet sites containing full-length sound recordings for other users to download, including songs by [the listed] artists." The sole evidence of any misrepresentation in this notice consists of the fact that Eli Mapstead stated that he later found one link on the MP3Board site leading to a song by one of the listed artists that was authorized to be on the Internet. (Eli Mapstead Dep. at 481-87.) However, the presence of one authorized song file does not constitute a material misrepresentation in light of the facts of this case. Moreover, MP3Board's claim must fail because there is no evidence that any misrepresentation by the RIAA was made knowingly. [*46]

MP3Board also contends that the RIAA's notification constituted "knowing material misrepresentation" because it improperly threatened a suit for money damages against a service provider that was immune from suit pursuant to *17 U.S.C. § 512*(a). However, Section 512 only penalizes copyright holders for knowingly materially misrepresenting "that material or activity is infringing." It does not provide a cause of action for knowingly materially misrepresenting that a service provider may be liable for hosting certain material.

In addition, MP3Board appears to seek liability for vagueness in the RIAA's notice, and the possibility that vagueness may have induced Metromedia to take the entire MP3Board site offline because Metromedia could not reasonably ascertain which of MP3Board's activities constituted infringing activity. However, vagueness does not constitute a material misrepresentation "that material or activity is infringing" pursuant to Section 512(f). MP3Board stretches Section 512 beyond its breaking point.

**B. The RIAA Is Entitled to Summary Judgment with Respect to MP3Board's Claims of Tortious Interference with Contractual Relations and Prospective** [*47] **Economic Advantage.**

MP3Board contends in its third claim for relief that when the RIAA caused Metromedia to disrupt MP3Board's service, the RIAA thereby tortiously interfered with MP3Board's contracts with Metromedia as well as MP3Board's expectation of prospective economic advantage from future visitors to its site. (Am. Countercl. PP 80-81.) By applying the New York choice of law rules, see *Arochem Int'l Inc. v. Buirkle, 968 F.2d 266, 269 (2d Cir. 1993),* the Court finds that California tort law applies in this matter; California has the greater interest in the litigation of this issue due to the fact that MP3Board is located in California and its contractual relationship with another California corporation was allegedly interfered with in California.

The elements of intentional interference with contractual relations are (1) a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of this contract; (3) intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the relationship; and (5) resulting damage. *Quelimane Co. v. Stewart Title Guar. Co., 19 Cal. 4th 26, 960 P.2d 513, 530, 77 Cal. Rptr. 2d 709 (Cal. 1998).* [*48]

The RIAA contends that MP3Board cannot assert a claim for tortious interference with contract because MP3Board never had a contract with Metromedia, but only had an arrangement with Lars Mapstead's company, Cyberzine, which in turn had a preexisting relationship with AboveNet (later Metromedia). (Noah Mapstead RIAA Dep. at 17-23; Lars Mapstead RIAA Dep. at 33, 407-08.) However, because there is evidence that the contract or a later modification of it was made expressly for MP3Board's benefit -- for example, AboveNet/Metromedia assigned a static IP address to MP3Board and agreed to serve as the contact for MP3Board in connection with MP3Board's registration with Network Systems, Inc., (Mapstead Decl. in Opp'n to RIAA's Mot. For Summ. J. PP 2, 4-5), -- at this juncture the Court cannot conclude that there was no valid contract with AboveNet/Metromedia that MP3Board could enforce as a third party beneficiary.

The RIAA also contends that the letter to Metromedia on April 18, 2000 was a simple pre-

litigation demand letter. However, to assert the litigation privilege -- an affirmative defense -- the RIAA must prove that its statements were made in good faith contemplating a suit. [*49] See *Sade Shoe Co. v. Oschin & Snyder, 162 Cal. App. 3d 1174, 1180, 209 Cal. Rptr. 124 (1984); Aronson v. Kinsella, 58 Cal. App. 4th 254, 263-65, 68 Cal. Rptr. 2d 305 (1997);* see also *Matsushita Electronics Corp. v. Loral Corp., 974 F. Supp. 345, 354-55 (S.D.N.Y. 1997).* Material issues of fact exist regarding whether the RIAA contemplated filing a suit against Metromedia in "good faith and on serious consideration." *Aronson, 58 Cal. App. 4th at 266; 68 Cal. Rptr. 2d 305.*

Nonetheless, no material issues of fact exist regarding the RIAA's justification for its actions. Pursuant to California state law, justification is an affirmative defense to a charge of tortious interference with contract. See *Echazabal v. Chevron U.S.A., Inc., 221 F.3d 1347 (9th Cir. 2000)* (unpublished), [published at *226 F.3d 1063]; Seaman's Direct Buying Serv., Inc. v. Standard Oil Co., 36 Cal. 3d 752, 686 P.2d 1158, 1165, 206 Cal. Rptr. 354 (Cal. 1984)* (overruled on other grounds). Seeking to protect a copyright by alerting a third party that the copyright is being infringed constitutes a justification defense to that claim. [*50] See, e.g., *Shapiro & Son Bedspread Corp. v. Royal Mills Assoc., 764 F.2d 69, 75 (2d Cir. 1985); Montgomery County Ass'n of Realtors, Inc. v. Realty Photo Master Corp., 878 F. Supp. 804, 818 (D. Md. 1995)* (notifying customers of an alleged copyright infringement in good faith is justified and does not constitute tortious interference with contractual relations). There have been no material issues of fact raised regarding whether the RIAA acted in good faith in notifying Metromedia of the infringement. Accordingly, the RIAA cannot be subjected to liability for tortious interference with contract and summary judgment should issue in its favor on this claim.

The elements in California of the tort of intentional interference with prospective economic advantage are (1) the existence of a prospective economic relationship containing the probability of future economic rewards for the plaintiff; (2) the defendant's knowledge of this relationship; (3) intentional acts designed to disrupt the relationship; (4) actual causation; and (5) proximate damages. *PMC, Inc. v. Saban Entm't, Inc., 45 Cal. App. 4th 579, 52 Cal. Rptr. 2d 877, 886 (1996).* The tort, which is also [*51] called interference with prospective economic relations, "imposes liability for improper methods of disrupting or diverting the business relationship of another which fall outside the boundaries of fair competition." *Settimo Assocs. v. Environ Sys., Inc., 14 Cal. App. 4th 842, 17 Cal. Rptr. 2d 757, 758 (1993)*

Because the general wrong inherent in intentional interference with prospective economic advantage is the interference with a business opportunity through methods which are not within the privilege of fair competition, a plaintiff must also prove that the defendant "engaged in conduct that was wrongful by some legal measure other than the fact of interference itself." *Della Penna v. Toyota Motor Sales, U.S.A., Inc., 11 Cal. 4th 376, 902 P.2d 740, 751, 45 Cal. Rptr. 2d 436 (Cal. 1995).* For tortious interference with prospective economic advantage, a plaintiff must prove that the defendant's conduct was not privileged; the defendant does not need to prove privilege as an affirmative defense. See *Bed, Bath & Beyond of La Jolla, Inc. v. La Jolla Square Venture Partners, 52 Cal. App. 4th 867, 60 Cal. Rptr. 2d 830, 839 (1997).* As set forth above, the RIAA [*52] was justified in sending Metromedia the April 18 notification of infringement and no liability can lie for tortious interference with prospective economic advantage.

Moreover, MP3Board has not shown the additional element of wrongful conduct required for a claim of intentional interference with prospective economic advantage. See *Della Penna, 902 P.2d at 751.* While threatening to litigate against a party who is known to be immune from suit -- as MP3Board alleges -- may sufficiently constitute wrongful conduct, see *PMC, 52 Cal. Rptr. 2d at 891;* see also *Matsushita, 974 F. Supp. at 354,* MP3Board's claim that Metromedia was known to be immune from suit pursuant to *17 U.S.C. § 512*(a) has no support. There is no evidence showing that the RIAA believed that Metromedia was engaged in "transitory digital network communications," pursuant to Section 512(a), which deals with the transient storage of material in the course of transmitting, routing or providing connections.

Rather, by all outward appearances Metromedia was hosting MP3Board's site on its network, leaving the RIAA to conclude that Metromedia was not merely [*53] transmitting, routing or providing connections for infringing material but that infringing activities were being conducted on Metromedia's system at MP3Board's direction. Pursuant to Section 512(c), entitled "information residing on systems or networks at direction of users," a service provider is "liable for monetary relief ... for infringement of copyright by reason of the storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider," unless the service provider does not have knowledge or reason to know of infringing activity and fails to expeditiously to remove or disable access to the infringing material. *17 U.S.C. § 512*(c)(1). Absent a showing that Metromedia was immune from liability pursuant to Section 512(a), and that the RIAA knew that Metromedia was immune, liability cannot be grounded on the RIAA's statement that Metromedia could be liable for hosting MP3Board's activities if Metromedia knew of

2002 U.S. Dist. LEXIS 16165, *; Copy. L. Rep. (CCH) P28,483

MP3Board's infringement but failed to disable access. MP3Board has pointed to no evidence whatsoever in support of its claim that the RIAA threatened legal action against a party that [*54] it knew to be immune from liability and therefore the RIAA is entitled to summary judgment on this claim.

**CONCLUSION**

For the reasons stated forth above, the record companies' motion for summary judgment is denied, MP3Board's motion for summary judgment is denied, and the RIAA's motion for summary judgment is granted.

Dated: New York, New York

August 28, 2002

SO ORDERED:

Sidney H. Stein, U.S.D.J.

1994 U.S. Dist. LEXIS 21457, *

LEXSEE 1994 U.S. DIST. LEXIS 21457

**CACI INTERNATIONAL INC. et al., Plaintiffs, v. PENTAGEN TECHNOLOGIES INTERNATIONAL, LTD., et al., Defendants.**

**Civil Action No. 93-1631-A**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF VIRGINIA, ALEXANDRIA DIVISION**

*1994 U.S. Dist. LEXIS 21457*

**June 16, 1994, Decided
June 16, 1994, Filed**

**DISPOSITION:** [*1] Plaintiffs' Motion for Summary Judgment GRANTED as to Counts I, II, IV and V, and DENIED as to Count III. Defendants' Motion for Summary Judgment GRANTED as to Count III and DENIED as to all other counts.

**COUNSEL:** For CACI, INTERNATIONAL, INC., CACI, INC - FEDERAL, plaintiffs: Christian Reginald Bartholomew, Joseph William Koegel, Jr., Steptoe & Johnson, Washington, DC.

For PENTAGEN TECHNOLOGIES INTERNATIONAL, LTD., JOHN C BAIRD, MITCHELL R LEISER, defendants: Gregory E. Stambaugh, Brown & Stambaugh, Manassas, VA.

For PENTAGEN TECHNOLOGIES INTERNATIONAL, LTD., JOHN C BAIRD, MITCHELL R LEISER, defendants: Joel Z. Robinson, New York, NY.

For MITCHELL R LEISER, defendant: John Kenneth Zwerling, Zwerling & Kemler, P.C., Alexandria, VA.

For USA, interested party: Robert A Spencer, U.S. Attorney's Office, Alexandria, VA.

**JUDGES:** Leonie M. Brinkema, United States District Judge.

**OPINIONBY:** Leonie M. Brinkema

**OPINION:**

MEMORANDUM OPINION

I

This matter is before the Court on motions for summary judgment. The central issue in this matter is whether plaintiffs have infringed a copyright by marketing software to a third party pursuant to a teaming agreement with the alleged copyright holder's [*2] subsidiary/licensee and the copyright holder's "successor in interest." Additionally, plaintiffs seek declaratory judgment regarding any infringement of defendants' trademark and damages for related state law claims of breach of contract, tortious interference with business relations, and defamation.

Plaintiffs moved for summary judgment on all issues pursuant to *Fed. R. Civ. P. 56*. Defendants filed an opposition to that motion in which they also moved for summary judgment on all issues. The Court's disposition of these matters is reflected in this opinion.

II

The ownership history of the software that is at the heart of this controversy is long and tortuous. Because this history bears on some of the issues in this matter, it will be necessary to recount it here, although every effort will be made to be succinct. The parties do not differ to any significant degree about these facts.

Defendant Pentagen Technologies International, Ltd. ("Pentagen") is an English corporation with an office in New York. Defendant Baird Technologies, Inc. ("BTI") is a Delaware corporation, also located in New York. BTI is the United States subsidiary of Pentagen. Defendant John Baird ("Baird") was an [*3] officer of both Pentagen and BTI during the time periods relevant to this lawsuit. He was also a developer of the MENTIX software, which is at the heart of the parties' dispute. Defendant Mitchell Leiser is a vice-president and director of Pentagen and was, at relevant times, an officer and director of BTI.

In 1989, Robert O'Brien invested in Pentagen through his company, Runaway Development Group, S.A. ("RDG"). Overall, O'Brien/RDG invested $ 400,000, part of which was common stock convertible into secured promissory notes of Pentagen. O'Brien exercised that option in Spring, 1990. Pentagen issued

the notes which were secured by the intellectual property of Pentagen, namely MENTIX. On June 21, 1990, Pentagen assigned its patent applications to RDG. O'Brien also began acting as a director of Pentagen and BTI. Pentagen defaulted on the loan and O'Brien asserted ownership of the software through his own corporations RDG and Expert Objective Systems Development Corporation (EOSD). O'Brien also filed suit against Pentagen and BTI in New York alleging securities fraud. Pentagen counterclaimed, asserting that O'Brien/RDG converted the MENTIX software because the underlying security interest [*4] was void under English law which does not allow for equity interests to be converted into secured loans.

At about the same time O'Brien/RDG converted equity interest in the fledgling software enterprise into a secured loan, BTI was marketing the MENTIX software to the Army Materiel Command (AMC), which is part of the United States Government Department of Defense. From all reports, the AMC was favorably impressed with the software, which purportedly translates programming applications from one language to another. Although the AMC expressed some interest in procuring the software, it had two notable reservations about the vendor, BTI. The first concern was that BTI had no "track record" of providing goods and services to the government, and therefore could not qualify as a "responsible party." The second concern was that BTI was a wholly owned subsidiary of an English company, and therefore its products would be difficult to procure in light of the Buy America Act. At this point BTI approached plaintiffs. CACI International ("CACI"), an international high-tech business for systems engineering and information sciences, is a Delaware corporation with its principal place of business [*5] in Virginia. CACI-Federal ("CACI-Fed") is a CACI subsidiary which focuses on systems integration, custom software development, and software engineering. BTI recognized that plaintiffs had significant experience marketing to the government and that CACI was recognized as a "responsible party." CACI and BTI, through its officer Baird and later through O'Brien, negotiated a teaming agreement under which CACI would market MENTIX to the AMC. BTI assured CACI that it had a Master Licensing Agreement with Pentagen which allowed it to license MENTIX to third parties, such as CACI and the AMC.

During these negotiations two events occurred, unknown to CACI at the time, which bear on this present imbroglio. The first was Pentagen's defalcation on the O'Brien loan with the subsequent assertion of ownership rights over MENTIX by RDG. The second was Pentagen's failure to make the appropriate corporate filings in England, which resulted in the corporation being struck from the list of companies from March 1990 to September 14, 1990, during which time its assets, including the intellectual property MENTIX, was bona vacantia, and forfeit to the Crown.

O'Brien and BTI's counsel advised CACI that [*6] RDG was a successor in interest to Pentagen's MENTIX copyright. Having been provided with a copy of the assignment of Pentagen's rights by O'Brien, and having been informed that RDG was licensing its subsidiary EOSD to provide MENTIX for the teaming agreement, CACI amended the draft teaming agreement to reflect that change. CACI sent the revised draft to O'Brien and Baird. Baird did not respond, but O'Brien continued the negotiations. On August 15, 1990, CACI signed the teaming agreement with BTI (O'Brien signing as "acting CEO"), EOSD and O'Brien. In that agreement, BTI, EOSD and O'Brien warranted to CACI, Inc.-Federal that they had good title to or adequate rights to license MENTIX. However, later that same day, Baird told CACI that RDG did not have title to MENTIX and suggested that CACI not enter into the teaming agreement with them. CACI advised Baird that the teaming agreement had already been signed.

Concerned by this communication, CACI turned to O'Brien for assurances regarding the ownership of MENTIX and licensing capabilities of EOSD, BTI and O'Brien. O'Brien again sent a copy of the assignments. Thereafter, pursuant to the teaming agreement, CACI made a copy of the software [*7] in September 1990 and returned the original MENTIX disks to O'Brien. n1

> n1 This copying was a two-step process. The first version of the software which O'Brien sent reflected the copyright holder as Baird. CACI sought clarification and O'Brien sent new disks which reflected that EOSD was the copyright holder.

Based on these representations, CACI proceeded to perform under the teaming agreement by sending a "white paper" to the AMC recommending a research project to develop MENTIX into a product that would serve the AMC's needs. Next, CACI prepared and presented a business proposal outlining the method of reengineering AMC information systems to integrate databases and modernize systems. Several meetings were held with AMC to make presentations and answer questions. At the end of September, 1991, after this work had been done, Baird again contacted CACI and disputed O'Brien's rights to MENTIX. Baird faxed to CACI a copy of the counterclaim to a suit brought by RDG against Pentagen and Baird in New York. Although [*8] CACI was referenced in the counterclaim, it was not a party in that lawsuit.

Three days later, Baird also asserted his belief that CACI was on the verge of entering into a contract with the AMC involving MENTIX, and offered to sign the

teaming agreement and to provide the licensing rights for MENTIX to CACI. On October 3, CACI informed Pentagen that there was no contract with the AMC. Pentagen again offered CACI what it believed were the necessary licensing rights and indemnification should CACI wish to proceed with an AMC procurement. At that point O'Brien again assured CACI that RDG had title to MENTIX. O'Brien sent another copy of the assignments. Additionally, NSL, the owner of the software from which MENTIX was derived, informed CACI by letter that "as far as we are concerned, Mr. Baird has no continuing arrangement or agreement with respect to Q'Nial."

CACI discontinued all activity related to marketing MENTIX to the AMC and began its own internal review of the situation. Eight weeks later, in January 1992, CACI terminated the teaming agreement and returned its copy of MENTIX to O'Brien. Defendants have presented no evidence of CACI making any additional copies of MENTIX or [*9] of getting any contract from AMC for this project.

The next month, the U.S. Army Information Systems Selection and Acquisition Agency issued a request for proposals for the Army's Sustaining Base Information Services ("SBIS") Program. CACI teamed with IBM to submit a proposal. In July 1993, IBM was awarded the SBIS contract, and CACI currently serves as a subcontractor to IBM on that contract.

At this point CACI was drawn into the litigation quagmire surrounding the ownership of MENTIX. In July 1993 Pentagen filed suit against CACI in the Supreme Court of New York claiming conversion of MENTIX based on CACI's marketing of the software to the AMC, as well as violations of the New York Penal Code and nonexistent sections of the Virginia Code of Criminal Justice based on the same marketing activity. CACI moved to dismiss in September, and that motion was still pending when, in January 1994, the action became removable to the federal court. That lawsuit is now on the docket of the United States District Court for the Southern District of New York and the motion to dismiss remains pending.

In December 1993, Pentagen filed a complaint against CACI in federal court alleging (1) copyright [*10] infringement under *17 U.S.C. § 501;* (2) trademark infringement and unfair competition under §§ 32 and 43 (a) of the Lanham Act, *15 U.S.C. § § 1114* and 1125; and (3) a violation of the Major Fraud Against the United States Act, *18 U.S.C. § 1031.* That complaint is based again on CACI's marketing MENTIX to the AMC and adds that CACI's use of its RENovate methodology and CACI's development of software on the SBIS contract will infringe Pentagen's copyright of MENTIX. CACI filed a motion to dismiss all counts of Pentagen's complaint on February 22, 1994.

Believing that the federal court in New York lacked jurisdiction over it and that Pentagen's claims would ultimately be litigated in the Eastern District of Virginia, CACI filed its complaint on December 22, 1993, seeking declaratory judgment regarding Pentagen's copyright infringement and trademark infringement and adding supplemental state law claims for damages arising from breach of contract, tortious interference with contract and defamation. Following this Court's ruling denying defendants' motion to dismiss, defendant BTI failed to file an answer. An Order entering [*11] Default Judgment against BTI issued on March 17, 1994.

With this background in mind, the Court now addresses the legal issues raised in the summary judgment motions.

III

Copyright infringement

The defendant owners of the MENTIX copyright are precluded as a matter of law from establishing copyright infringement with respect to some of CACI's activity while CACI possessed the software. Registration of a copyright is a prerequisite for bringing an infringement claim *17 U.S.C. § 411*(a); See *Eastern Pub. and Advertising, Inc. v. Chesapeake Publ. & Advertising, Inc., 831 F.2d 488, 490 (4th Cir. 1987).* Pentagen did not register its MENTIX copyright until December 7, 1993. Additionally, the statute of limitations for copyright infringement claims is three years from the date the cause of action accrued. Because the registration did not occur until December 1993, activities that predate December 1990 are not actionable under a copyright infringement theory. Defendants argue that the Court should consider the teaming agreement and marketing to the AMC as a continuous and on-going scheme and have the later alleged acts of infringement relate [*12] back to earlier activities. This Court has rejected any application of a "rolling statute of limitations" theory under the copyright law. *Hoey v. Dexel Systems Corp., et al, 716 F. Supp. 222, 223 (E.D. Va. 1989).* Therefore, activities predating December 7, 1990, are as a matter of law outside the scope of this lawsuit. Specifically, CACI's making one backup copy of MENTIX in September 1990 cannot constitute copyright infringement.

This Court limits its examination of the copyright infringement question to the marketing activities to AMC that occurred after December 7, 1993 and in connection with the SBIS contract. A claim of copyright infringement requires a showing of ownership of a valid copyright and unauthorized copying of the copyrighted work. *Avtec Systems, Inc. v. Peiffer, 1994 U.S. App. LEXIS 6522, *7 (4th Cir. 1994).* Although plaintiffs raise some challenges to defendants' ownership of a valid copyright, the central issue to be decided is whether

marketing without actual distribution of a software package constitutes copyright infringement. n2 For the reasons set forth below, we hold that it does not.

n2 Plaintiff argues that during the time Pentagen was not a registered company, March to September 1990, it cannot assert ownership of the copyright because its assets were bona vacantia and property of the Crown. Though the intricacies of British property law as they relate to the application of copyright ownership under the U.S. Code are of keen academic interest, the Court finds that the issues in this case can be squarely addressed without resort to such Rumpolean antics.

[*13]

The owner of a copyright under Title 17 has certain exclusive rights, including the right to authorize (1) the reproduction of a copyrighted work, (2) the preparation of derivative works based upon the copyrighted work, and (3) the distribution of copies of the copyrighted work to the public by sale or other transfer of ownership, or by rental, leasing, or lending. *17 U.S.C. § 106.* In marketing the work to the AMC, plaintiffs offered to prepare a derivative work, MENTIX-MVS. There is no evidence in the record that the derivative work was actually prepared or that MENTIX was copied (within the statutory time frame) or distributed in any respect pursuant to the AMC during CACI's marketing efforts under the teaming agreement. In rebuttal to plaintiffs' evidence that it did none of those things, defendants offer only a statement by an AMC employee that he overheard a comment related to MENTIX from which he inferred that a copy of the software had been made by CACI and provided to the AMC. Such evidence does not rise to a genuine dispute of material fact, let alone act as proof of infringement. In claiming that a mere offer to provide a derivative work of copyrighted [*14] material constitutes infringement, defendants overlook an essential element of an infringement claim: that the work was copied. A copyright holder may prove copying by showing access to the copyrighted work and substantial similarity between the copyrighted work and the infringing work. *M. Kramer Mfg. Co., Inc. v. Andrews, 783 F.2d 421 (4th Cir. 1986).* Apart from the backup copy, there is no direct evidence of copying. There is no evidence in the record of a work that is "substantially similar" to MENTIX resulting from the AMC marketing efforts.

As to the SBIS contract, defendants contend that CACI's offer to provide re-engineering services through its RENovate methodology would necessarily require use of a product either derived from or substantially similar to MENTIX. CACI disputes that it had access to the MENTIX software at the time it teamed with IBM to prepare a proposal on the SBIS contract. The evidence supports CACI's assertion that MENTIX was returned the month before the government solicited SBIS proposals. Even if the Court draws the inference that CACI contemplated using a MENTIX-infringing copy or derivative in a government contract before the Army's [*15] request for proposals came out, particularly during the time before the backup copy of the software was returned, there is still no evidence in the record that CACI created a product that is substantially similar to MENTIX. Moreover, the unrebutted evidence, specifically the report of Dr. Rotenstreich, plaintiffs' expert, reflects that MENTIX (or its derivative) could not perform the reengineering offered by CACI in the SBIS project. That report also concluded that MENTIX is almost "identical" to Q'Nial and that "as a software engineering tool Q'Nial can be replaced by many other tools that are much better and less expensive." Such a finding substantively undercuts defendants' arguments that a software product developed by CACI under the SBIS contract to provide software reengineering depended on access to MENTIX or would be substantially similar to MENTIX. Therefore, the Court finds that with respect to both the AMC marketing effort and the SBIS contract proposal, plaintiffs are entitled to declaratory judgment on Count I.

Trademark infringement

Plaintiffs seek declaratory judgment that their use of the word MENTIX in marketing efforts with the AMC does not constitute trademark [*16] infringement or unfair competition under *15 U.S.C. § § 1114* and 1125. In addressing the issue of trademark infringement, the Court is without jurisdiction to look at claims arising before December 1991. Trademark infringement claims are subject to a two-year statute of limitations. See *Unlimited Screw Products, Inc. v. Malm, 781 F. Supp. 1121, 1125 (E.D.Va. 1991).* Defendants allege that plaintiffs deceived the United States government by stating to the AMC that it could legally provide MENTIX software when it allegedly could not. Those proposals, however, were made before December 1991. There is no evidence in the record of activity by plaintiffs within the scope of the limitations period that could have infringed MENTIX's trademark. Therefore, this Court finds that plaintiffs are entitled to summary judgment as to count II.

Breach of Contract

Plaintiffs allege that defendants breached the teaming agreement which plaintiffs terminated on January 20, 1992. Under the terms of the August 15, 1990, teaming agreement between CACI and BTI/EOSD/O'Brien, BTI and EOSD warranted that they

had good title or adequate right to license MENTIX and [*17] that they would indemnify and hold plaintiff CACI-Federal harmless with respect to infringement claims, and shall "(i) defend at its own expense, (ii) obtain through negotiation or (iii) modify the product to make it noninfringing while preserving the original functionality, so as to enable the parties to continue using such products as originally intended under this Agreement." Pltf. Ex. 4B. Plaintiffs seek to enforce the indemnification clause against both BTI, a signatory to the agreement, and Pentagen, as the alter ego of BTI which exercised pervasive control over BTI. Plaintiffs also ask the Court to find defendants Baird and Leiser personally liable because they held themselves out as officers of Pentagen during the time Pentagen was not a corporation, which included the time the teaming agreement was signed.

The Court has already entered default judgment against BTI, requiring BTI to indemnify and hold CACI harmless with respect to the claims asserted by Pentagen. Under the May 2, 1994 Order of this Court, CACI needs to establish that: (1) Pentagen was BTI's alter ego; and (2) Baird and Leiser were Pentagen's or BTI's alter egos in order to obtain summary judgment [*18] against all three defendants.

The teaming agreement is governed by the law of Virginia. With respect to piercing the corporate veil, plaintiffs must show that BTI is "the alter ego, alias, stooge, or dummy of the individuals sought to be charged personally and that the corporation was a device or sham used to disguise wrongs, obscure fraud, or conceal crime." *RF&P Corp. v. Little, 247 Va. 309, 440 S.E.2d 908, 913 (Va. 1994)* (quoting *Cheatle v. Rudd's Swimming Pool Supply Co., 234 Va. 207, 360 S.E.2d 828, 831 (Va. 1987).*

Plaintiffs direct the Court to a number of factors in arguing that Pentagen was BTI's alter ego: the directors of Pentagen and BTI were "essentially identical", the boards of directors met simultaneously, BTI borrowed substantial sums from Pentagen which have not been repaid (because BTI is insolvent), and Pentagen owned a majority of BTI's stock. Given these facts, plaintiffs argue, the Court should find that Pentagen was the alter ego of BTI. Virginia courts are reluctant to pierce the corporate veil in contract situations. *Beale v. Kappa Alpha Order, 192 Va. 382, 64 S.E.2d 789 (1951); Garrett v. Ancarrow Marine, Inc., 211 Va. 755, 180 S.E.2d 668 (1971).* [*19] This is especially true where, as here, the two companies have held themselves out as separate entities, separate records are kept, and the formalities associated with corporate entities are observed. Moreover, under the facts developed in this record, it was BTI as controlled by O'Brien, not Pentagen, which entered into the teaming agreement. The Court, therefore, denies plaintiffs' request for summary judgment on Count

III. Under the default judgment already entered plaintiffs are entitled to an ex parte hearing in which to offer proof of damages as to BTI.

Tortious interference with business relations

Plaintiffs claim that defendants Pentagen, Baird and Leiser have tortiously interfered with CACI's contract with IBM to perform work on the SBIS program. To prove tortious interference with contract under Virginia law, plaintiffs must show "(1) the existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy on the part of the interferer; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy [*20] has been disrupted." *Duggin v. Adams, 360 S.E.2d 832, 835, 234 Va. 221 (Va. 1987)* (quoting *Chaves v. Johnson, 230 Va. 112, 335 S.E.2d 97, 102 (Va. 1985).*

Defendants do not dispute any of the facts alleged by plaintiffs. CACI teamed with IBM to perform work under the SBIS contract and is a subcontractor for the SBIS contract. Pentagen was aware of the contractual relationship between IBM and CACI, as evidenced by Pentagen's press releases of October 28, 1993 and December 10, 1993 which reference the IBM/CACI contract. There is also undisputed evidence that Pentagen communicated with other parties to the SBIS contract, such as the Army and other contractors in an attempt to interfere with CACI's contractual relationship with IBM. Indeed, Pentagen threatened IBM, other subcontractors and the Army with litigation for associating with CACI and urged a losing bidder to pursue a bid protest of the SBIS award based on the allegation that CACI was infringing on the MENTIX software copyright.

CACI argues that Pentagen's interference was premeditated and harassing. As a result of Pentagen's action IBM advised CACI that CACI could not use its RENovate methodology on the [*21] SBIS contract without IBM's prior written authorization. Because of discovery abuses and failure to follow court orders, defendants were precluded on May 2, 1994, from submitting evidence on the issue of tortious interference.

CACI has not submitted evidence that Baird and Leiser acted as other than officers of Pentagen when these interfering actions were made. All these actions were taken after Pentagen had been reinstated as a corporation. Therefore, the Court does not find individual liability on this count as to Baird and Leiser for whom summary judgment is granted. However, as to the corporate defendants, the Court finds that plaintiffs are entitled to summary judgment on Count IV in an amount to be determined at trial.

Defamation

Plaintiffs seek recovery for defamation, contending that Pentagen alleged in a press release dated September 13, 1993, and elsewhere, that CACI used and marketed the MENTIX computer software or a derivative of MENTIX as a significant component of CACI's RENovate process. This Court must follow the legal standard for defamation articulated in *Swengler v. ITT Corp., 993 F.2d 1063 (4th Cir. 1993),* which holds that under Virginia [*22] law it is defamation per se to prejudice a person in his trade, and that prejudice arises from statements "which cast aspersion on its honesty, credit, efficiency or its prestige or standing in its field of business." Id., quoting *General Products Co., Inc. v. Meredith Corp., 526 F. Supp. 546, 549-50 (E.D. Va. 1981).* In an October 28, 1993, press release Pentagen alleged that CACI's SBIS software bears a striking similarity to MENTIX and infringes Pentagen's copyright and trademark in MENTIX. CACI offered to allow Pentagen to review records that would demonstrate that CACI was not using MENTIX software in connection with RENovate, but Pentagen did not accept the offer. The record further reflects that Pentagen made those public statements with knowledge that they were false. Specifically, after defendant Leiser conducted his own "investigation" in September, 1993 of plaintiffs' RENovate methodology he concluded that "Renovate is a process and it is !!!!!TOOL INDEPENDENT!!!!" To put it clearly, defendants knew that plaintiffs' RENovate process did not infringe the MENTIX copyright at all before they issued press releases to the contrary. After the public allegations [*23] were made, the defendants purposefully ignored opportunities to learn the facts relevant to their allegations. Plaintiffs have established by clear and convincing evidence that defendants acted with malicious intent and are therefore entitled to punitive damages. *Swengler, supra.*

Therefore, the Court finds that plaintiffs are entitled to judgment on count V and the trial will go forward to determine the amount of compensatory and punitive damages.

Entered this 16th day of June, 1994.

Leonie M. Brinkema

United States District Judge

ORDER

For the reasons stated in the accompanying Memorandum Opinion, plaintiffs' Motion for Summary Judgment is GRANTED as to Counts I, II, IV and V, and DENIED as to Count III. Defendants' Motion for Summary Judgment is GRANTED as to Count III and DENIED as to all other counts. It is hereby

ORDERED that judgment is entered against Pentagen Technologies International, Ltd. on Counts I and II, declaring that: plaintiffs' marketing efforts directed at the AMC did not infringe Pentagen's MENTIX copyright; CACI's RENovate process does not infringe Pentagen's MENTIX copyright; the work to be performed by CACI on the SBIS contract does [*24] not infringe Pentagen's MENTIX copyright; and plaintiffs' marketing efforts directed at the AMC did not infringe any trademark held by Pentagen.

Further, it is hereby

ORDERED that judgment is entered against Pentagen Technologies International, Ltd. on Count IV, as to Pentagen's liability for tortiously interfering with the contractual relationship between CACI-Federal and IBM.

Further, it is hereby

ORDERED that judgment is entered against Pentagen Technologies International, Ltd., Baird and Leiser as to Count V, as to the defendants' liability for defamation per se.

Further, it is hereby

ORDERED that judgment is entered against plaintiffs with respect to defendants Pentagen Technologies International, Ltd., Baird and Leiser as to Count III.

In sum, the issues that remain for trial on June 20, 1994 are damages on Count IV, compensatory and punitive damages on Count V, and plaintiffs' ex parte proof of damages against BTI on Count III.

The Clerk is directed to forward copies of this Order and the Memorandum Opinion to counsel of record.

Entered this 16th day of June, 1994.

Leonie M. Brinkema

United States District Judge

Alexandria, Virginia

2005 U.S. Dist. LEXIS 30388, *

LEXSEE 2005 U.S. DIST. LEXIS 30388

**ELEKTRA ENTERTAINMENT GROUP, INC., a Delaware corporation; VIRGIN RECORDS AMERICA, INC., a California corporation; UMG RECORDINGS, INC., a Delaware corporation; BMG MUSIC, a New York general partnership; and SONY BMG MUSIC ENTERTAINMENT, a Delaware general partnership, Plaintiffs, -against- PATRICIA SANTANGELO, Defendant.**

**05 Civ. 2414 (CM)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2005 U.S. Dist. LEXIS 30388*

**November 28, 2005, Decided**

**COUNSEL:** [*1] For Elektra Entertainment Group Inc., Elektra Entertainment Group Inc., a Delaware corporation; Virgin Records America, Inc., Virgin Records America, Inc., a California corporation, UMG Recordings, Inc., UMG Recordings, Inc., a Delaware corporation; BMG Music, BMG Music, a New York general partnership; Sony BMG Music Entertainment, Sony BMG Music Entertainment, a Delaware general partnership, Plaintiffs: J. Christopher Jensen, Tmothy E. Congrove, Cowan, Liebowitz & Latman, P.C., New York, NY.

For Patricia Santangelo, Defendant: Morlan Ty Rogers, Beldock Levine & Hoffman LLP, New York, NY.

**JUDGES:** Colleen McMahon, U.S.D.J.

**OPINIONBY:** Colleen McMahon

**OPINION:**

**DECISION AND ORDER DENYING DEFENDANT'S MOTION TO DISMISS**

McMahon, J:

Plaintiffs Elektra Entertainment Group, Inc., Virgin Records America, Inc., UMG Recordings, Inc., BMG Music, and Sony BMG Music Entertainment (collectively "Plaintiffs") are recording companies that own or control exclusive rights to copyrights in sound recordings. (Complaint ("Cplt.") P11). Pursuant to the Copyright Act of 1976, *17 U.S.C. § 106*, Plaintiffs enjoy the exclusive right to reproduce and to distribute to the public the copyrighted [*2] sound recordings at issue. (Cplt. P12).

Plaintiffs bring this action against defendant for copyright infringement, seeking damages and injunctive relief. In their Complaint, Plaintiffs allege that:

> Plaintiffs are informed and believe that Defendant, without the permission or consent of Plaintiffs, has used, and continues to use, an online media distribution system to download the Copyrighted Recordings, to distribute the Copyrighted Recordings to the public, and/or to make the Copyrighted Recordings available for distribution to others. In doing so, Defendant has violated Plaintiffs' exclusive rights of reproduction and distribution. Defendant's actions constitute infringement of Plaintiff's copyrights and exclusive rights under copyright. (Cplt. P13).

Defendant moves to dismiss pursuant to *Federal Rule of Civil Procedure 12(b)(6)*, on the ground that Plaintiffs have failed to satisfy the pleading requirements set forth in *Federal Rule of Civil Procedure 8(a)*, as applied to copyright infringement claims. Because the court finds that Plaintiffs have adequately plead their claim under *Rule 8*'s [*3] lenient pleading standard, defendant's motion is denied.

**Standard of Review**

Dismissal of a complaint for failure to state a claim pursuant to *Federal Rule of Civil Procedure 12(b)(6)* is proper where "it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Harris v. City of New York, 186 F.3d 243, 247 (2d Cir.1999)*. The test is not whether the plaintiff is likely to prevail, but whether he is entitled to offer evidence to support his claims. *Chance v. Armstrong, 143 F.3d 698, 701 (2d Cir.1998)*. The court assumes that all factual allegations in the complaint

are true, and draws all reasonable inferences in the plaintiff's favor. *EEOC v. Staten Island Sav. Bank, 207 F.3d 144, 148 (2d Cir.2000)*. "In considering a motion to dismiss for failure to state a claim under *Fed.R.Civ.P. 12(b)(6)*, a district court must limit itself to facts stated in the complaint or in documents attached to the complaint as exhibits or incorporated in the complaint by reference." *Kramer v. Time Warner, Inc. 937 F.2d 767, 773 (2d Cir. 1991)*. [*4]

### Discussion

Defendant moves to dismiss the Complaint on the ground that Plaintiffs have failed to satisfy the pleading requirements applicable to copyright infringement claims. In particular, defendant claims that Plaintiffs fail to set forth the specific acts and the dates and times of the alleged copyright infringement, as required by *Federal Rule of Civil Procedure 8*.

Pursuant to *Rule 8*, a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." *Fed. R. Civ. P. 8(a)(2)*. The purpose of the rule is to "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Gmurzynska v. Hutton, 355 F.3d 206, 209 (2d Cir. 2004)* (citing *Swierkiewicz v. Sorema N.A., 534 U.S. 506, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002))*. "With the exception of claims for fraud and mistake [] the sufficiency of a complaint is judged by the 'liberal system of notice pleading' set up by the federal rules." *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y., 375 F.3d 168, 177 (2d Cir. 2004)* (citing *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit, 507 U.S. 163, 113 S. Ct. 1160, 122 L. Ed. 2d 517 (1993))*. [*5]

A complaint alleging copyright infringement sufficiently complies with *Rule 8* when the plaintiffs assert (1) which specific original works form the subject of the copyright claim; (2) that plaintiffs own the copyright in those works; (3) that the copyrights have been registered in accordance with the statute; and (4) by what acts and during what time the defendant infringed the copyright. *Franklin Elec. Publ'r, Inc. v. Unisonic Prod. Corp., 763 F.Supp. 1, 4 (S.D.N.Y. 1991)*; *Home & Nature Inc. v. Sherman Specialty Co, Inc., 322 F.Supp.2d 260, 266 (E.D.N.Y. 2004)*. A properly plead copyright infringement claim must identify "the particular infringing acts . . . with some specificity. Broad, sweeping allegations of infringement do not comply with *Rule 8*." *Marvullo v. Gruner & Jahr, 105 F.Supp.2d 225, 230 (S.D.N.Y. 2000)*.

Plaintiffs' Complaint satisfies *Rule 8*'s pleading requirements, as applied to copyright infringement claims. It is undisputed that Plaintiffs have identified which specific works form the subject of the copyright claim, and have asserted that Plaintiffs own the

copyrights in those works and that such copyrights have [*6] been properly registered. The court finds that Plaintiffs also have satisfied the final requirement- that Plaintiffs identify by what acts and during what time defendant infringed the copyrights.

The Complaint, to which a list of the relevant copyrighted recordings is attached, alleges that defendant "has used, and continues to use, an online media distribution system to download the Copyrighted Recordings, to distribute the Copyrighted Recordings to the public, and/or to make the Copyrighted Recordings available for distribution to others." (Cplt. P13). This statement, while brief, contains more than "simply broad and sweeping allegations of infringement." Rather, it sufficiently puts defendant on notice as to which acts-- downloading and distribution of certain copyrighted recordings via online media-- form the basis of the Plaintiffs' claim. See *Home & Nature Inc, 322 F.Supp.2d at 266-267* (finding sufficient under *Rule 8* plaintiff's claim that, since December 2000, defendant has infringed one or more copyrights by "importing, causing to be manufactured, selling and/or offering for sale unauthorized tattoo-like jewelry items"); *Buckman v. Citicorp, 1996 U.S. Dist. LEXIS 891, 1996 WL 34158,* [*7] *2 (S.D.N.Y. Jan. 30, 1996)* (finding that the complaint, which alleged that defendant "copied by Electronically Reproducing," misappropriated, used and exploited "Buckman's Theory," sufficiently put defendant on notice of plaintiff's claims); cf. *Marvullo, 105 F.Supp.2d at 230* (finding that, "Aside from the specific allegation that defendant [] violated plaintiff's copyright by unauthorizedly cropping the McNeely photograph, [the complaint] fails to allege with specificity any acts by which either defendant directly or contributorily violated plaintiff's copyright").

Moreover, contrary to defendant's contention, it is of no consequence that Plaintiffs plead on "information and belief," rather than setting forth specific evidentiary facts to support their allegations. At least one court has expressly held that, "Pleading 'upon information and belief' is sufficient to satisfy federal notice pleading under *Fed.R.Civ.P. 8(a)*." *Steinbrecher v. Oswego Police Officer Dickey, 138 F.Supp.2d 1103, 1109-1110 (N.D.Ill. 2001)*. Under *Rule 8*, Plaintiffs need only give notice of the claim, leaving "factual details and evidentiary [*8] issues [to be] developed during discovery." *Capitol Records, Inc. v. Wings Digital Corp., 218 F.Supp.2d 280, 284 (E.D.N.Y. 2002)*; see also *Plunket v. Estate of Conan Doyle, 2001 U.S. Dist. LEXIS 2001, 2001 WL 175252, *6 (S.D.N.Y. Feb. 22, 2001)* (holding that plaintiff need not specify in the complaint each infringing act, as "discovery is likely to provide many of the details of the allegedly infringing acts and much of this information may be exclusively in defendant's control").

With respect to the time period of the alleged

copyright infringement, the Complaint alleges that, since February 28, 2005 (the date the Complaint was filed), defendant has "used and continues to use an online media distribution system to download the Copyrighted Recordings." (Cplt. P13). This assertion of continuous and ongoing infringement satisfies the pleading requirements applicable to claims for copyright infringement. In Franklin Electronic Publishers, the court found it sufficient under *Rule 8* that, ". . . while plaintiff has not alleged the date defendants allegedly commenced their infringing activities, plaintiff has alleged that defendant continues to infringe." *Franklin Elec. Publ'r, 763 F.Supp. at 4*; [*9] cf. *Plunket, 2001 U.S. Dist. LEXIS 2001, 2001 WL 175252 at *5* (dismissing copyright infringement claim under *Rule 8* in part because complaint did not include any description whatsoever of the time period during which the alleged infringement occurred). Similarly, in Home & Nature, the court concluded that "the fourth element [of pleading a copyright infringement claim] is satisfied because plaintiff states that the defendant has, since December 2000, infringed and continues to infringe 'one or more' of its copyrights by 'importing, causing to be manufactured, selling and/or offering for sale unauthorized tattoo-like jewelry items.'" *Home & Nature Inc., 322 F.Supp.2d at 266-267*. The court declined to order a more definite statement with regard to the copyright infringement claim, finding that the complaint adequately put the defendant on notice of the acts and times of alleged infringement. Id. Likewise, in the present case, Plaintiffs' allegation of continuous and ongoing infringement satisfies *Rule 8*'s pleading requirements.

For the foregoing reasons Defendant's motion to dismiss is denied.

The Court notes that this case has garnered a considerable following on the [*10] Internet -- partly due to a mistaken belief that I have already decided the case in favor of Mrs. Santangelo. I have not -- and today's simple pleading ruling does not begin to address the merits. We will turn to them now, and to the question that is raised by this and similar complaints: is an Internet-illiterate parent, who does not know Kazaa from a kazoo, and who can barely retrieve her e-mail, liable for copyright infringement committed by that parent's minor child, who downloads music over the Web without the parent's knowledge or permission -- but using the parent's Internet account?

This constitutes the decision and order of the Court.

Dated: November 28, 2005

Colleen McMahon

U.S.D.J.