UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------x

ELEKTRA ENTERTAINMENT GROUP INC.
et al.,

                                  Plaintiffs,                No. 05 CV 7340 (KMK)

    -against-

DENISE BARKER,

                                  Defendant.

-----------------------------------------------------------x

**AMICUS CURIAE BRIEF OF THE ELECTRONIC FRONTIER FOUNDATION IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS THE COMPLAINT**

Wendy Seltzer (WS-4188)
250 Joralemon St.
Brooklyn, NY 11201
Phone: (718) 780-7961
Fax: (415) 436-9993
Email: wendy@seltzer.org

Fred von Lohmann
ELECTRONIC FRONTIER FOUNDATION
454 Shotwell Street
San Francisco, CA 94110
Phone: (415) 436-9333 x123
Fax: (415) 436-9993
Email: fred@eff.org

**TABLE OF CONTENTS**

STATEMENT OF INTEREST ..................................................................................................... 1

BACKGROUND AND SUMMARY OF ARGUMENT ............................................................. 1

ARGUMENT .................................................................................................................................. 3

I.   The Plain Language of § 106(3) Limits the Distribution Right to the Dissemination of Tangible Material Objects. ................................................................................................... 3

II.  Contrary Precedents Cited by Plaintiffs are Unpersuasive and Conflict with Binding Second Circuit Law. ............................................................................................................. 7

III. The WIPO Treaties Provide No Support for Plaintiffs' Conception of § 106(3) .................. 10

IV.  Misreading § 106(3) to Encompass Transmissions Undermines Other Provisions of the Copyright Act. .................................................................................................................... 11

CONCLUSION ............................................................................................................................ 14

## TABLE OF AUTHORITIES

**CASES**

*A&M Records v. Napster,* 239 F.3d 1004 (9th Cir. 2001) ........................................................... 7

*Agee v. Paramount Communications, Inc.,* 59 F.3d 317 (2d Cir. 1995) ............................... passim

*In re Aimster Copyright Litigation,* 252 F. Supp. 2d 634 (N.D. Ill. 2002), *aff'd*, 334 F.3d 643 (7th
   Cir. 2003) ................................................................................................................................. 8

*In re Napster,* 377 F.Supp.2d 796 (N.D. Cal. 2005) .................................................................... 6

*Marobie-FL, Inc. v. Nat'l Assoc. of Fire Equip. Distribs.,* 983 F.Supp. 1167 (N.D. Ill. 1997) ...... 9

*Perfect 10 v. Google,* __ F.Supp.2d ___, No. CV 04-9484 AHM (C.D. Cal. Feb. 21, 2006) ........ 9

*Playboy Enterprises v. Frena*, 839 F.Supp. 1552 (M.D. Fla. 1993) .......................................... 8, 9

*Playboy Enterprises, Inc. v. Hardenburgh,* 982 F.Supp. 503 (N.D. Ohio 1997) .......................... 9

*Sony v. Universal City Studios,* 464 U.S. 417, 431 (1984) .................................................... 3, 13

**OTHER AUTHORITIES**

David J. Loundy, *Revising the Copyright Law for Electronic Publishing,* 14 J. MARSHALL J.
   COMPUTER & INFO. L. 1 (1995) ............................................................................................ 10

H.R. 2441, 104th Cong. § 2 (1995) ....................................................................................... 7, 11

H.R. Rep. No. 94-1476 (1976) ................................................................................................ 4, 5

INFORMATION INFRASTRUCTURE TASK FORCE, INTELLECTUAL PROPERTY AND THE NATIONAL
   INFORMATION INFRASTRUCTURE: THE REPORT OF THE WORKING GROUP ON INTELLECTUAL
   PROPERTY RIGHTS (1995) ....................................................................................................... 7

Jane C. Ginsburg, *International Copyright: From a Bundle of National Copyright Laws to a
   Supranational Code?*, 47 J. COPYR. SOC'Y U.S.A. 265 (2000) ............................................. 10

John Borland, *Tension Grows Between Labels and Digital Radio*, CNET NEWS.COM (Jan. 13,

2006) ..............................................................................................................................13

R. Anthony Reese, *The Public Display Right: The Copyright Act's Neglected Solution to the Controversy Over RAM Copies,* 2001 U. OF ILL. L. REV. 83, 122-38 (2001).................... passim

S. 1284, 104th Cong. § 2 (1995)....................................................................................... 7, 11

S. Rep. No. 104-128 (1995) ...................................................................................................6

Testimony of Marybeth Peters, Register of Copyrights, *WIPO Copyright Treaties Implementation Act and Online Copyright Liability Limitation Act*, 105th Cong. (Sept. 16, 1997) ...............................................................................................................................11

**STATEMENT OF INTEREST**

The Electronic Frontier Foundation (EFF) is a member-supported, nonprofit public interest organization devoted to maintaining the traditional balance that copyright law strikes between the interests of copyright owners and the interests of the public. Founded in 1990, EFF represents more than 10,000 contributing members including consumers, hobbyists, computer programmers, entrepreneurs, students, teachers, and researchers united in their reliance on a balanced copyright system that ensures adequate protection for copyright owners while ensuring access to information in the digital age.

**BACKGROUND AND SUMMARY OF ARGUMENT**

Defendant Denise Barker, like more than 19,000 others, is accused by several major record companies of using peer-to-peer (P2P) file sharing software to download and upload music.[1] When individuals use P2P file sharing software to make unauthorized copies of sound recordings,[2] record companies are within their rights to sue them for making unauthorized reproductions. *See* 17 U.S.C. § 106(1) (exclusive right of reproduction). In the thousands of suits filed thus far, however, the record companies have also alleged infringement of their distribution rights under 17 U.S.C. § 106(3), apparently in hopes that an expansive judicial interpretation of the distribution right may support quick summary judgments based on the bare fact that a defendant has "offered" files for download.[3]

---

[1] For an overview of the history of the recording industry's litigation campaign, *see* EFF White Paper, RIAA v. the People: Two Years Later (Nov. 2005) (available at <http://www.eff.org/IP/P2P/RIAAatTWO_FINAL.pdf>).

[2] Strictly speaking, material objects embodying sound recordings are referred to as "phonorecords" under the Copyright Act, with "copies" reserved for material objects embodying all other forms of copyrightable expression. *See* 17 U.S.C. § 101. For convenience, we will refer to phonorecords herein by the more familiar lay term.

[3] EFF agrees with Defendant that merely "offering" to transmit a sound recording does not

1

Not all "distributions," however, infringe § 106(3). The Copyright Act grants to copyright owners the exclusive right "to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending." 17 U.S.C. § 106(3). The plain language of the Act—as well as legislative history, historical practice, and binding Second Circuit precedent—requires that a physical, tangible, material object change hands before the distribution right can be infringed. Plaintiffs' complaint ignores this plain statutory language and instead attempts to expand § 106(3) to encompass intangible transmissions between computers over the Internet.

To support their view, Plaintiffs cite a handful of rulings, none binding on this Court, that include loose language regarding the § 106(3) right. None of those rulings includes any analysis of the question posed by Plaintiffs' complaint here: do intangible computer network transmissions infringe the § 106(3) right? In brushing past this threshold question, Plaintiffs fail to mention the most relevant Second Circuit precedent, *see Agee v. Paramount Communications, Inc.,* 59 F.3d 317 (2d Cir. 1995), or the leading scholarly treatment of the issue, *see* R. Anthony Reese, *The Public Display Right: The Copyright Act's Neglected Solution to the Controversy Over RAM Copies,* 2001 U. OF ILL. L. REV. 83, 122-38 (2001) (hereafter "Reese, *The Public Display Right*"), both of which reject Plaintiffs' view.

Expanding § 106(3) to include transmissions would not only contravene the plain statutory language, but would upset settled expectations in a variety of contexts and upset the delicate balance struck by Congress in the Copyright Act. Congress has enacted several copyright limitations, exceptions and statutory licenses based on the assumption that

---

violate the § 106(3) right, but limits this brief to addressing the prior question of whether transmissions over computer networks can violate the distribution right, even if completed.

2

transmissions are properly encompassed by the public performance right, not the distribution right. Treating Internet transmissions as "distributions" under § 106(3) threaten those statutory provisions.

Accordingly, because "the distribution right as currently framed… does not appear to encompass transmissions of copyrighted works over computer networks," Reese, *The Public Display Right*, at 126-27, and because Plaintiffs did not (and cannot) allege that Ms. Barker transferred any material objects embodying sound recordings, this Court should dismiss Plaintiffs' distribution claim.[4]

## ARGUMENT

### I. The Plain Language of § 106(3) Limits the Distribution Right to the Dissemination of Tangible Material Objects.

Copyright is, first and foremost, a creature of statute. *See Sony v. Universal City Studios,* 464 U.S. 417, 431 (1984) ("[T]he protection given to copyrights is wholly statutory."). It represents a carefully crafted set of complex legislative compromises aimed at balancing the interests of both owners and users of copyrighted works. *Id.* at 429. The six limited exclusive rights granted to copyright owners, each carefully delineated by statutory definitions, form the foundation of the copyright edifice. *See* 17 U.S.C. § 106. The scope of each exclusive right is further defined by a web of statutory exceptions, many of which apply differently depending on which exclusive right is implicated. *See, e.g.,* 17 U.S.C. §§ 109 (first sale limitation on distribution right); 110 (exceptions to public performance right); 111 (statutory license for public performance by cable television); 114 (statutory license for public performance by webcasters);

---

[4] EFF takes no position with respect to whether Plaintiffs adequately plead their reproduction claim here. Whether Ms. Barker may have any applicable defenses is, of course, not a question appropriately addressed on this motion to dismiss.

3

118 (statutory license for public performance by nonprofit broadcasters). In addition, because each exclusive right can be separately assigned or licensed, many copyright owners and licensees control only a subset of the exclusive rights, which in turn means that many contractual licensing arrangements between private parties depend on a careful parsing of the six exclusive rights. Precisely because so much in the copyright system turns on a clear understanding of which exclusive rights are implicated by any particular activity, it is critical that courts attend closely to the statutory scheme, rather than freely embroidering on it based on the equities of any particular case.

Section 106(3) provides that the owner of a copyright has the exclusive right: "**to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending**." When defining the right, Congress deliberately chose not to define the right expansively as a right to distribute *the copyrighted work*, but instead limited it to encompass only the distribution *of copies or phonorecords* of the work. *Compare* 17 U.S.C. § 106(4)-(6) (granting the exclusive right to perform or display "the copyrighted work" publicly). This distinction is critical, as the Copyright Act defines both "copies" and "phonorecords" as "material objects" in which copyrighted works are fixed. *See* 17 U.S.C. § 101; *see also* 17 U.S.C. § 202 (distinguishing ownership of work from ownership of copies); H.R. Rep. No. 94-1476, at 53 (1976)[5] (hereafter "1976 House Report") (emphasizing "fundamental distinction" between the intangible copyrighted work and the material objects in

---

[5] The 1976 House Report, which is the principal legislative history for the 1976 Copyright Act that forms the basis of Title 17, is reprinted at 1976 U.S.C.A.A.N. 5659 and is included as an appendix to both of the leading copyright law treatises, PAUL GOLDSTEIN, GOLDSTEIN ON COPYRIGHT (3d ed. 2005) and MELVILLE NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT (2005).

which it can be embodied). In short, "the copyright owner's exclusive right of distribution is a right to distribute such tangible, physical things." Reese, *The Public Display Right,* at 126.

The relevant legislative history buttresses the unambiguous statutory language. The 1976 House Report, in discussing § 106(3), consistently refers to the distribution right as the right to distribute "copies" and "phonorecords," each of which denotes solely material objects. *See id.* at 127 (citing the 1976 House Report at 72). When referring to the intangible copyrighted work, separate from a tangible copy, the 1976 House Report and the Copyright Act, as well as copyright specialists generally, refer to the "work" or "sound recording" rather than "copies" or "phonorecords."

The limitation of § 106(3) to distribution of material objects is further borne out by the treatment of "publication" under the Copyright Act. *Id.* at 131-32. As Plaintiffs themselves point out, "distribution" and "publication" are closely related terms in the Copyright Act. *See* Pls. Opp. at 16; *Agee v. Paramount,* 59 F.3d at 325. When discussing the concept of publication, the legislative history not only repeats the emphasis on copies and phonorecords (i.e., material objects), but also states:

> The definition…makes it plain that *any form of dissemination in which a material object does not change hands*—performances or displays on television, for example—*is not publication* no matter how many people are exposed to the works.

1976 House Report at 138 (emphasis added); *see also* Reese, *The Public Display Right*, at 131-23 (discussing relation of "publication" and other copyright provisions to "distribution").

5

Legislative activity since the passage of the 1976 Copyright Act also supports the view that § 106(3) is properly limited to situations where a material object changes hands. In 1995, Congress addressed the nascent market for "digital downloads" of music by creating a statutory license that permits licensees to "distribute…a phonorecord…by means of a digital transmission which constitutes a digital phonorecord delivery." 17 U.S.C. § 115(c)(3)(A). While Plaintiffs may argue that this implicitly expanded the § 106(3) right to include transmissions over computer networks, it is telling that Congress specifically chose *not* to amend § 106(3). The relevant legislative history shows that this was deliberate; Congress acknowledged that reading § 106(3) to include digital transmissions was controversial and "expresse[d] no view on current law in this regard." S. Rep. No. 104-128, at 17 (1995), *reprinted in* 1995 U.S.C.A.A.N. 357, 364; *see also* Reese, *The Public Display Right*, at 133.

Similarly, although Congress has acted on several occasions to enhance the criminal penalties applicable to those who infringe copyrights by means of computer networks, it has consistently refused to alter the underlying language of § 106(3). *See In re Napster,* 377 F.Supp.2d 796, 804 (N.D. Cal. 2005) (the Artists' Rights and Theft Prevention (ART) Act of 2005 does not expand the scope of § 106(3)); Reese, *The Public Display Right*, at 133 (the No Electronic Theft (NET) Act should not be read to expand § 106(3)).

Congressional unwillingness to amend § 106(3) to encompass digital transmission has not been the result of inattention. During the early 1990s, the Clinton Administration undertook a comprehensive inter-agency review of copyright in order to propose updates to the law to in light of digital technologies. The resulting 1995 report, known as "The NII White Paper," specifically proposed an amendment to § 106(3), noting that "it is unclear under the current law that a transmission can constitute a distribution of copies or phonorecords of a work." INFORMATION

6

INFRASTRUCTURE TASK FORCE, INTELLECTUAL PROPERTY AND THE NATIONAL INFORMATION INFRASTRUCTURE: THE REPORT OF THE WORKING GROUP ON INTELLECTUAL PROPERTY RIGHTS at 213 (1995).[6] Although bills were subsequently introduced that would have amended § 106(3) to include transmissions, they did not pass. *See* H.R. 2441, 104th Cong. § 2 (1995); S. 1284, 104th Cong. § 2 (1995); Reese, *The Public Display Right*, at 135.

### II. Contrary Precedents Cited by Plaintiffs are Unpersuasive and Conflict with Binding Second Circuit Law.

Plaintiffs cite several cases that assume, without analysis, that transmissions over computer networks can violate § 106(3). This Court should take this opportunity to be the first to examine the plain statutory language of § 106(3), follow the Second Circuit's ruling in *Agee v. Paramount,* 59 F.3d 317, and reject Plaintiffs' proffered contrary nonbinding authority.

The question of whether § 106(3) should be expanded beyond its plain statutory language to encompass transmissions over computer networks has never been argued or analyzed in any published opinion involving P2P file sharing. Plaintiffs make much of one line in the Ninth Circuit's ruling in *A&M Records v. Napster*: "Napster users who upload file names to the search index for others to copy violate plaintiffs' distribution rights." *A&M Records v. Napster,* 239 F.3d 1004, 1014 (9th Cir. 2001). Because the existence of direct infringement was never disputed by the defendant in that preliminary injunction appeal, the statement is dicta. *See* Def. Reply at 10; *A&M Records v. Napster,* 239 F.3d at 1013. Moreover, because the issue of the proper scope of § 106(3) was not argued by the parties in that appeal, the Ninth Circuit did not have the benefit of briefing on the subject.[7] Similarly, the existence of direct infringement was conceded by the defendants in *In re Aimster Copyright Litigation,* 252 F. Supp. 2d 634, 648 (N.D. Ill.

---

[6] Available at <http://www.uspto.gov/web/offices/com/doc/ipnii/>.
[7] All the briefs in *A&M v. Napster* are available at <http://www.eff.org/IP/P2P/Napster/>.

7

2002), *aff'd*, 334 F.3d 643 (7th Cir. 2003), and thus the question of the scope of § 106(3) was never briefed by the parties or analyzed by the courts.

Binding Second Circuit authority, in contrast, strongly supports the view that the § 106(3) distribution right does not encompass transmissions. In *Agee v. Paramount*, 59 F.3d 317 (2d Cir. 1995), the court specifically examined whether the electronic transmission of a sound recording, resulting in a reproduction by a third party, could infringe § 106(3). In that case, Paramount Pictures "copied portions of [plaintiff's] sound recording to make the audio track of a segment of a television program, and transmitted the program to [affiliated] TV stations, which in turn made their own copies for transmission to the viewing public." *Id.* at 318. Writing for a unanimous panel, Judge Newman explained that "distribution is generally thought to require the transmission of a 'material object' in which the sound recording is fixed: a work that is of 'more than transitory duration.'" *Id.* at 325. Emphasizing the "distinction between material and non-material embodiments," the court concluded that Paramount's transmission did not infringe the distribution right. *Id.* at 326.

The Second Circuit specifically left for another day the question of whether "disseminations must always be in physical form to constitute 'distributions.'" *Id.* at 325 (noting the district ruling in *Playboy Enterprises v. Frena*, 839 F.Supp. 1552 (M.D. Fla. 1993)). Plaintiffs' distribution claim in this case, however, squarely poses that question. Just as in *Agee v. Paramount*, the defendant here is accused of having made unauthorized copies of sound recordings and of electronically transmitting those sound recordings to others, who, thanks to the transmissions, make their own copies. From a copyright standpoint, it is irrelevant that Paramount used satellite communications technology to transmit the sound recordings, whereas Ms. Barker is alleged to have used the Internet. *See* Reese, *The Public Display Right*, at 131 ("If

8

liability for violation of the distribution right turns merely on a user's ability to make a new copy of transmitted material, then any transmitter could be violating the distribution right merely by engaging in transmissions of displays."). Both are electronic transmissions, and both enabled third parties to reproduce the sound recordings in question (in Paramount's case, affiliated television stations recorded the transmissions, while in Ms. Barker's case, it would be other Kazaa users). Accordingly, just as Paramount's transmissions of sound recordings could not constitute "distributions" within the meaning of § 106(3), Ms. Barker's transmissions also cannot.[8]

Rather than mention Second Circuit authority, Plaintiffs cite several district court rulings that have included loose language, unsupported by analysis, suggesting that transmissions over computer networks can infringe § 106(3). *See, e.g., Marobie-FL, Inc. v. Nat'l Assoc. of Fire Equip. Distribs.,* 983 F.Supp. 1167, 1173 (N.D. Ill. 1997); *Playboy Enterprises, Inc. v. Hardenburgh,* 982 F.Supp. 503, 513 (N.D. Ohio 1997); *Playboy Enterprises, Inc. v. Frena,* 839 F.Supp. 1552, 1556 (M.D. Fla. 1993).[9] None of these cases is binding on this Court, nor are they persuasive on the question of the proper scope of § 106(3). Not one of these rulings addresses the plain language of § 106(3) or explains the basis for extending the right beyond the distribution of

---

[8] In *Agee v. Paramount*, the court noted that transmissions generally implicate the public performance right, but that Congress at the time had not extended the public performance right to include sound recordings. *See Agee v. Paramount,* 59 F.3d at 325. Although owners of sound recording now enjoy a limited public performance right that encompasses digital transmissions, *see* 17 U.S.C. § 106(6), Plaintiffs here have not alleged an infringement of their performance rights.

[9] Just a few days ago in a case involving Google, another court declined a copyright owner's invitation to extend the § 106(3) right to encompass transmissions over the Internet, finding the issue moot in light of plaintiff's reproduction and public display claims. *See Perfect 10 v. Google,* __ F.Supp.2d ___, No. CV 04-9484 AHM, slip op. at 23 n.11 (C.D. Cal. Feb. 21, 2006) (order granting preliminary injunction, available at <http://www.eff.org/legal/cases/Perfect10_v_Google/perfect10_order.pdf>).

9

material objects. *See* Reese, *The Public Display Right* at 128 & n.174 ("The cases that conclude that a transmission over a computer network is a distribution offer no explanation for how such activity constitutes a transfer of a material object within the scope of § 106(3)."). In each of these cases, moreover, the invocation of the distribution right was redundant and unnecessary, as the defendants had also infringed either the reproduction or public display right. Finally, all of the cases rely on a 1993 ruling in *Playboy v. Frena,* 839 F.Supp. at 1556, which itself has been criticized by commentators and includes no rationale to support its expansive view of § 106(3). *See* Reese, *The Public Display Right,* at n.174; David J. Loundy, *Revising the Copyright Law for Electronic Publishing,* 14 J. MARSHALL J. COMPUTER & INFO. L. 1, 21 (1995) (criticizing *Frena* for misapplying § 106(3)).

### III. The WIPO Treaties Provide No Support for Plaintiffs' Conception of § 106(3).

Plaintiffs' invocation of the WIPO Copyright Treaty (WCT) and the WIPO Performances and Phonograms Treaty (WPPT) borders on frivolous. As Defendant properly notes, those treaties are not self-executing and thus lack any binding legal authority separate from their implementation through the Copyright Act. Def. Reply at 11-12. In addition, these treaties are solely concerned with ensuring minimum protections for *foreign* rightsholders. Nothing about them purports to limit U.S. sovereignty with respect to the treatment of domestic copyright owners. *See* Jane C. Ginsburg, *International Copyright: From a Bundle of National Copyright Laws to a Supranational Code?*, 47 J. COPYR. SOC'Y U.S.A. 265, 270 (2000) ("[T]he Berne minima apply to a Union member's protection of works from other Berne members; no Berne member is obliged to accord its own authors treaty-level protection.").

Furthermore, as noted above, when considering how to implement the "making available" obligations of the WIPO treaties, Congress specifically considered and rejected

10

proposals that would have amended § 106(3) to include transmissions. *See* H.R. 2441, 104th Cong. § 2 (1995); S. 1284, 104th Cong. § 2 (1995). Instead, Congress left § 106(3) unchanged, concluding that the combination of the existing exclusive rights of reproduction, distribution, and public performance already provided copyright owners (foreign and domestic) with protections that met the requirements of the WIPO treaties. *See* Testimony of Marybeth Peters, Register of Copyrights, *WIPO Copyright Treaties Implementation Act and Online Copyright Liability Limitation Act*, 105th Cong. (Sept. 16, 1997) at 43 (testifying that the Copyright Office had, "after an extensive analysis," concluded that no amendment to § 106 was necessary in order to comply with the WIPO treaties).

As illustrated by *Agee v. Paramount*, when a work is "made available" by transmission, U.S. copyright law has traditionally addressed the issue through the public performance right, rather than the distribution right. Plaintiffs, as owners of sound recording copyrights, may be frustrated by the fact that Congress has given them only limited public performance rights, *see* 17 U.S.C. § 106(6). But nothing in the WIPO treaties justifies overturning that Congressional decision by treating transmissions as "distributions" under § 106(3).

### IV. Misreading § 106(3) to Encompass Transmissions Undermines Other Provisions of the Copyright Act.

Some may question whether the careful parsing of exclusive rights is important in this case. After all, if P2P file sharers are infringing Plaintiffs' reproduction rights when they download, what's the harm in "piling on" with a distribution claim when they upload? Rulings that misconstrue the scope of § 106(3), however, have the potential to cause serious disruption in contexts far removed from P2P file sharing. The Copyright Act carefully distinguishes and describes each of the exclusive rights, subjecting each to a distinct and elaborate array of statutory exceptions, limitations and statutory licenses. Relying on those distinctions, private

11

parties, in turn, have arranged their affairs with reference to these statutory categories. Judicial rulings that blur the statutory lines in one context can thus disrupt settled expectations in others.

Fundamental to the edifice of copyright law has been a distinction between the reproduction and dissemination of material objects—activities regulated by the reproduction and distribution rights—and the transmission of works to the public—activity regulated by the rights of the public performance and display. *See* Reese, *The Public Display Right,* at 92-138. When one person "uploads" a file to another, the work is transmitted over the Internet such that the recipient is left with a complete copy of the transmitted work at the end of the transmission. *See id.* at 130. While it may be tempting to describe this set of events as a "distribution," it is important to recall that § 106(3) does not encompass all acts of distribution, but is instead statutorily cabined to the exchange of material objects. Instead, from the perspective of § 106 of the Copyright Act, P2P file sharing principally implicates the right of reproduction (and potentially public performance), rather than distribution. *See* Reese, *The Public Display Right,* at 129-30.

The distinction is not a mere exercise in formalism, as an increasing number of activities in the digital age involve very similar "transmit and reproduce" functions. For example, cable and satellite television broadcasters rely on a statutory license that permits them to transmit copyrighted programming to their subscribers. *See* 17 U.S.C. §§ 111, 122. That statutory license, however, is limited to the public performance right and does not encompass § 106(3). Today, however, millions of American cable subscribers routinely use VCRs and digital video recorders (DVRs)—often supplied by their cable or satellite TV provider—to turn those transmissions into "downloads." By injecting uncertainty about the applicability of the distribution right to these

activities, Plaintiffs' reading of § 106(3) could undermine the settled expectations of this industry.

Similarly, when satellite radio broadcasters (like XM and Sirius) transmit music to subscribers, they rely on a statutory license that applies only to the public performance right in sound recordings. *See* 17 U.S.C. § 114(d)(2). Those same satellite radio broadcasters, however, have recently begun selling recorders that enable their subscribers to store transmitted music for later playback. *See* John Borland, *Tension Grows Between Labels and Digital Radio*, CNET NEWS.COM (Jan. 13, 2006).[10] Expansive conceptions of § 106(3) raise the specter that these satellite radio broadcasters thereby infringe the distribution right. This outcome would effectively render the statutory license a dead letter, as satellite radio broadcasters would be forced to negotiate with copyright owners for distribution rights.[11]

Several other copyright exceptions and statutory licenses that treat transmissions as public performances would be jeopardized if this Court adopts Plaintiffs' reading of 106(3), including those affecting libraries and nonprofit broadcasters. *See* 17 U.S.C. §§ 110, 118. Finally, expanding the scope of § 106(3) would also threaten to upset existing private contractual arrangements that are premised on the traditional division of distribution, reproduction, and performance rights.

---

[10] Available at <http://news.com.com/Tension+grows+between+labels+and+digital+radio/2100-1025_3-6027079.html>.
[11] Although the subscribers are making reproductions with these satellite radio recorders, those "time-shifted" copies are themselves subject to a statutory licensing regime, *see* 17 U.S.C. § 1008, and may also qualify as a fair use, *see Sony v. Universal City Studios,* 464 U.S. at 447-55.

13

**CONCLUSION**

For the reasons discussed above, Plaintiffs' § 106(3) claim must be dismissed for failure to state a claim on which relief may be granted.

Dated: New York, New York  Respectfully submitted,
February 23, 2006

/s/ Wendy Seltzer
*Attorney for Amicus Curiae*
*Electronic Frontier Foundation*

Wendy Seltzer (WS-4188)
250 Joralemon St.
Brooklyn, NY 11201
Phone: (718)780-7961
Fax: (415) 436-9993
Email: wendy@seltzer.org

*Of Counsel:*
Fred von Lohmann
Electronic Frontier Foundation
454 Shotwell Street
San Francisco, CA 94110
Phone: (415) 436-9333 x123
Fax: (415) 436-9993
Email: fred@eff.org