**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------X
                                                :
ELEKTRA ENTERTAINMENT GROUP       :
INC., a Delaware corporation; UMG
RECORDINGS, INC., a Delaware corporation;  :
and VIRGIN RECORDS AMERICA, INC., a   :
California corporation,
                                                :
            Plaintiffs,              Case No. 05CV7340 (KMK) (THK)
                                                :
        -against-                        :
                                                :
DENISE BARKER,                      :
                                                :
            Defendant.
--------------------------------------------------------X

**BRIEF OF *AMICUS CURIAE* MOTION PICTURE ASSOCIATION OF**
**AMERICA, INC. (MPAA) IN CONNECTION**
**WITH DEFENDANT'S MOTION TO DISMISS THE COMPLAINT**

Eric. J. Schwartz
**SMITH & METALITZ LLP**
1747 Pennsylvania Avenue, NW, Suite 825
Washington, D.C.  20006-4637
(202) 833-4198
e-mail: schwartz@smimetlaw.com

Jonathan Zavin
**LOEB & LOEB LLP**
345 Park Avenue
New York, New York 10154-1895
(212) 407-4000

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................................... ii

INTERESTS OF THE AMICUS ....................................................................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT .............................................................1

ARGUMENT .................................................................................................................................3

I.      THE DIGITAL TRANSMISSION OF AN ELECTRONIC FILE OVER A COMPUTER
        NETWORK FOR THE PURPOSES OF REPRODUCTION CONSTITUTES A
        "DISTRIBUTION" UNDER § 106(3) ...............................................................................3

II.     U.S. COPYRIGHT LAW HAS LONG PROVIDED A RIGHT OF "MAKING
        AVAILABLE" IN 17 U.S.C. § 106(3) ..............................................................................6

III.    U.S. COPYRIGHT LAW  PROVIDES A RIGHT OF "MAKING AVAILABLE" IN 17
        U.S.C. § 106(3) AS REQUIRED BY THE WIPO DIGITAL TREATIES ......................12

        A.  The WIPO Digital Treaties Clearly Require a Right of "Making Available" in the
            Rights of Distribution and Communication to the Public......................................12

        B.  All Treaty Rights Must Be Found in U.S. (Copyright) Law Because the WIPO
            Digital Treaties Are Not Self-Executing…………………………………………16

IV.     FINDING THAT U.S. COPYRIGHT LAW DOES NOT PROTECT COPYRIGHT
        OWNERS FROM THE UNAUTHORIZED DISTRIBUTION THROUGH MAKING
        AVAILABLE IS CONTRARY TO CONGRESS' PUBLIC POLICY OBJECTIVES ....19

# **TABLE OF AUTHORITIES**

## **Cases**

*A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004 (9th Cir. 2001)................................. 2, 10, 18

*Agee v. Paramount Commun., Inc.,* 59 F.3d 317 (2d Cir. 1995) ..................................... 6

*Brode v. Tax Memt, Inc.*, No. 88 C 10698, 1990 U.S. Dist. LEXIS 998
   (N.D. Ill. Jan. 31, 1990) ............................................................ 10

*Capitol Records, Inc. v. Bertelsmann AG*, No. 00-cv-10369 (N.D. Cal. May 12, 2005) ..............11

*Capitol Records, Inc. v. Bertelsmann AG*, 377 F. Supp. 2d 796 (N.D. Cal. 2005).......................11

*Curb v. MCA Records,* 898 F. Supp. 586 (M.D. Tenn. 1995) ................................. 10, 11

*Eldred v. Ashcroft*, 537 U.S. 186 (2003)...................................................... 18

*Expediters Int'l v. Direct Line Cargo Mgmt. Servs.,* 995 F.Supp. 468 (D.N.J. 1998) ................. 11

*Ford Motor Co. v. Summit Motor Prods., Inc*., 930 F.2d 277 (3d Cir. 1991) ........................... 7, 8

*Getaped.com v. Cangemi*, 188 F. Supp. 2d 398 (S.D.N.Y. 2002) ................................. 10

*Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539 (1985) ....................... 7

*Hotaling v. Church of Jesus Christ of Latter-Day Saints*, 118 F.3d 199 (4th Cir. 1997).............. 9

*In re Aimster Copyright Litig.*, 334 F.3d 643 (7th Cir. 2003), *cert. denied,* 540 U.S. 1107
   (2004)..................................................................................2

*Marobie-FL, Inc. v. National Ass'n of Fire Equipment Distribs. & Northwest Nexus, Inc.*, 983 F.
   Supp. 1167 (N.D. Ill. 1997)) .................................................... 10

*Matlow v. Solomon*, No. Civ. 04-6109, 2005 U.S. Dist. LEXIS 36119 (D. Or. Feb. 7, 2005)..... 10

*Metro-Goldwyn-Mayer Studios, Inc., v. Grokster Ltd.,* 125 S. Ct. 2764 (2005) ............... 3, 19, 20

*NFL v. Primetime 24 Joint Venture,* No. 98 Civ. 3778 (LMM), 1999 U.S. Dist. LEXIS 3592
   (S.D.N.Y. March 24, 1999)................................................... 11

*Playboy Enters., Inc. v. Russ Hardenburgh, Inc.,* 982 F. Supp. 503 (N.D. Ohio 1997).............. 10

*Playboy Enters., Inc. v. Frena,* 839 F. Supp. 543 (N.D. Tex. 1997), *aff'd,* 168 F.3d 486 (5th Cir.
   1999) .......................................................................... 6

*Sony Music Entm't, Inc. v. Scott*, No. 03-CV-6886 (S.D.N.Y. Jan. 3, 2006)............................... 10

*Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417 (1984). .................................... 18

*State v. Perry*, 697 N.E. 2d 624 (Ohio 1998) ............................................................................... 10

*Wildlife Internationale, Inc. v. Clements*, 591 F. Supp. 1542 (S.D. Ohio 1984) ........................ 10

*Peer Int'l Corp. v. Latin Am. Music Corp.*, 161 F. Supp. 2d 38 (D.P.R. 2001) ........................... 10

**Statutes & Treaties**

17 U.S.C. § 101 ................................................................................................................................. 7

17 U.S.C. § 102 ........................................................................................................................... 4, 13

17 U.S.C. §§ 103-106(A) ……………………………………………………………………….4

17 U.S.C. § 106 ....................................................................................................................... passim

17 U.S.C. §§107 - 112……………………………………………………………………………4

17 U.S.C. § 115 ............................................................................................................................. 3-5

17 U.S.C. § 117……………………………………………………………………………………4

17 U.S.C. § 506……………………………………………………………………………………18

Artists Rights and Theft Prevention Act of 2005, § 103, Pub. L. No. 109-9, 119 Stat. 218 (codified at 17 U.S.C. § 506(a)(1) as amended)……………………………………………………18

Digital Performance Right in Sound Recordings Act, Pub. L. No. 104-39, 109 Stat. 336 (codified at 17 U.S.C. § 115)……………………………………………………………………………..3

WIPO Copyright Treaty, Dec. 20, 1996, art. 6 & 8 ................................................................. 12-16

WIPO Performances and Phonograms Treaty, Dec. 20, 1996, art. 12 & 14 ........................... 12-16

WIPO Copyright and Performances and Phonograms Treaties Implementation Act of 1998, Pub. L. 105-304, 112 Stat. 2861 (1998) ...............................................................................................17

**Other Authorities**

H.R. Rep. No. 105-551 (1998)........................................................................................................ 17

H.R. Rep. No. 94-1476 (1976)......................................................................................................... 7

Dr. Mihaly Ficsor, <u>The Law of Copyright and the Internet: The 1996 WIPO Treaties, Their Interpretation and Implementation</u> (2002) ...................................................................................15

Jorg Reinbothe & Silke von Lewinski, <u>The WIPO Treaties 1996</u> (2002) ................................15,16

<u>Kaminstein Legislative History Project, Copyright Act of 1976</u> (Alan Latman & James F. Lightstone, eds. 1981).........................................................................................................................7

Letter from Marybeth Peters to Rep. Howard L. Berman 1 (Sept. 25, 2002), *reprinted in Piracy of Intellectual Property on Peer-to-Peer Networks:  Hearing Before the Subcomm. on Courts, the Internet, and Intellectual Property of the House Comm. on the Judiciary*, 107th Cong. 114-15 (2002)............................................................................................................................... 17

Melville Nimmer & David Nimmer, <u>Nimmer on Copyright</u> ("Nimmer on Copyright") (2005) ............................................................................................................................ 4, 7, 8

Message from the President of the United States, WIPO Copyright Treaty (WCT) and WIPO Performances and Phonograms Treaty (WPPT) (1996) Treaty Doc. 105-17 (Jul. 28, 1997)... 16

Resolution of Ratification, WIPO Copyright Treaty (WCT) and WIPO Performances and Phonograms Treaty (WPPT) (1996) Treaty Doc. 105-17 (Oct. 21, 1998). .............................. 12

S. Rep. No.104-128 (1995) ...................................................................................................... 5

Statement of Marybeth Peters, Register of Copyrights, *WIPO Copyright Treaties Implementation Act and Online Copyright Liability Limitation Act: Hearing on H.R. 2281 & H.R. 2180 Before the House Subcomm. on Courts and Intellectual Property of the Comm. on the Judiciary*, 105th Cong. 43 (1997). ........................................................................................................ 17

Statement of Sen. Stevens, *Issues Related to MGM v. Grokster: Hearing Before the Senate Committee on Commerce*, 109th Cong. (2005). ..................................................................... 20

World Intellectual Property Organization, Guide to the Copyright and Related Rights Treaties Administered by WIPO (2003)..............................................................................................13, 15

## INTERESTS OF THE AMICUS

In accordance with the Court's order of March 3, 2006, the Motion Picture Association of America, Inc. (MPAA) respectfully submits this amicus brief in opposition to Defendant's motion to dismiss.[1]  The MPAA is a trade association whose members include the largest motion picture distributors in the United States.[2]  Founded in 1922, the MPAA serves as the voice and advocate of the domestic motion picture, home video and television industries.  Increasingly, MPAA member companies – as well as other copyright owners of books, music, films, sound recordings, photographs, and business and entertainment software – are taking advantage of new ways of distributing their works in electronic form.  But, these efforts have been undercut by the fact that such works are widely distributed without permission via peer-to-peer networks.  The harmful impact of this illegal activity is felt not just by copyright owners, but also by consumers who otherwise benefit from the added creativity and public dissemination of a cornucopia of copyrighted material, encouraged through effective copyright protection.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Defendant and/or amici curiae EFF, CCIA and USIIA argue that the distribution right in the Copyright Act found in 17 U.S.C. § 106(3) is not invoked where only an electronic transmission of a copyrighted work occurs (EFF's position), and that the "making available" of copies for distribution is not a violation of the exclusive distribution right (CCIA's and USIIA's position).  The plain language of the statute, the case law, and the legislative history make clear

---

[1] The MPAA is authorized to represent to the Court that the following organizations support and join this amicus brief: American Society of Media Photographers, Inc. (ASMP); Association of American Publishers (AAP); Association of American University Presses (AAUP); Directors Guild of America (DGA); Entertainment Software Association (ESA); and, the Independent Film and Television Alliance (IFTA).  These organizations represent authors and owners of copyrights in a wide range of commercially distributed materials, including motion pictures and television programs, photographs, books, entertainment software, and databases.

[2] The members of the MPAA are Buena Vista Pictures Distribution (Disney), Metro-Goldwyn-Mayer Studios Inc., Paramount Pictures Corporation, Sony Pictures Entertainment Inc., Twentieth Century Fox Film Corporation, Universal City Studios LLLP and Warner Bros. Entertainment Inc.

that proving infringement of the distribution right does not require proof that any copy was actually transferred or transmitted from one point or one person to another, and that under U.S. copyright law the right of distribution includes a right of making available. As more fully set forth below, if the Defendant, without authorization, loaded copies of Plaintiffs' sound recordings on her computer (whether legal or illegal copies), and made them available for other users of the peer-to-peer network to download, she infringed Plaintiffs' § 106(3) distribution rights, regardless of whether any other user of the peer-to-peer service can be shown to have downloaded a copy from the Defendant's computer. It is no different than if Defendant had put a table on a street corner with copies of Plaintiffs' works and a sign that said "Free – Take One" – except that in the present case Plaintiffs' works were being made available for the taking simultaneously to millions of Internet users. That the "right of making available" is subsumed within the distribution right was confirmed in 1998-1999 by the legislative and executive branches of the United States when faced with that precise question in the context of U.S. ratification and implementation of two "digital treaties" adopted by the World Intellectual Property Organization (WIPO). At that time both branches reached exactly the opposite conclusion from Defendant's claim.

The briefs submitted by EFF, CCIA and USIIA pay lip service to the obvious truth that an unauthorized copying of a copyrighted work on the Internet is a violation of the copyright owners' rights.[3] EFF, CCIA and USIIA advance new theories to limit copyright owners'

---

[3] *See Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.,* 125 S. Ct. 2764 (2005) ("the vast majority of [peer-to-peer] users' downloads are acts of infringement"); *In re Aimster Copyright Litig.*, 334 F.3d 643 (7th Cir. 2003), *cert. denied,* 540 U.S. 1107 (2004) ("such swapping [using Aimster/Madster service], which involves making and transmitting a digital copy of the music, infringes copyright"); *A&M Records, Inc. v. Napster, Inc*., 239 F.3d 1004 (9th Cir. 2001) ("Napster users infringe at least two of the copyright holder's exclusive rights…reproduction…[and] distribution").

exclusive distribution rights in the digital environment[4] in the obvious hope that such a limitation

will make it too difficult or too expensive for copyright owners to prevent persons from using

peer-to-peer networks to infringe their copyrighted works.  Not being able to deny the copyright

owners the right, the Defendant and her amici hope to eliminate the remedy.  Amicus

respectfully recommends that this Court deny Defendant's motion.

## ARGUMENT

I.     **THE DIGITAL TRANSMISSION OF AN ELECTRONIC FILE OVER A COMPUTER NETWORK FOR THE PURPOSES OF REPRODUCTION CONSTITUTES A "DISTRIBUTION" UNDER § 106(3)**

Statutory and case law are clear that a digital transmission of an electronic file (such as a

music file) over a computer network is a distribution.  Amicus EFF argues that such a digital

transmission of a copy can never be a "distribution" under § 106(3), relying in part on EFF's

interpretation of the Digital Performance Right in Sound Recordings Act ("DPRA"), Pub. L. No.

104-39, 109 Stat. 336 (codified at 17 U.S.C. § 115).  For all of the reasons stated by Plaintiffs,

and below, EFF is incorrect.

In 1995, Congress passed the DPRA which, among other things, amended 17 U.S.C. §

115 to provide for the compulsory licensing of nondramatic musical compositions in connection

with "digital phonorecord deliveries."[5]  Amicus EFF implies that this was a limited expansion of

the § 106(3) distribution right, and created a distribution right that did not exist before.  Amicus

Curiae Brief of EFF In Support of Defendant's Motion to Dismiss ("EFF Amicus Br."), at 6.

Contrary to EFF's position, the 1995 Act did not amend § 106(3) and did not create any new

---

[4]The theories advanced by EFF, CCIA and USIIA in their briefs have never been advanced or, if advanced, have never prevailed, in all of the prior litigation involving copyright infringement via peer-to-peer networks.
[5] Section 115(d) defines a "digital phonorecord delivery" as:

      [E]ach individual delivery of a phonorecord by digital transmission of a sound recording *which results in a specially identifiable reproduction* by or for any transmission recipient of a phonorecord of that sound recording, regardless of whether the digital transmission is also a public performance of the sound recording of any nondramatic musical work embodied therein.  *Id*. (emphasis added).

distribution right. Rather, § 115 was amended. Section 115(3) is, by its own clear language, a limitation on the <u>existing distribution right</u> (and specifically of the digital distribution right) already embodied in § 106(3).[6] This conclusion is confirmed by the very first sentence of § 115, which clearly and unequivocally states that this section acts as a limitation on the already existing distribution right.[7]

Historically, the purpose of § 115 was to ensure that certain sound recordings could be made and distributed without infringing the rights of the copyright owner of the nondramatic musical composition that was reproduced in the sound recording. *See* Melville Nimmer & David Nimmer, <u>Nimmer on Copyright</u> ("Nimmer on Copyright") § 8.04[A] (2005). Absent a license from the owner of the musical composition, the sound recording could not be distributed. As far back as the 1909 Copyright Act, Congress provided a mechanism (i.e., a compulsory license) by which a performing artist could secure the right to reproduce and distribute a copy of an already published musical composition, whether the owner of the musical composition voluntarily consented or not. *Id.* Section 115 of the Copyright Act of 1976 contained a similar provision. *Id.* This § 115 license is a limitation on the exclusive rights of reproduction and distribution granted in § 106 – in other words, Congress acknowledged that the copyright owner of a musical composition had the exclusive rights of reproduction and distribution of traditional and digital works, but determined that he must grant a license for those rights for a set fee under certain circumstances. *See id.* at § 8.23[A][1] (noting that § 115 creates an exception to both the reproduction and distribution rights).

---

[6] The Copyright Act grants copyright holders rights in §§ 102 through 106A; it imposes limitations on those rights in §§ 107 through 112, 115, 117, among others.

[7] This first sentence reads: "In the case of nondramatic musical works, the exclusive rights provided by clauses (1) and (3) of § 106, to make and *distribute* phonorecords of such works, are subject to compulsory licensing under the conditions specified by this section." 17 U.S.C. § 115 (Emphasis added).

All Congress did in 1995 was expand § 115 to take into account that sound recordings were being transmitted digitally via the Internet. *Id.* at § 8.04[A]. Thus, the § 115 license was extended to electronic phonorecords, called digital phonorecord deliveries (a "DPD"). As such, a performing artist (or record company) could obtain a compulsory license for nondramatic musical works that were digitally distributed for reproduction via the Internet, and such reproduction and *distribution* would not infringe the *already existing rights of digital distribution* and reproduction of the copyright owner of the underlying musical composition. *Id.* at § 8.04[L].[8] For this reason Congress was careful not to otherwise limit or abridge any of the rights and remedies available to a copyright owner under the Copyright Act. *See* 17 U.S.C. § 115(c)(3)(H)(i).

Notwithstanding EFF's contention to the contrary, the 1995 amendment did not give any new distribution right to copyright owners of nondramatic musical works; rather, the § 115 amendment acknowledged that there was an *existing* exclusive right of distribution in digital transmissions for the purpose of reproduction via the Internet, and provided in the case of nondramatic musical works that this existing right would be subject to a compulsory license, as was the more old fashioned method of distributing musical compositions on phonorecords. If the

---

[8] The Senate Report with respect to § 115 states:

> [u]nder existing principles of copyright law, the transmission or other communication to the public of a musical work constitutes a public performance of that work. *In addition, the digital transmission of a sound recording that results in the reproduction by or for the transmission recipient of a phonorecord of that sound recording implicates the exclusive rights to reproduce and distribute the sound recording and the musical work embodied therein.* New technological uses of copyrighted sound recordings are arising which require an *affirmation of existing copyright principles to the digital transmission* of sound recordings, to encourage the creation of and protect rights in those sound recordings and the musical works they contain.

S. Rep. No. 104-128, at 27 (1995) (emphasis added). EFF, through citation to a brief excerpt from the legislative history of the DPRA, suggests that Congress took no view on whether the § 106(3) distribution right encompasses distribution by transmission. This is disingenuous. A careful reading of the entire section from which that excerpt is drawn reveals that Congress understood that the § 106(3) distribution right encompassed distribution by transmission, but declined to express a view on whether the Copyright Act should be amended to confirm and clarify that right. Although Congress noted that such an amendment might later be considered, for the purposes of the DPRA, it confined its focus "to the rights of musical work and sound recording copyright owners as to certain types of digital transmissions described in the bill as 'digital phonorecord deliveries.'" *Id.* at 17.

copyright owner of the nondramatic musical work did not already have an exclusive right of distribution in digital transmissions, such a compulsory license would have been completely unnecessary, and the compulsory licensing provisions of § 115 for DPDs would have no meaning.

Amicus EFF cites *Agee v. Paramount Commun., Inc.*, 59 F.3d 317 (2d Cir. 1995) in support of its position that transmissions, because they do not cause the transfer of a *material* object from one location to another, can never, as a matter of law, constitute a distribution. *Agee*, however, provides scant support for EFF's position. First, *Agee* was decided on June 26, 1995, four months before the passage of the DPRA, which occurred on November 1, 1995. The Court in *Agee* did not have the benefit of the DPRA to aid in its analysis. Second, in *Agee*, the Second Circuit specifically declined to state that all § 106(3) distributions must be in "physical form." *Id.* at 325. In fact, it rightly conceded that there were cases, such as *Playboy Enters. v. Frena*, 839 F. Supp. 543 (N.D. Tex. 1997), *aff'd*, 168 F.3d 486 (5th Cir. 1999), where the courts have found that digital transmissions could and would violate the § 106(3) right of distribution. *Id.* at 325-26. Third, *Agee* is distinguishable on its facts. In *Agee*, the Second Circuit considered whether broadcast transmissions, not transfers of files (i.e., copies or phonorecords) which must by definition result in a copy being made, infringed the right of distribution. For these reasons and those set forth by Plaintiffs, it is clear that the exclusive right of distribution contained in § 106(3) includes a digital distribution.

## II.    U.S. COPYRIGHT LAW HAS LONG PROVIDED A RIGHT OF "MAKING AVAILABLE" IN 17 U.S.C. § 106(3)

As Plaintiffs have clearly shown, the right of making available has been a long-standing part of U.S. Copyright Law. Plaintiffs' Opposition to Defendant's Motion to Dismiss at 15-18.

Pursuant to 17 U.S.C. § 106(3) a copyright owner of a work or sound recording has the exclusive right to "distribute copies . . . to the public by sale or other transfer of ownership, or by rental, lease, or lending" and/or to authorize others to do so.  The language of the statute is clear that the making available right is subsumed in the right of distribution.[9]

First, the Copyright Act does not define "distribute" or "distribution."  It does, however, define "publication" in § 101 as

> the distribution of copies or phonorecords of a work to the public by sale or other transfer of ownership by rental, lease, or lending.  The offering to distribute copies or phonorecords to a group of persons for purposes of further distribution, public performance, or public display, constitutes publication.  A public performance or display of a work does not itself constitute publication.

The "publication" definition has been sufficient by its plain text to define a work as "published" based on a mere "offering."  *See* Nimmer on Copyright at § 4.04 (collecting cases). Courts have often pointed to the definition of "publication" in determining the scope of the distribution right.  As the Supreme Court has noted, the legislative history of the 1976 revision of the Copyright Act indicates that "Clause (3) of section 106, established the exclusive right of publication . . ." *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 552 (1985) (quoting H.R. Rep. No. 94-1476, at 62 (1976)).[10]  Subsequent courts have also interpreted this reference in the legislative history to equate "distribution" with "publication."  *See, e.g.*, *Ford*

---

[9] The difference between rights pertaining to "copies" (reproduction and distribution) and those that do not entail a "copy" (as by a public performance via a broadcast) is an important part of U.S. law.  As it is for "copies" in the distribution right, the making available right is also subsumed in the right of public performance or public display in §§ 106(4) and 106(5), respectively, when no "copy" is involved, as by a broadcast.  However, this Defendant is not a broadcaster.  She is alleged to have taken a copy of Plaintiffs' works and offered it to others on the peer-to-peer network.  Thus, only copy-based rights, not public performance rights which may not entail a copy, are the focus of this case.

[10] The 1976 Act's legislative history refers, as early as 1961, to the right of distribution as a right of "publishing copies."  *See* Kaminstein Legislative History Project, Copyright Act of 1976 at 171 (Alan Latman & James F. Lightstone, eds. 1981), "Discussion of Proposed Amendment", Report of Register of Copyrights on the General Revision of the U.S. Copyright Law, 87th Cong., 1st Sess. (1961), Chapter III, Recommendations ("subject to certain limitations and exceptions to be discussed below, the statute should continue [as it did under the prior 1909 Act] to accord to copyright owners the exclusive rights to exploit their works by (1) making [reproducing] and publishing [distributing] copies").

*Motor Co. v. Summit Motor Prods., Inc*., 930 F.2d 277, 299 (3d Cir. 1991) (noting that

"'[p]ublication' and the exclusive right protected by section 106(3) are for all practical

purposes[] synonymous"). So, "offering" copies to the public, as the Defendant is alleged to

have done, is sufficient to violate the right of distribution.

Second, as noted above, a copyright owner not only enjoys the exclusive right "to do" but

also "to authorize" a distribution. Accordingly, pursuant to the plain language of the statute, the

exclusive right of distribution is also violated whenever a person authorizes the transfer of a

copyrighted work without the permission of the copyright owner.

In the digital environment, a person who stores copies of copyrighted files on the hard

drive of her computer in a shared directory (thereby making those files available for copying by

others) authorizes the transfer of those files to other peer-to-peer users whenever the peer-to-peer

software is running on her computer. Because the plain language of § 106 specifically defines

the distribution right as encompassing the right to authorize a transfer of a copyrighted work, an

infringement occurs in the act of authorization. The violation is not derivative of other infringing

conduct. Notwithstanding amici's assertions to the contrary, Plaintiffs need not "establish a

connection between an uploader and a corresponding downloader, to establish the facts of an

actual transaction," CCIA and USIIA Amici Br. at 17, in order to state a claim for infringement.

Neither is there anything on the face of § 106 to suggest that evidence of a consummated transfer

is necessary in order to establish a violation of the statutory right to authorize. *See* Nimmer on

Copyright at § 12.04 ("Given that the statute does not tie such authorization to an actual act of

infringement, it would seem that no further requirement exists of direct infringement"). In

alleging that Defendant made available copyrighted files, thereby authorizing the transfer of

those files to other peer-to-peer users, Plaintiffs have clearly stated a cognizable claim for infringement.

Case law shows that an offer to disseminate a copyrighted work violates the copyright owner's exclusive rights, even absent evidence of an actual dissemination. In *Hotaling v. Church of Jesus Christ of Latter-Day Saints*, 118 F.3d 199 (4th Cir. 1997), the court held that a library distributes a work per § 106(3) by placing an infringing copy in its collection and making it available to the public, even if there is no evidence that the work has ever been accessed. The court reasoned, "[a]t that point, members of the public can visit the library and use the work." *Id.* at 203. Thus, because the plaintiff showed that the library had taken every step toward a transfer but the last – and made it possible for its patron to take that last step at a time of the patron's choosing – the library was held liable for violating the exclusive right of distribution. If the plaintiff had been required to prove a final transfer, the court reasoned, liability could hinge on whether the defendant recorded such transfers, a factor irrelevant to liability. *Id.* Similarly, in this case, whether or not the peer-to-peer system used by Defendant logged downloads made by other users of the copy that she made available should be irrelevant to liability for infringement of the distribution rights.

In fact, in the online context, requiring proof of the last step would require proof of a reproduction as well as extensive record-keeping of transfer, making the distribution right superfluous and too unnecessarily burdensome to enforce. When a person offers to disseminate a work over a peer-to-peer network where it can easily and frequently be further disseminated, she threatens the copyright owner's enjoyment of copyright from the moment she makes the work available to the public. The Ninth Circuit has recognized this fact -- "Napster users who upload file names to the search index for others to copy violate plaintiff's distribution rights."

*A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1014 (9th Cir. 2001).  This Court also recognized this rule in *Getaped.com v. Cangemi*, 188 F. Supp. 2d 398, 401 (S.D.N.Y. 2002) when it stated that "posting music files, software or photographs on a webpage . . . has been held in numerous instances to constitute publication."  And in *Sony Music Entm't, Inc. v. Scott*, No. 03-CV-6886 at 2 (S.D.N.Y. Jan. 3, 2006), this Court reiterated the precept when it granted judgment to the plaintiff because the "Defendant distributed 944 music files through the Kazaa system, making each of them available for downloading to millions of other Kazaa users."

As the Plaintiffs have noted, a plethora of other courts have also treated offers for sale or distribution to fall within the copyright owners' exclusive rights.  *See* Plaintiff's Opposition to Defendant's Motion to Dismiss at 16-19.[11]

Similarly, the cases support the statutory right to "authorize" distributions in § 106, and explicitly acknowledge that an act of authorization is sufficient to establish distribution within the meaning of the statute.  In *Curb v. MCA Records*, 898 F. Supp. 586 (M.D. Tenn. 1995), the court considered the question of whether a copyright owner's rights are violated where the allegedly infringing conduct consists solely of the domestic authorization of acts that take place abroad.  *Id.* at 596.  Dismissing contrary authority, the court held that both the language and legislative history of the 1976 Copyright Act support the conclusion that an act of authorization would be sufficient to establish liability wherever the authorized act "is the sort of activity that infringes upon a copyright owner's exclusive 106 rights."  *Id.*  The court viewed the

---

[11] The cases Plaintiffs cite include: *Wildlife Internationale, Inc. v. Clements*, 591 F. Supp. 1542, 1547 (S.D. Ohio 1984); *Peer Int'l Corp. v. Latin Am.  Music Corp.*, 161 F. Supp. 2d 38, 55 (D.P.R. 2001); *Brode v. Tax Mgmt., Inc.*, No. 88C10698, 1990 U.S. Dist. LEXIS 998 (N.D. Ill. Jan. 31, 1990); *Playboy Enters., Inc. v. Russ Hardenburgh, Inc.*, 982 F. Supp. 503, 513 (N.D. Ohio 1997); *State v. Perry*, 697 N.E. 2d 624, 628 (Ohio 1998); and *Marobie-FL, Inc. v. National Ass'n of Fire Equi. Distribs. & Northwest Nexus, Inc.*, 983 F. Supp. 1167, 1173-74 (N.D. Ill. 1997).  In another case involving distribution on the Internet (cited by Plaintiffs), the U.S. District Court for the District of Oregon held that a defendant infringed a plaintiff's copyrights when he "offered [the works] for sale" on eBay despite the likelihood that no one ever purchased the works.  *Matlow v. Solomon*, No. Civ. 04-6109, 2005 U.S. Dist. LEXIS 36119 (D. Or. Feb. 7, 2005).

authorization right as a separate, independent basis of liability: "tying the authorization right solely to a claim of justiciable contributory infringement appears contrary both to well-reasoned precedent, statutory text, and legislative history." *Id.* at 594.

Likewise, in *Expediters Int'l v. Direct Line Cargo Mgmt. Servs.*, 995 F. Supp. 468 (D. N.J. 1998), the court considered whether the plaintiff's exclusive rights in its copyrighted software program were violated when the defendant unlawfully authorized its foreign affiliates to use the program. The defendant argued that the "mere authorization" of infringing acts abroad was not sufficient to establish primary liability for infringement. *Id.* at 475. The court, however, found that "the mere authorization of infringing acts abroad constitutes direct infringement and is actionable under United States Copyright Law." *Id.* at 476. The court, following *Curb,* reasoned that "imposing direct liability for authorizing infringement more closely serves the underlying policies of the Copyright Act in this modern era." *Id.*

Finally, in an order denying defendant's motion to dismiss in *NFL v. Primetime 24 Joint Venture,* a case in this district, District Judge McKenna specifically acknowledged that § 106 "create[s] an infringeable right of authorization independent of infringement of one of the specific enumerated rights set forth in that section." *NFL,* No. 98 Civ. 3778 (LMM), 1999 U.S. Dist. LEXIS 3592 at 13-12 (S.D.N.Y. March 24, 1999).[12]

---

[12] Two other opinions bear discussion – even as they intertwine the definitions of "publication" and "distribution." In *Capitol Records, Inc. v. Bertelsmann AG*, No. 00-cv-10369 (N.D. Cal. May 12, 2005), Judge Patel rejected the notion that the operator of a peer-to-peer service that maintains an index of infringing files "distributes" those works within the meaning of 17 U.S.C. § 106(3), thus denying plaintiffs' motion for summary judgment on liability. However, Judge Patel did not address the question that this court faces, that is, when someone like the Defendant allegedly makes a copy available. In the second opinion, *Capitol Records, Inc. v. Bertelsmann AG*, 377 F. Supp. 2d 796 (N.D. Cal. 2005), the same judge rejected the argument that "Napster itself directly infringed plaintiffs' distribution rights by maintaining a centralized indexing system listing the file names of all MP3-formatted music files available on the Napster network." *Id.* at 801. However, Judge Patel established a two prong test: "a copyright owner seeking to establish that his or her copyrighted work was distributed in violation of § 106(3) must prove that the accused infringer either (1) actually disseminated one or more copies of the work to members of the public or (2) offered to distribute copies of that work for purposes of further distribution, public performance, or public display." *Id.* at 805. Thus, if as alleged, Defendant "offered" Plaintiffs' works, that would be sufficient under this judge's test to infringe the right of distribution in accordance with § 106(3).

11

The Defendant's arguments, as well as those of her amici, urge this Court to depart from long-standing precedent and alter the established protections granted by Congress and the courts to copyright owners.  The Court should decline this invitation.

**III.    U.S. COPYRIGHT LAW PROVIDES A RIGHT OF "MAKING AVAILABLE" IN 17 U.S.C. § 106(3) AS REQUIRED BY THE WIPO DIGITAL TREATIES**

In implementing and ratifying the WIPO Copyright Treaty (WCT), and the WIPO Performances and Phonograms Treaty (WPPT) – collectively known as the "WIPO digital treaties" – both Congress and the President affirmed that the right of making available is incorporated into the right of distribution.[13]  As more fully set forth below, recognition of the right of making available as encompassed within the exclusive rights of copyright owners was a prerequisite for U.S. adherence to and compliance with the two WIPO digital treaties.  Congress and the President determined that 17 U.S.C. § 106 already encompassed this right, a conclusion reached by the U.S. Copyright Office and other copyright-expert federal agencies.  Plaintiffs are not "rewriting" copyright law, as amici CCIA and USIIA suggest, but rather are asking the Court to uphold the law as the Congress, the President, and the relevant federal agencies in the U.S. government have already certified it exists.

A. The WIPO Digital Treaties Clearly Require a Right of "Making Available" in the Rights of Distribution and Communication to the Public

---

[13] On September 14, 1999, the United States deposited its instrument of ratification to the WIPO digital treaties. The President of the United States ratified the treaties, with the advice and consent of the Senate.  In fact, the U.S. Senate conditioned U.S. ratification on the following proviso: "Condition for Ratification.--The United States shall not deposit the instruments of ratification for these Treaties until such time as the President signs into law a bill that implements the Treaties."  Resolution of Ratification, WIPO Copyright Treaty (WCT) and WIPO Performances and Phonograms Treaty (WPPT) (1996) Treaty Doc. 105-17 (Oct. 21, 1998).  Thus, the President of the United States certified that the U.S. was in full compliance with the treaties, including the "making available" right.

The two WIPO digital treaties[14] explicitly require member states to provide copyright owners with a right to make their works available to the public, whether in hard copy or electronic form, and whether or not copies are actually transferred or transmitted – the so-called "making available" right. Thus, the treaties require that copyright owners authorize when or if their works are offered in copies, that is, in tangible hard copy or electronic formats (such as MP3 files), or in intangible ways, as by broadcasts, for example. The meaning and history of these provisions is well documented.

Article 6 of the WCT, the "Right of Distribution," provides in paragraph (1) that "Authors of literary and artistic works shall enjoy the exclusive right of <u>authorizing the making available to the public</u> of the original and copies of their works through sale or other transfer of ownership." WIPO Copyright Treaty, Dec. 20, 1996, art. 6. The Agreed Statement concerning Articles 6 notes that: "As used in these Articles, the expressions 'copies' and 'original and copies,' being subject to the right of distribution and the right of rental under the said Articles, refer exclusively to fixed copies that can be put into circulation as tangible objects." This reference in Article 6 to "copies" and "tangible objects" includes the digital dissemination of electronic copies. Dr. Mihaly Ficsor, the former Assistant Director General of WIPO, was the Secretary of the Diplomatic Conference and a key force in the creation, drafting, and negotiation of the treaty provisions. He also wrote the authoritative guide to the treaties (which he prepared for the WIPO), which states that the wording of Article 6 "made [the article] suitable for [its]

---

[14] The necessity of two WIPO digital treaties – one for works, one for sound recordings or "phonograms" in international parlance -- resulted from the differences between civil and common law copyright systems (the former protecting copyright and "neighboring" rights). Thus, two distinct treaties were agreed to in order to harmonize the differences, where relevant. The U.S. does not distinguish its protection for works versus neighboring rights. *See* 17 U.S.C. § 102(a). More to the point, the treatment of the right of "making available" for works, or the subject of "neighboring rights" under the two treaties are identical in all respects relevant to the issue in dispute in this case.

application to interactive transmissions in digital networks."  WIPO, Guide to the Copyright and

Related Rights Treaties Administered by WIPO, 294 (2003).

Similarly, Article 8 of the WCT, the "Right of Communication to the Public," provides:

Without prejudice to the provisions of Articles 11(1)(ii), 11*bis*(1)(i) and (ii), 11*ter*(1)(ii), 14(1)(ii) and 14*bis*(1) of the Berne Convention, authors of literary and artistic works shall enjoy the exclusive right of authorizing any communication to the public of their works, by wire or wireless means, including the making available to the public of their works in such a way that members of the public may access these works from a place and at a time individually chosen by them.

*Id.* at art. 8 (emphasis added).[15]

The provisions in Articles 6 and 8 (and the corresponding Articles 12 and 14 in the

WPPT applicable for, *inter alia,* producers of phonograms) guarantee copyright owners the right

to authorize the making available of their works and sound recordings in both traditional and

electronic formats.  This right is invoked (and infringed if undertaken without authorization)

whether or not a tangible copy is actually transferred, transmitted or distributed.  That is the

essence of the right of "making available."

A major issue in the WIPO treaty negotiations was not whether to guarantee the making

available right, but how to do so.  Common law and civil law countries take different approaches

to copyright.  The former (e.g., the U.S.) employ a distribution right.  The latter (e.g., the nations

of continental Europe) generally rely on a broad "right of communication to the public."

---

[15] As with Article 6 of the WCT, Article 12 of the WPPT provides that "Producers of phonograms shall enjoy the exclusive right of authorizing the making available to the public of the original and copies of their phonograms through sale or other transfer of ownership."  Moreover, Article 14 of the WPPT provides:

Producers of Phonograms shall enjoy the exclusive right of authorizing the making available to the public of their phonograms, by wire or wireless means, in such a way that members of the public may access them from a place and at a time individually chosen by them.

WIPO Performances and Phonograms Treaty, Dec. 20, 1996, art. 12 and 14.  These provisions require treaty signatories to provide the producers of phonograms with a making available right analogous to the right that Articles 6 and 8 of the WCT provide to copyright owners of works.

Ultimately, rather than requiring a single means for implementing the rights, the signatory countries to the treaties adopted the so-called "umbrella" solution. This permits countries to provide the panoply of rights in Articles 6 and 8 of the WCT, and Articles 12 and 14 of the WPPT, to include the interactive right in their national laws either through a distribution right or a right of communication, or by some other means.

As Dr. Ficsor explained in his book on the treaties, "the most basic element of the 'umbrella solution' is the neutral, legal-characterization-free description of interactive transmissions." Dr. Mihaly Ficsor, The Law of Copyright and the Internet: The 1996 WIPO Treaties, Their Interpretation and Implementation 496 (2002). This solution allowed signatories to the treaties the freedom to "decide through the recognition of which existing or newly established right they would implement the exclusive [making available] right." *See id.* at 496-497 (emphasis added). Dr. Ficsor has explained that one "existing" right that signatory nations could rely on is the distribution right, and that the United States in fact did so. *Id.* at 502-503.

Dr. Ficsor also notes in his guidebook that Article 8 covers acts such as those of the Defendant's, "which only consist of making the work[s] accessible to the public, and in the case of which members of the public still have to cause the system to make [the works] actually available to them." Guide to Copyright and Related Rights Treaties at 208. This interpretation has been accepted by other respected international copyright experts. *See, e.g.,* Jorg Reinbothe & Silke von Lewinski, The WIPO Treaties 1996 108 (2002) ("[T]he mere establishment of a server which may be accessed individually by members of the public and at their choice regarding time and place constitutes making available under Article 8 WCT.").[16] *See also id.* at 369-70 (discussing the corresponding WPPT provisions and explaining that "the technical means of making the phonograms available are irrelevant").

---

[16] Dr. Reinbothe headed the delegation of the European Commission to the WIPO treaties' Diplomatic Conference.

In sum, the WIPO digital treaties give the copyright owner the exclusive rights either to "push" the work to end-users by traditional means of distribution, in analog or digital formats, or instead to place the work onto a public site, such as a server or the "share" folder of a peer-to-peer system, from which end-users may "pull" the work for their enjoyment, at a time and place determined by the users. *Id.* at 371-72. The "pull" scenario is precisely what the Defendant is alleged to have done. Guaranteeing that such uses are exclusively controlled by copyright owners was the primary purpose of the WIPO digital treaty provisions discussed above, and one of the main goals of the entire effort to adopt the WIPO digital treaties.

### B. All Treaty Rights Must Be Found in U.S. (Copyright) Law Because the WIPO Digital Treaties Are Not Self-Executing

The U.S. signed the WIPO digital treaties on December 20, 1996 in Geneva, at the conclusion of the Diplomatic Conference at which the treaties were negotiated. The U.S. could not ratify these treaties, however, until U.S. law was brought into full compliance with their provisions. MPAA agrees with amici EFF, CCIA and USIIA that the WIPO digital treaties are not self-executing. Accordingly, title 17, and not the language of the treaties, governs compliance with and adjudication of the rights required by the WIPO digital treaties. Towards that end, the United States legislative and executive branches were required to consider whether and what legislation was needed before ratification of the treaties.[17] If U.S. copyright law did not include a making available right, then Congress would have needed to adopt one before ratifying the treaties.

---

[17] As noted in the President's letter of transmittal to the Senate of the two WIPO digital treaties, "Legislation [was] required to implement certain provisions of the Treaties. Legislation [was] also required to ensure that parties to the Treaties [would be] granted, under U.S. copyright law, the rights of which they are entitled under the Treaties." Message from the President of the United States, WIPO Copyright Treaty (WCT) and WIPO Performances and Phonograms Treaty (WPPT) (1996) Treaty Doc. 105-17 (Jul. 28, 1997).

The President prepared and presented the legislation needed to ratify the treaties.  *See* WIPO Copyright and Performances and Phonograms Treaties Implementation Act of 1998, Pub. L. 105-304, 112 Stat. 2861 (1998).  The legislation made no changes to the exclusive rights of copyright owners in 17 U.S.C. § 106.   The President proposed none; Congress made none.  This reflected a determination by both branches that the panoply of exclusive rights provided by U.S. law in 17 U.S.C. § 106 already met the obligations of the WIPO digital treaties, including the treaty obligations to provide the right of "making available."  Congress recognized in the implementing legislation's legislative history that "[t]he treaties do not require any change in the substance of copyright rights or exceptions in U.S. law."  H.R. Rep. No. 105-551, at 9 (1998). The President necessarily concurred in this conclusion when he submitted the instrument of ratification to the WIPO digital treaties, a step he was not empowered to take until U.S. law had been brought into compliance with the treaties.

The federal agency with expertise in the copyright law and policy-making in this discipline, the U.S. Copyright Office, also endorsed this view.  The Register of Copyrights assured Congress prior to the ratification of the WIPO digital treaties that there was "no need to alter the nature and scope of the copyrights and exceptions, or change the substantive balance of rights embodied in the Copyright Act" in order to provide a making available right.  Statement of Marybeth Peters, Register of Copyrights, *WIPO Copyright Treaties Implementation Act and Online Copyright Liability Limitation Act: Hearing on H.R. 2281 & H.R. 2180 Before the House Subcomm. on Courts and Intellectual Property of the Comm. on the Judiciary*, 105th Cong. 43 (1997).   The Register later explained to Congress that "making [a work] available for other users of [a] peer to peer network to download . . . constitutes an infringement of the exclusive distribution right..."  Letter from Marybeth Peters to Rep. Howard L. Berman 1 (Sept. 25, 2002),

17

(citing *A&M Records v. Napster*, 239 F.3d 1004, 1014 (9th Cir. 2001) ("Napster users who upload file names to the search index for others violate plaintiffs' distribution rights.")), *reprinted in Piracy of Intellectual Property on Peer-to-Peer Networks: Hearing Before the Subcomm. on Courts, the Internet, and Intellectual Property of the House Comm. on the Judiciary*, 107th Cong. 114-15 (2002). The Plaintiffs have also cited evidence of representatives of the U.S. Commerce Department's Patent and Trademark Office and the U.S. State Department that endorsed this view in congressional hearings. Plaintiffs' Opposition to Defendant's Motion to Dismiss at 23.

As amici CCIA and USIIA note, the Supreme Court has "articulated the importance of judicial deference to Congress"[18] when it said, "it is generally for Congress, not the courts, to decide how best to pursue the Copyright Clause's objectives," *Eldred v. Ashcroft*, 537 U.S. 186, 212-213 (2003), and that it "is Congress that has been assigned the task of defining the scope of [rights] that should be granted to authors…" *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 429 (1984). Congress clearly believed that the distribution right in 17 U.S.C. § 106(3) already included the exclusive right of copyright owners to make their works available online when it passed legislation implementing the WIPO treaties without altering or clarifying any of the § 106 exclusive rights pertaining to the making available right.[19] Where, as here, there is clarity about Congress' intention and interpretation of the right of distribution, that judgment merits substantial deference. In short, this Court should reject the invitation of the Defendant and her amici to second guess Congress' conclusion regarding the scope of the

---

[18] CCIA and USIIA Amici Br. at 3.

[19] That Congress clearly believed that the distribution right includes the right of making available was confirmed yet again in 2005 when Congress amended the Copyright Act to provide for criminal penalties in cases of willful infringements committed "by the distribution of a work being prepared for commercial distribution, by making it available on a computer network accessible to members of the public …." *See* Artists Rights and Theft Prevention Act of 2005, § 103, Pub. L. No. 109-9, 119 Stat. 218 (codified at 17 U.S.C. § 506(a)(1) as amended). The plain language of this amendment makes clear that making available is a form of distribution.

distribution right.[20]  To hold that U.S. law does not provide copyright owners with such an exclusive right would put at naught the main goal of Congress and the President, which was to bring U.S. law into compliance with the treaties so that the U.S. could ratify them.

**IV.   FINDING THAT U.S. COPYRIGHT LAW DOES NOT PROTECT COPYRIGHT OWNERS FROM THE UNAUTHORIZED DISTRIBUTION THROUGH MAKING AVAILABLE IS CONTRARY TO CONGRESS' PUBLIC POLICY OBJECTIVES**

Finally, there are strong policy reasons supporting a finding that the unauthorized making available of copyrighted works infringes the distribution right.  As the Supreme Court recently noted, while commenting on the difficulties associated with proving the exact numbers of downloads over peer-to-peer networks, "the probable scope of copyright infringement [over peer-to-peer networks] is staggering."  *Metro-Goldwyn-Mayer Studios, Inc., v. Grokster Ltd.,* 125 S. Ct. 2764, 2772 (2005).  Congress and the President (and all relevant government agencies) were well aware of the threat that the then emerging Internet would pose to copyright owners if the protections provided by the Copyright Law did not keep up with the changing times when they ratified the WIPO digital treaties without finding it necessary to amend § 106. Unless the Copyright Law is interpreted to provide copyright owners with the protections that Congress and the President intended it to provide, the ever-expanding forms of unauthorized dissemination that the Internet makes possible will eviscerate the value of the Plaintiffs' copyrights along with those of millions of other copyright owners.  A finding that the distribution

---

[20] The arguments regarding the WIPO treaties put forward by EFF fail to provide the court with any hook upon which to hang a denial of the existence of the making available right in § 106(3). *See* EFF Amicus Br. at 10-11. First, the Plaintiffs are not arguing that the treaties are self executing.  Instead, the Plaintiffs maintain that § 106(3) provided a making available right prior to the implementation and ratification of the WIPO digital treaties and thus Congress did not need to amend §106(3) prior to such ratification.  Second, the fact that the WIPO digital treaties do not require the United States to provide a making available right for domestic phonogram producers is irrelevant. U.S. copyright law accords identical exclusive rights to domestic and foreign copyright owners, and there is absolutely no evidence that Congress meant to bring U.S. law into compliance only for the benefit of the latter. Third, EFF itself admits that Congress concluded that the rights provided in § 106 "already provided copyright owners (foreign and domestic) with protections that met the requirements of the WIPO treaties." *Id.* at 11.  The court should not reject Congress' conclusion.

right does not apply either when it is for the purpose of a reproduction, or where there is an unauthorized distribution without dissemination of a copy, would make the U.S. distribution right practically meaningless in the digital age by suggesting that authorizing and enabling others to make illegal copies, even in the thousands, is permissible absent proof that someone took a defendant up on her unauthorized offer.

As one influential senator said after the Supreme Court's ruling in *Grokster*, "[w]e have got to find some way to meet this concept of protecting our intellectual property. We can hardly accuse the people abroad of stealing our intellectual property if we can't protect it at home." Statement of Sen. Stevens, *Issues Related to MGM v. Grokster: Hearing Before the Senate Committee on Commerce*, 109th Cong. (2005). The purpose of the U.S. ratifying the WIPO digital treaties was to make it clear to the world that U.S. Copyright Law does adequately protect copyrights in the digital age. A ruling for the Defendant in this case would be contrary to this purpose. This Court should deny Defendant's motion to dismiss.

Dated: March 17, 2006                    Respectfully submitted,

                                         _____
                                         Eric J. Schwartz (ES-5166)
                                         Smith & Metalitz LLP
                                         1747 Pennsylvania Avenue, NW, Suite 825
                                         Washington, DC  20006
                                         (202) 833-4198

                                         Jonathan Zavin (JZ-1846)
                                         Loeb & Loeb LLP
                                         345 Park Avenue
                                         New York, New York 10154-1895
                                         (212) 407-4000

                                         Counsel for *Amicus Curiae*
                                         MOTION PICTURE ASSOCIATION OF
                                         AMERICA, INC. (MPAA)