UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
ELEKTRA ENTERTAINMENT GROUP INC., a   :
Delaware corporation; UMG RECORDINGS, INC.,
a Delaware corporation; VIRGIN RECORDS        :
AMERICA, INC., a California corporation; and
SONY BMG MUSIC ENTERTAINMENT,          :
a Delaware general partnership,

                                 :

               Plaintiffs,             05 Civ. 7340 (KMK)

                                  :

      - v. -

                                  :

DENISE BARKER,

                                  :

             Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## STATEMENT OF INTEREST OF THE UNITED STATES OF AMERICA
### IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE COMPLAINT

                        MICHAEL J. GARCIA
                        United States Attorney for the
                        Southern District of New York
                        Attorney for the United States of America
                        86 Chambers Street, 3rd Floor
                        New York, New York 10007
                        Tel.: (212) 637-2714

REBECCA C. MARTIN (RM 0486)
Assistant United States Attorney

PETER D. KEISLER, Assistant Attorney General
JOHN FARGO, Director, Intellectual Property Staff, Commerical Litigation Branch
United States Department of Justice, Civil Division

MICHAEL M. DUBOSE, Deputy Chief
JOHN H. ZACHARIA, Trial Attorney
Computer Crimes and Intellectual Property Section
United States Department of Justice, Criminal Division

– Of Counsel –

TABLE OF CONTENTS

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A.    STATUTORY BACKGROUND:  THE COPYRIGHT ACT . . . . . . . . . . . . . . . 2

    B    INTEREST OF THE UNITED STATES  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    C.    THE UNITED STATES RESPECTFULLY RESERVES THE
        RIGHT TO SUPPLEMENT ITS STATEMENT OF INTEREST
        REGARDING THE "MAKING AVAILABLE" ISSUE RAISED
        BY AMICI . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

ARGUMENT  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

THE UNAUTHORIZED DISTRIBUTION OF ELECTRONIC FILES
OVER THE INTERNET VIOLATES THE EXCLUSIVE RIGHT
OF DISTRIBUTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    A    THE COPYRIGHT ACT'S DEFINITION OF THE DISTRIBUTION RIGHT
        INCLUDES THE UNAUTHORIZED DISTRIBUTION OF ELECTRONIC
        FILES OVER THE INTERNET  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    B.    EFF'S AND DEFENDANT'S RELIANCE ON LEGISLATIVE
            HISTORY IS SIMILARLY UNAVAILING . . . . . . . . . . . . . . . . . . . . . . . 11

        1 .    The Legislative History of the Copyright Act of 1976
            Shows that Congress Did Not Limit the Distribution
            Right to Preclude Online Dissemination of Copies of
            Copyrighted Works . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

            a.    Principles of Statutory Construction  . . . . . . . . . . . . . . . . . . . . . 12

            b.    Section 202 of the Copyright Act and Relevant
                  Legislative History Show that the Term "Material
                  Object" Was Intended to Obviate a Common Law
                  Presumption Limiting the Distribution of Copyrighted
                  Works and EFF's Proposed Interpretation Renders
                  Other Provisions of the Act Nonsensical . . . . . . . . . . . . . . . . . . 12

2.    The Legislative Intent Behind the Digital Performance Right in Sound Recordings Act of 1995 Shows that Congress Understood That Where the Recipient of a Digital Transmission Obtained a Copy of a Work, Section 106(3) Was Violated . . . . . . . . . . . . . . . . . . 16

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

## TABLE OF AUTHORITIES

Cases:                                                                      Page

A&M Records Inc. v. Napster, Inc.,
    239 F.3d 1004 ......................................................... 10

Agee v. Paramount Communications Inc.,
    59 F.3d 317 ....................................................... 2, 10

In re Aimster Copyright Litigation,
    334 F.3d 643 (7th Cir. 2003) cert. denied, 540 U.S. 1107 ...................... 10

BedRoc Ltd. v. United States,
    541 U.S. 176 ......................................................... 12

Bobbs-Merrill Co. v. Straus,
    210 U.S. 339 ......................................................... 12

Dunn v. Commodity Futures Trading Commission,
    519 U.S. 465 ......................................................... 15

Florez v. Callahan,
    156 F.3d 438 ......................................................... 15

Getaped.Com Inc. v. Cangemi,
    188 F.Supp.2d 398 ................................................. 8, 10

Harper & Row Publs., Inc. v. Nation Enterprises,
    471 U.S. 539 .......................................................... 3

Holloway v. United States,
    526 U.S. 1 ........................................................... 12

Kelly v. L.L. Cool J.,
    145 F.R.D. 32 (S.D.N.Y. 1992) aff'd 23 F.3d 398 (2d Cir.),
    cert. denied, 513 U.S. 950 ............................................. 15

Koons Buick Pontiac GMC Inc. v. Nigh,
    543 U.S. 50 .......................................................... 12

MAI Systems Corp. v. Peak Computer, Inc.,
    991 F.2d 511 (9th Cir. 1993) cert. dismissed, 510 U.S. 1033 .................... 9

Metropolitan-Goldwyn-Mayer Studios Inc. v. Grokster Ltd.,
    125 S.Ct. 2764 ...................................................... 10

In re Napster Inc. Copyright Litigation,
    377 F.Supp.2d 796 ................................................... 10

New York Times Co. v. Tasini,
    533 U.S. 483 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Pavia v. 1120 Avenue of the Americas Associates,
    901 F.Supp. 620 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Playboy Enterprises Inc. v. Frena
    839 F.Supp. 1552 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Pushman v. New York Graphic Society Inc,
    287 N.Y. 302, 39 N.E.2d 249 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14

United States v. Fisk,
    70 U.S. (3 Wall.) 445 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

United States v. Gayle,
    342 F.3d 89 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13


Statutes:

17 U.S.C. § 102 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

17 U.S.C. § 106 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

17 U.S.C. § 115 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16

17 U.S.C. § 506 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 4, 16, 17

18 U.S.C. § 2319 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 4

28 U.S.C. § 517 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Copyright Act of 1976, 17 U.S.C. § 101 et seq . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim


Treaties and International Agreements:

An Act to Implement the United States-Australia Free Trade Agreement,
PL 108-286, Title I, Sec.101(a)(2), 118 STAT. 920 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Free Trade Agreement, U.S. - Australia (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

World Intellectual Property Organization Copyright Treaty (1996) . . . . . . . . . . . . . . . . . . . . . . . 6

World Intellectual Property Organization Performances and Phonograms Treaty (1996) . . . . . . 6

Miscellaneous:

H.R. Rep. No. 94-1476, 1976 U.S.C.C.A.N 5659 (Sept. 3, 1976) . . . . . . . . . . . . . . . . . . 3, 14, 15

H.R. Rep. No. 104-274 (Oct. 11, 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Letter from Marybeth Peters, Register of Copyrights, to Rep. Howard Berman
(Sept. 25, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

S. Rep. 104-128, 1995 U.S.C.C.A.N. 356, . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18, 19, 20

Testimony of Marybeth Peters, The Register of Copyrights, before the
Sub-committee on Courts and Intellectual Property, Committee on the Judiciary,
United States House of Representatives, 105th Congress, 1st Sess., Sept. 16, 1997,
on WIPO Copyright Treaties Implementation Act (H.R. 2281) and On-Line
Copyright Liability Limitation Act (H.R. 2180) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

U.S. submission to World Trade Organization Trade Policy Review Body in
Response to Questions from Japan regarding Copyright Issues, WT/TPR/M/88/Add.1
at 121 (Jan. 8, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

U.S. submission to World Treade Organization Trade Policy Review Body in Response to
Questions from Chile, WT/TPR/M/126/Add.3, Chile #4 at 140 (Nov. 22, 2004) . . . . . . . . . . . 7

## PRELIMINARY STATEMENT

The United States of America, by and through its attorney, Michael J. Garcia, United States Attorney for the Southern District of New York, respectfully submits this Statement of Interest pursuant to 28 U.S.C. § 517.[1] The United States, through the Department of Justice's Criminal Division and the United States Attorney's Offices across the country, enforce the criminal provisions of the Copyright Act pursuant to 17 U.S.C. § 506 and 18 U.S.C. § 2319. Many of these prosecutions, past and present, are predicated on the unauthorized distribution of electronic files over the Internet, i.e., online or digital distribution. As a result, the United States has a significant interest in this Court's construction of the distribution right of copyright owners as provided for in Section § 106(3) of the Copyright Act of 1976, 17 U.S.C. § 106(3).

Section 106(3) of the Copyright Act of 1976 provides that every copyright holder has the right "to do and to authorize" the "distribut[ion of] copies and phonorecords" of the copyrighted work. The overwhelming weight of judicial authority and the plain meaning of the statutory language of 17 U.S.C. § 106(3) and related statutory provisions of the Copyright Act of 1976, 17 U.S.C. § 101 et seq., as amended (also referred to as the "Copyright Act" or the "Act"), demonstrate that the exclusive right of distribution set forth in § 106(3) encompasses distribution of copyrighted works over the Internet. The contention of amicus Electronic Frontier Foundation ("EFF") and Defendant that the "material object" terminology of the Copyright Act excludes Internet distribution from § 106(3) distorts the clear language of the Act and has the nonsensical result of excluding from its reach distribution of copyrighted works through the most powerful and efficient method of distribution available.

---

[1] "The Solicitor General, or any officer of the Department of Justice, may be sent by the Attorney General to any ... district in the United States ... to attend to any "interest of the United States." 28 U.S.C. § 517.

The Court should not adopt this construction of the distribution right. In every case in which unauthorized Internet or online distribution of copyrighted works has been at issue, courts have found that such activity constitutes a violation of the distribution right. The sole case cited by EFF in support of its position, <u>Agee v. Paramount Communications, Inc.</u>, 59 F.3d 317 (2d Cir. 1995), is not to the contrary. Further, EFF's strained reading of the distribution right of § 106(3) cannot be harmonized with numerous, related provisions of the Copyright Act. Indeed, the "material object" terminology on which EFF and Defendant rely, was not adopted to limit the distribution right, but to eliminate a common law presumption, <u>i.e.</u>, a presumption that the sale of the object embodying a copyrighted work, <u>e.g.</u>, a manuscript, carried with it the intangible legal right in the copyright itself. Thus, by defining "copies" and "phonorecords" as material objects, Congress was not carving out future computer to computer distributions, but was distinguishing between the intangible right in the work and the physical embodiment of that work in order to unencumber the distribution right from its common law limitations. Finally, later amendments to the Copyright Act and the very legislative history upon which EFF and Defendant rely show that Congress unequivocally understood the distribution right of § 106(3) to encompass, among other things, Internet distribution of copyrighted works.

## BACKGROUND

### A.     STATUTORY BACKGROUND: THE COPYRIGHT ACT

Under the Copyright Act, "copyright protection subsists . . . in original works of authorship fixed in any tangible medium of expression, now known or later developed, from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device." 17 U.S.C. § 102(a). The Copyright Act grants copyright owners the exclusive right "to do and to authorize" any of the following: (1) to reproduce copyrighted

works in copies or phonorecords; (2) to prepare derivative works based upon the copyrighted work; (3) to distribute copies or phonorecords of the copyrighted work to the public; (4) to perform the copyrighted work publicly; (5) to display the copyrighted work publicly; and (6) to perform copyrighted sound recordings publicly by means of a digital audio transmission. 17 U.S.C. § 106. Paragraphs (4)-(6) of § 106 do not apply to all copyrighted works, but only to those types of works specified in each of these paragraphs. In addition, all six of these rights are subject to limitations set forth in sections 107 through 122 of the Copyright Act. Id.

First enacted as part of the Copyright Act of 1976, section 106(3) grants copyright owners the exclusive right "to do and to authorize" the "distribut[ion of] copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending." Although the Copyright Act does not define the term "distribute,"[2] the Act does define the terms "copies" and "phonorecords." 17 U.S.C. § 101. Specifically, the Act provides that "phonorecords" are "material objects in which sounds, other than those accompanying a motion picture or other audiovisual work, are fixed by any method now known or later developed, and from which the sounds can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device." Id. Similarly, the Act provides that "copies" are "material objects, other than phonorecords, in which a work is fixed by any method now know or later developed, and from which the work can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device." Id.

---

[2] Although the Act does not define "distribution," it does define "publication" of a copyrighted work. Publication requires either "the distribution of copies or phonorecords of a work to the public by sale or other transfer of ownership, or by rental, lease, or lending," or alternatively, "[t]he offering to distribute copies or phonorecords to a group of persons for purposes of further distribution, public performance, or public display." 17 U.S.C. § 101. "A public performance or display of a work does not of itself constitute publication." Id. The Supreme Court has observed that the term "distribution" is closely related to the right of "publication," i.e., a copyright owner's "'right to control the first public distribution of an authorized copy . . . of his work.'" Harper & Row, Publs., Inc. v. Nation Enterprises, 471 U.S. 539, 552 (1985) (quoting H.R. Rep. No. 94-1476, at 62).

The Act does not define the phrase "material objects," but does prescribe that "[a] work is 'fixed' in a tangible medium of expression when its embodiment in a copy or phonorecord, by or under the authority of the author, is sufficiently permanent or stable to permit it to be perceived, reproduced, or otherwise communicated for a period of more than a transitory duration." Id.

## B.    INTEREST OF THE UNITED STATES

The Department of Justice's Criminal Division and United States Attorneys' offices across the country prosecute defendants under several federal criminal intellectual property laws, including criminal copyright infringement pursuant to 17 U.S.C. § 506 and 18 U.S.C. § 2319. To prosecute a defendant for felony copyright infringement, the federal government must establish beyond a reasonable doubt that, inter alia, the defendant committed copyright infringement by unauthorized reproduction or distribution only. See 18 U.S.C. § 2319 (imposing maximum prison terms of more than one year only where the offense consists of an infringement of the reproduction or distribution rights). The definition of the distribution right, set forth in 17 U.S.C. § 106(3), and cases interpreting this right, apply equally to civil and criminal copyright infringement.

In the last five years, the number of federal prosecutions for felony copyright infringement over the Internet has increased significantly. In these cases, the government regularly prosecutes defendants for illegally distributing pirated copies of copyrighted works over the Internet. The government has convicted more than 100 defendants for unauthorized distribution of pirated copies over the Internet, and almost 100 more indictments are pending against defendants accused of similar crimes.

EFF and Defendant argue that when an unauthorized transfer of copies or phonorecords of copyrighted works occurs over the Internet, then no "distribution" has occurred under the

4

Copyright Act. If the Court adopts this argument, then former, current, and future copyright prosecutions could be threatened. For instance, not only would current indictments based on violations of the distribution right be jeopardized, but defendants already convicted for violating this right would have a new basis for challenging their convictions. In addition, under EFF's and Defendant's interpretation of the distribution right, federal prosecutors would have no choice but to rely exclusively on a violation of the reproduction right to establish felony copyright infringement that occurs online. Accordingly, this Court's decision on whether the distribution right applies to the electronic transfer of digital files will have a direct impact on federal prosecutions of criminal copyright infringement and hence directly affect the interests of the United States.

## C.    THE UNITED STATES RESPECTFULLY RESERVES THE RIGHT TO SUPPLEMENT ITS STATEMENT OF INTEREST REGARDING THE "MAKING AVAILABLE" ISSUE RAISED BY AMICI

This Statement of Interest is limited to the United States' interest in protecting its criminal prosecutions, which are immediately put into question by the current posture of this case to the extent that it raises the question of whether the dissemination of copies or phonorecords over the Internet infringes the copyright owner's exclusive distribution right.[3] At this juncture in the case, the United States has not sought through this Statement of Interest to address the issue raised by amici Computer & Communications Industry Association ("CCIA") and U.S. Internet Industry Association ("IIA") of whether the copyright holder's exclusive rights under the Copyright Act encompass the right to make electronic files available for downloading (the "making available" right). That issue is not necessary for a resolution of Defendant's motion at this stage of the case where Defendant attacks the adequacy of a complaint that alleges in a single count that Defendant infringed Plaintiffs' rights by (1) downloading/

---

[3] In contrast, the United States has not prosecuted acts that consist merely of making copyrighted works available for downloading.

5

reproducing their works, (2) distributing their works to others, and/or (3) making their works available for distribution to others. Compl. at ¶ 12. Indeed, Defendant and her amici do not even contest the adequacy of Plaintiff's claim insofar as it relates to the downloading/reproduction of copyrighted works, and as is demonstrated herein, the distribution theory is also well-grounded.

Nevertheless, should this Court deem it necessary to reach the "making available" issue now or at a later point in this litigation, the United States respectfully reserves its right to file a Statement of Interest addressing it. The United States has entered into and implemented two treaties and several Trade Agreements containing specific provisions regarding the "making available" right. See, e.g., World Intellectual Property Organization ("WIPO") Copyright Treaty, Art. 8 (1996) ("[A]uthors of literary and artistic works shall enjoy the exclusive right of authorizing any communication to the public of their works, by wire or wireless means, including the making available to the public of their works in such a way that members of the public may access these works from a place and at a time individually chosen by them"); WIPO Performances and Phonograms Treaty, Art. 14 (1996) (copyright holders of phonorecords "shall enjoy the exclusive right of authorizing the making available to the public of their phonograms, by wire or wireless means, in such a way that members of the public may access them from a place and at a time individually chosen by them"); Free Trade Agreement, U.S.- Australia (2004), Art. 17.5 ("[E]ach Party shall provide to authors the exclusive right to authorize or prohibit the communication to the public of their works, by wire or wireless means, including the making available to the public of their works in such a way that members of the public may access those works from a place and at a time individually chosen by them"). Notably, with respect to each Trade Agreement containing provisions regarding the "making available" right, the President has informed Congress that no change to existing U.S. law was required to

6

implement those provisions.  See, e.g., An Act to Implement the United States-Australia Free

Trade Agreement, PL 108-286, Title I, Sec. 101(a)(2), 118 STAT. 920 (2004). Consequently, the

interests of the United States regarding these agreements could be implicated in the event that the

"making available" issue were to be reached by this Court.[4]

## ARGUMENT

## THE UNAUTHORIZED DISTRIBUTION OF ELECTRONIC FILES OVER THE INTERNET VIOLATES THE EXCLUSIVE RIGHT OF DISTRIBUTION

EFF and Defendant contend that, as a matter of law, a copyright owner's exclusive right

of distribution does not apply on the Internet.  EFF reasons that, because the distribution right

involves "copies" or "phonorecords" in the form of "material objects" in which copyrighted

works are fixed, the copyright owner's exclusive right of distribution cannot include the

electronic transfer of copies of copyrighted works over the Internet.  See, e.g., EFF's Feb. 23,

2006 "Amicus Curiae Brief of the Electronic Frontier Foundation in Support of Defendant's

Motion to Dismiss the Complaint" ("EFF Brief"), at 4-5.[5]  EFF further contends that it draws this

conclusion not only from the "unambiguous statutory language" of the Copyright Act, but from

---

[4]  The Government notes that outside the context of this case, the United States Copyright Office and the United States Patent and Trademark Office have stated that the exclusive rights of the copyright holder encompass such a "making available" right.  See, e.g., Testimony of Marybeth Peters, The Register of Copyrights, before the Sub-committee on Courts and Intellectual Property, Committee on the Judiciary, United States House of Representatives, 105th Congress, 1st Sess., Sept. 16, 1997, on WIPO Copyright Treaties Implementation Act (H.R. 2281) and On-Line Copyright Liability Limitation Act (H.R. 2180) (available at http://www.copyright.gov/docs/2180_stat.html); Letter from Marybeth Peters, Register of Copyrights, to Rep. Howard Berman, Sept. 25, 2002, at p. 1 (reprinted in Piracy of Intellectual Property on Peer-to-Peer Networks: Hearing Before the Subcommittee on Courts, the Internet and Intellectual Property of the House Comm. on the Judiciary, 107th Cong. 114-15 (2002)); U.S. submission to World Trade Organization ("WTO") Trade Policy Review Body in Response to Questions from Japan regarding Copyright Issues, WT/TPR/M/88/Add.1 at 121 (Jan. 8, 2002) (stating that "making available" right is provided under existing U.S. copyright law); accord U.S. submission to WTO Trade Policy Review Body in Response to Questions from Chile, WT/TPR/M/126/Add.3, Chile #4 at 140 (Nov. 22, 2004).

[5] The United States does not concede, as EFF assumes without explanation, that computer to computer transmissions are "intangible," i.e., not material objects.  See EFF Br. at 2.  This Court, however, does not need to reach the question of whether online transmissions – which are indisputably physical phenomena – are "material objects."  As discussed infra, Congress intended the "material object" terminology to distinguish between intangible legal rights in the copyrighted work itself and the physical objects in which the copyrighted work was fixed.  "Material object" was never intended to create a requirement that works be fixed in any particular type of object.

the legislative history of the Act and subsequent statutes. <u>Id.</u> at 5. EFF, however, has misinterpreted the statute and legislative history, and courts that have referenced the distribution right in the context of online file transfers have uniformly viewed such transfers of digital copies as constituting a distribution.

A.    **THE COPYRIGHT ACT'S DEFINITION OF THE DISTRIBUTION RIGHT INCLUDES THE UNAUTHORIZED DISTRIBUTION OF ELECTRONIC FILES OVER THE INTERNET**

Section 106(3) grants copyright owners the exclusive right "to do and to authorize" the distribution of "copies or phonorecords" of a copyrighted work to the public. 17 U.S.C. § 106(3). The "copies" and "phonorecords" that are distributed are defined as "material objects." 17 U.S.C. § 101. The Copyright Act, however, does not describe what form a copy or phonorecord must take as it is disseminated from one point to another. Where, however, the recipient of the copy or phonorecord has, at the end of the transaction, a material object embodying a copyrighted work, a distribution has occurred. <u>See, e.g.</u>, <u>Getaped.Com, Inc. v. Cangemi</u>, 188 F. Supp. 2d 398, 400 (S.D.N.Y. 2002) (electronic file has been "published" or "distributed" where an "Internet user . . . download[s] a file containing a copyrighted work and thereby gain[s] control of it, that is, gain[s] a proprietary or possessory interest in the copyrighted work"); M. Nimmer and D. Nimmer, Nimmer on Copyright § 4.07 (2001) (publication has occurred where recipient gains "a possessory interest in tangible copies" of the copyrighted work). Thus, the fact that a defendant distributes a digital copy of a copyrighted work <u>electronically</u> does not categorically exclude that dissemination from the distribution right where the result of the transfer is a fixation of that work on a recipient's computer – <u>i.e.</u>, a material object embodying a copyrighted work.

8

This interpretation of the distribution right is consistent with the view that a defendant who downloads a copyrighted work to his computer without authorization violates the reproduction right set forth in 17 U.S.C. § 106(1). See, e.g., MAI Systems Corp. v. Peak Computer, Inc., 991 F.2d 511, 518 (9th Cir. 1993) (holding that computer random access memory creates a "copy" of computer program under the Copyright Act and that "[i]n the absence of ownership of the copyright or express permission by license, such acts constitute copyright infringement") (quotations omitted), cert. dismissed, 510 U.S. 1033 (1994). Further, it appears that neither the parties nor amici dispute the notion that an electronic file embodying a sound recording that resides on a downloader's computer constitutes a copy or phonorecord under the Copyright Act. See Plaintiffs' March 3, 2006 "Brief in Response to the Amicus Curiae Brief of the Electronic Frontier Foundation" ("Pl. Opp. to EFF Brief"), at 4. If an electronic file is undisputedly a "copy" or "phonorecord" when it resides on a computer, then disseminating such a file over a peer-to-peer ("P2P") network so that it appears as an electronic file on another computer constitutes a distribution pursuant to 17 U.S.C. § 106(3). Simply put, the fact that the file was disseminated electronically does not change the fact that a distribution has occurred.

Although no court has exhaustively analyzed the issue, every court that has addressed it, either summarily or in dicta, has found that the unauthorized dissemination of a digital copy of a copyrighted work over the Internet constitutes a distribution under § 106(3). For example, the Supreme Court found that uploading copyrighted articles to electronic databases and publicly distributing them through the NEXIS database violates the exclusive right of distribution under § 106(3). New York Times Co. v. Tasini, 533 U.S. 483, 498 (2001) ("LEXIS/NEXIS, by selling copies of the Articles through the NEXIS Database, 'distribute copies' of the Articles 'to the public by sale,' § 106(3)"). Further, in the context of P2P file sharing, the Supreme Court held

9

that purveyors of P2P file-sharing software could be liable under a contributory or "inducement" theory where the users of such software directly infringe copyrights. <u>Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.</u>, 125 S. Ct. 2764, 2782 (2005). Implicit in both <u>Tasini</u> and <u>Grokster</u> is the Supreme Court's understanding that the unauthorized electronic dissemination of digital files could violate the distribution right. Lower courts appear to share that understanding. <u>See In re Aimster Copyright Litigation</u>, 334 F.3d 643, 645 (7th Cir. 2003) ("If the music is copyrighted, such [file-]swapping, which involves making and transmitting a digital copy of the music, infringes copyright."), <u>cert. denied</u>, 540 U.S. 1107 (2004); <u>A&M Records, Inc. v. Napster, Inc.</u>, 239 F.3d 1004, 1014 (9th Cir. 2001) (Napster users infringed both the reproduction and distribution rights of copyright owners whose works were uploaded and downloaded via the Napster network); <u>In re Napster, Inc. Copyright Litigation</u>, 377 F. Supp. 2d 796, 806 (N.D. Cal. 2005) (same); <u>Getaped.com</u>, 188 F. Supp. 2d at 402; <u>Playboy Enterprises, Inc. v. Frena</u>, 839 F. Supp. 1552, 1556 (M.D. Fla. 1993) (holding that electronic dissemination of unauthorized copies of copyrighted work over subscription billboard service violated distribution right).

Against this tide of case law, EFF essentially relies on a single, inapposite case, <u>Agee v. Paramount Communications, Inc.</u>, 59 F.3d 317 (2d Cir. 1995). In <u>Agee</u>, the Second Circuit reached the unremarkable conclusion that a television station's transmission of a program for broadcast involved the copyright owner's exclusive right of performance, set forth in 17 U.S.C. § 106(4), not the exclusive right of distribution set forth in 17 U.S.C. § 106(3). <u>Id.</u> at 326. Unlike "merely transmitting a sound recording to the public on the airwaves," the Second Circuit held that "distribution is generally thought to require transmission of a 'material object' in which the sound recording is fixed: a work that is of 'more than transitory duration.'" <u>Id.</u> at 325. In this way, <u>Agee</u> expressly distinguished the situation where a broadcast is merely transmitted for

audiences to see on television (implicating the public performance right) from a situation, like the one at bar, where the transmission recipient receives a fixed copy or phonorecord of a copyrighted work (implicating the distribution right). Id. at 325-26. In fact, the Second Circuit stated that "we are unwilling to say that disseminations must always be in physical form to constitute 'distributions.'" Id. at 325 (distinguishing its facts from Frena, 839 F. Supp. 1552). Thus, to the extent Agee is relevant to an analysis of the distribution right at issue in this case, it supports the government's position.

## B.    EFF'S AND DEFENDANT'S RELIANCE ON LEGISLATIVE HISTORY IS SIMILARLY UNAVAILING

1 .    The Legislative History of the Copyright Act of 1976 Shows that Congress Did Not Limit the Distribution Right to Preclude Online Dissemination of Copies of Copyrighted Works

To support its contention that "distribution" does not encompass the electronic dissemination of files over the Internet where that dissemination results in a copy of a copyrighted work being placed on the recipient's computer, EFF distorts substantial portions of the legislative history of the Copyright Act of 1976. Nothing in the Copyright Act limits the distribution right as EFF suggests. Indeed, the statutory language and legislative history of the Copyright Act of 1976 show clearly that Congress's use of the term "material object" was not intended to limit the distribution right in the manner asserted by EFF, but was used instead for the express purpose of eliminating a common law doctrine that had imposed problematic limitations on the copyright owners' ability to distribute the copyrighted work. The origin and purpose of the "material object" requirement show that EFF's argument would require wrenching the "material object" requirement out of its context and, further, would render other provisions of the Copyright Act nonsensical.

11

a.    Principles of Statutory Construction

"In the construction of statutes, it is the duty of the court to ascertain the clear intention of the legislature." United States v. Fisk, 70 U.S. (3 Wall.) 445, 447 (1865). The starting point for that endeavor is the statutory text. BedRoc Ltd. v. United States, 541 U.S. 176, 183 (2004). However, "[s]tatutory construction is a holistic endeavor," requiring courts to read the text of a provision in its proper context rather than view it in isolation. Koons Buick Pontiac GMC, Inc. v. Nigh, 543 U.S. 50, 60 (2004) (internal quotation marks omitted); accord Holloway v. United States, 526 U.S. 1, 7 (1999) ("the meaning of statutory language, plain or not, depends on context") (internal quotation marks omitted); United States v. Gayle, 342 F.3d 89, 92–93 (2d Cir. 2003) ("plain meaning" depends on "statutory scheme as a whole" and "context of that statute").

With respect to construction of the Copyright Act, it is clear that the "copyright statutes ought to be reasonably construed, with a view to effecting the purposes intended by Congress. They ought not to be unduly extended by judicial construction to include privileges not intended to be conferred, nor so narrowly construed as to deprive those entitled to their benefit of the rights Congress intended to grant." Pavia v. 1120 Ave. of the Americas Associates, 901 F. Supp. 620, 628 (S.D.N.Y. 1995) (citing Bobbs-Merrill Co. v. Straus, 210 U.S. 339, 346 (1908)).

b.    Section 202 of the Copyright Act and Relevant Legislative History Show that the Term "Material Object" Was Intended to Obviate a Common Law Presumption Limiting the Distribution of Copyrighted Works and EFF's Proposed Interpretation Renders Other Provisions of the Act Nonsensical

Contrary to EFF's assertions, the Copyright Act's use of the term "material object" does not exclude electronic dissemination of copyrighted work from the distribution right of § 106(3). While "copies" and "phonorecords" are defined as being "material objects," see 17 U.S.C. § 101 (defining "copies" and "phonorecords"), this definition cannot be understood in isolation from other relevant provisions of the Copyright Act. See, e.g., Gayle, 342 F.3d at 92-93. Viewed in

12

the larger context of the Act and its legislative history, the term "material object" simply eliminates a quirk of common law pursuant to which a copyright owner was presumed to have sold the intangible right in the copyrighted work itself simply by selling the manuscript or work of art embodying the work. See, e.g., Pushman v. New York Graphic Society, Inc., 287 N.Y. 302, 39 N.E.2d 249 (1942).

To eliminate this common-law presumption, Congress drew a sharp distinction in Section 202 of the Copyright Act between the intangible legal rights in the copyright of the work and the work's physical embodiment.[6] Clarifying the purpose of this distinction, Congress stated in the legislative history relevant to this section that "[t]he principle restated in section 202 is a fundamental and important one:  that copyright ownership and ownership of the material object in which the copyrighted work is embodied are entirely separate things" and that through "the interaction of this section [202] and the provisions of section 204(a) [transfer of copyright ownership] and 301 [federal preemption of common and state copyright law], the bill would change a common law doctrine exemplified by the decision in Pushman v. New York Graphic Society, Inc., 287 N.Y. 302, 39 N.E.2d 249 (1942)" where authors are "presumed to transfer common law literary property rights when they sell their manuscripts."  H.R. Rep. 94-1476, at 123, 1976 U.S.C.C.A.N. 5659, at 5739-5740 (Sept. 3, 1976).  Thus, by using the term "material

---

[6]  Section 202, distinguishing between ownership of a copyright and ownership of the "material object" in which the work is fixed, reads as follows:

**§ 202 Ownership of copyright as distinct from ownership of a material object**

Ownership of a copyright, or of any of the exclusive rights under a copyright, is distinct from ownership of any material object in which the work is embodied. Transfer of ownership of any material object, including the copy or phonorecord in which the work is first fixed, does not of itself convey any rights in the copyrighted work embodied in the object; nor, in absence of any agreement, does transfer of ownership of a copyright or of any exclusive rights under a copyright convey property rights in any material object.

13

object," Congress was not endeavoring to engraft an inflexible, "material object" requirement on the distribution right, thereby excluding future, more technologically advanced methods of distributing copies of the copyrighted work.

Indeed, construing the term "material object" in the limiting and artificial manner urged by EFF would not comport with the broad, flexible reading that Congress intended for that term. In enacting the Copyright Act of 1976, Congress was aware that advances in technology had already and would continue to affect the operation of copyright law. See, e.g., H.R. Rep. 94-1476, at 47, 1976 U.S.C.C.A.N. at 5660 ("The technical advances have generated new industries and new methods for the reproduction and dissemination of copyrighted works, and the business relations between authors and users have evolved new patterns."). Further, Congress specifically rejected any "artificial . . . distinctions" between the various forms or media in which copyrighted works subsist, noting there are a "multitude of material objects in which [a work] can be embodied." H.R. Rep. 94-1476, at 52-53, 1976 U.S.C.C.A.N. at 5665. Indeed, the Report was clear about need for flexibility in this area:

> Under the bill it makes no difference what the form, manner, or medium of fixation may be -- whether it is in words, numbers, notes, sounds, pictures, or any other graphic or symbolic indicia, whether embodied in a physical object in written, printed, photographic, sculptural, punched, magnetic, or any other stable form, and whether it is capable of perception directly or by means of any machine or device 'now known or later developed.'

H.R. Rep. 94-1476, at 52, 1976 U.S.C.C.A.N. at 5665.

Further, interpreting § 106(3) not to encompass electronic transfers of files would impermissibly render superfluous, indeed, nonsensical, numerous provisions of the Copyright Act. See, e.g., Dunn v. Commodity Futures Trading Comm'n, 519 U.S. 465, 472 (1997) ("legislative enactments should not be construed to render their provisions surplusage"); accord

Florez v. Callahan, 156 F.3d 438, 443 (2d Cir. 1998) ("If courts were free to pick and choose what part of a statute . . . to rely on and what to ignore, then the courts—and not Congress or an executive agency promulgating its own regulations—would, in effect, draft the law as well as construe its meaning.").

For instance, the compulsory licensing provision of § 115 would become nonsensical if § 106(3) were read as EFF and Defendant urge.  Section 115 states, "In the case of nondramatic musical works, the exclusive rights provided by clauses (1) and (3) of section 106, to make and to distribute phonorecords of such works, are subject to compulsory licensing under the conditions specified in the section."   Because the compulsory licensing scheme explicitly grants a license for "digital phonorecord deliveries" of copyrighted nondramatic musical works,[7] 17 U.S.C. § 115(a)(1), that portion of the licensing scheme makes no sense if the distribution right of 106(3) is read not to encompass the very digital phonorecord deliveries that the compulsory license is designed to permit.  Similarly, certain provisions relating to criminal infringement of copyrights, which, inter alia, provide for criminal enforcement of the copyright owner's right of distribution, would be rendered meaningless if EFF's position were adopted.[8]  See 17 U.S.C. § 506(a)(1)(B) (proscribing willful infringement if the infringement was committed "by the reproduction or distribution, including by electronic means ... of 1 or more copies or phonorecords of 1 or more copyright works . . .") and 17 U.S.C. § 506(1)(C) (proscribing infringement "by the distribution of a work . . . on a computer network . . .").

---

[7] Section 115(d) defines "digital phonorecord delivery" as "each individual delivery of a phonorecord by digital transmission of a sound recording which results in a specially identifiable reproduction by or for any transmission recipient of a phonorecord of that sound recording, regardless of whether the digital transmission is also a public performance of the sound recording of any nondramatic musical work embodied therein."

[8] See Kelly v. L.L. Cool J., 145 F.R.D. 32, 39 (S.D.N.Y. 1992) (conduct that does not support civil action for copyright infringement cannot constitute criminal conduct under criminal provisions of copyright law), aff'd 23 F.3d 398 (2d Cir.), cert. denied, 513 U.S. 950 (1994).

15

Accordingly, there is no basis in the statute or its legislative history to read the Copyright

Act as excluding from the distribution right electronic dissemination of copyrighted works over

the Internet where the recipient obtains a copy. By defining copies and phonorecords in the

manner in which it did, Congress did not engraft a limitation that would serve to exclude the

right to control distribution of copyrighted works on the Internet. Instead, Congress was

endeavoring to free copyright owners from a common-law presumption that impeded distribution

by drawing a distinction between (1) intangible legal rights in the copyrighted work and (2) the

physical embodiment of the work. Congress's understanding of the distribution right was broad

and, indeed, inclusion of digital phonorecord deliveries in the compulsory licensing scheme of §

115 and the prohibitions of § 506(1)(B) and (C) make that breadth unmistakably clear. It would

be an ironic result if the very measures Congress took to protect the distribution right were used

to eliminate copyright owners' control over Internet dissemination of their work.

2. The Legislative Intent Behind the Digital Performance Right in Sound Recordings
   Act of 1995 Shows that Congress Understood That Where the Recipient of a Digital
   Transmission Obtained a Copy of a Work, Section 106(3) Was Violated

EFF asserts that legislative activity since the 1976 Copyright Act shows that Congress

did not understand the distribution right to include electronic transmissions. Specifically, EFF

asserts that "it is telling that Congress specifically chose not to amend § 106(3)" in the context of

enacting the Digital Performance Right in Sound Recordings Act of 1995 (the "Sound

Recordings Act"). EFF Br. at 6. EFF's contention, however, is flatly contradicted by the text

and legislative history of the Sound Recordings Act, which demonstrates that Congress

understood that § 106(3) of the 1976 Copyright Act already granted copyright owners the

exclusive right to distribute copies through computer to computer transmission of the work.

16

As explained by the Senate Report, the Sound Recordings Act was enacted for the following purpose:

> . . . [T]o ensure that performing artists, record companies and others whose livelihood depends upon effective copyright protection for sound recordings, will be protected as new technologies affect the ways in which their creative works are used. S. 227 does this by granting a limited right to copyright owners of sound recordings which are publicly performed by means of a digital transmission. In addition, the bill clarifies the application of the existing reproduction and distribution rights of musical work and sound recording copyright owners in the context of certain digital transmissions.

S. Rep. 104-128, at 10, 1995 U.S.C.C.A.N. 356, at *357.

Up until the Sound Recordings Act, Congress had chosen to grant sound-recording copyright holders only the exclusive rights to reproduce, distribute and create derivative works and had deliberately withheld a public performance right – in stark contrast to the rights of copyright holders in other creative works, such as musical compositions. Id. See also 17 U.S.C. § 106(4) (public performance right granted to copyright owners of "literary, musical, dramatic and choreographic works, pantomimes and motion pictures and other audiovisual works").

With the advent of on-demand, digital transmissions of performances, however, the traditional sources of revenue for sound recording copyright holders, i.e., reproduction and distribution, were being undermined by the ability of members of the public, through interactive digital music services, to hear particular sound recordings on demand. S. Rep. 104-128, at 14, 1995 U.S.C.C.A.N. at *361. Specifically, Congress was concerned that interactive digital transmission services "enable a member of the public to receive, on request, a digital transmission of the particular recording that person wants to hear." Id. To eliminate this highly particularized harm, Congress "created a carefully crafted and narrow performance right, applicable only to certain digital transmissions of sound recordings," S. Rep. 104-128, at 13,

1995 U.S.C.C.A.N. at *360, and granted sound recording copyright owners a limited right of public performance in "digital audio transmissions." See 17 U.S.C. § 106(4).

In addition to creating this limited performance right for copyright owners of sound recordings, the Sound Recordings Act amended the compulsory licensing scheme of Section 115 of the 1976 Copyright Act, which amendment, as discussed supra in Point II.1.B, compelled copyright owners to license the "digital delivery" of phonorecords. Thus, Congress understood § 106(3) to encompass the digital transmission of phonorecords. Further, the Senate Report for the Sound Recording Act stated, "[T]his section [amending the compulsory licensing scheme of § 115] is intended to confirm and clarify the right of musical work and sound recording copyright owners to be protected against infringement when phonorecords embodying their works are delivered to consumers by means of transmissions rather than by means of phonorecord sales." S. Rep. 104-128, at 37,  1995 U.S.C.C.A.N. 356, at *384.

Indeed, the legislative history of the Sound Recordings Act is replete with statements showing Congress's understanding that a digital transmission resulting in the creation of a fixed copy of the copyrighted work implicated the distribution right. For instance, in the context of the Senate Committee's analysis of § 114(d)(4) (the "Savings Clause"), Congress stated as follows:

> Under existing principles of copyright law, the transmission or other communication to the public of a musical work constitutes a public performance of that musical work.  In addition, the digital transmission of a sound recording that results in the reproduction by or for the transmission recipient of a phonorecord of that sound recording implicates the exclusive rights to reproduce and distribute the sound record and the musical work embodied therein. New technological uses of copyrighted sound recordings are arising which require an affirmation of existing copyright principles and application of those principles to the digital transmission of sound recordings, to encourage the creation of and protect rights in those sound recordings and the musical works they contain.

18

S. Rep. 104-128, at 27, 1995 U.S.C.C.A.N. at *374 (emphasis added). <u>See also</u> H.R. Rep. 104-274, at 21 (same); S. Rep. 104-128, at 27, 1995 U.S.C.C.A.N. at *374 (discussing the amendments to § 115 and stating that digital audio transmission can "constitute a distribution of a phonorecord as well as a public performance of a sound recording"). In short, there is no question that Congress understood that the digital transmission of a copyrighted work that results in the cre-ation of a copy of that work constitutes distribution of that work and is encompassed in § 106(3).

Ignoring Congress's unambiguous statements regarding digitial transmissions, EFF misleadingly asserts that "Congress acknowledged that reading § 106(3) to include digital trans-missions was controversial and 'expresse[d] no view on current law in this regard.' S. Rep. No. 104-128 at 17 (1995)." EFF Br. at 6. EFF simply mischaracterizes Congress's statement in this regard. Far from "acknowledging" that inclusion of digital transmission in the distribution right was "controversial," Congress noted that the Working Group on Intellectual Property Rights of the Information Infrastructure Task Force had, in a preliminary report issued in 1994, "prelimin-arily concluded" that it was "not clear" that digital transmissions could be considered, under then-current law, distributions. S. Rep. No. 104-128 at 17 (1995) (citing A Preliminary Draft of The Report of the Working Group on Intellectual Property Rights, Information Infrastructure Task Force, at 120-21 (July 1994)). Not only has the case law since this 1994 preliminary report made clear that digital transmissions are within the distribution right, <u>see supra</u> Point I, EFF fails to note that in the final September 1995 version of this report, the Working Group endorsed the legal position that the "right of distribution encompasses transmissions of copies and that no amendment is necessary," noting that this interpretation "properly conforms to the intent of the distribution right and, we believe, is correct from both a practical and legal standpoint."

19

Intellectual Property and National Information Infrastructure: The Report of the Working Group on Intellectual Property Rights, Information Infrastructure Task Force, at 214 (Sept. 1995).

Finally, EFF also neglects to mention that it, along with other like-minded organizations, has for years sought both from Congress and at least one federal agency a limitation on the distribution right, specifically where the distribution was made by a transmission. <u>See</u> U.S. Copyright Office, DMCA Sec. 104 Rep., Vol. 2, Comments of the Digital Future Coalition (2001) [at <u>http://www.copyright.gov/reports/studies/dmca/sec-104-report-vol-2.pdf</u>]. Having been rebuffed in those efforts to change the law, EFF now brings its policy goals to this Court.

20

## CONCLUSION

For the foregoing reasons, the Court should hold that the unauthorized transfer of files over the Internet violates the distribution right set forth in 17 U.S.C. § 106(3).

Dated: New York, New York
        April 21, 2006

                                    Respectfully submitted,

                                    MICHAEL J. GARCIA
                                    United States Attorney
                                    for the Southern District of New York
                                    Attorney for the United States of America

                    By:    _____
                                    REBECCA C. MARTIN (RM 0486)
                                    Assistant United States Attorney
                                    86 Chambers Street, 3rd Floor
                                    New York, New York 10007
                                    Telephone: (212) 637-2714
                                    Facsimile:  (212) 637-2686

Of Counsel:

PETER D. KEISLER, Assistant Attorney General
JOHN FARGO, Director, Intellectual Property Staff, Commerical Litigation Branch
United States Department of Justice, Civil Division

MICHAEL M. DUBOSE, Deputy Chief
JOHN H. ZACHARIA, Trial Attorney
Computer Crimes and Intellectual Property Section
United States Department of Justice, Criminal Division